Shirley D. KEENAN and Daniel
E. Keenan, husband and
wife, Plaintiffs,

v.

Wallace E. ALLAN, a married man; Janis M. Whitener–Moberg, a married woman; County of Grant By and Through the Grant County District Court and the Grant County Board of Commissioners; and Helen Fancher, Leroy Allison and Tim Snead, personally and in their representative capacities as members of the Grant County Board of County Commissioners, Defendants.

No. CS–94–0070–AAM.

United States District Court,
E.D. Washington.

May 12, 1995.

**1334**

Robert A. Dunn and Keller W. Allen of McCormick, Dunn & Black, P.S., Spokane, WA, for plaintiffs Shirley D. and Daniel E. Keenan.

John Francis Kennedy, Tacoma, WA, for defendant Wallace E. Allan.

Sheryl J. Willert and Elizabeth K. Maurer of Williams, Kastner & Gibbs, Seattle, WA, for defendant Janis M. Whitener–Moberg.

Daniel E. Huntington of Richter–Wimberley, P.S., Spokane, WA, for defendants Grant County, Helen Fancher, Leroy Allison and Tim Snead.

## ORDER GRANTING SUMMARY JUDGMENT

McDONALD, District Judge.

Before the Court are Plaintiffs' Motion for Partial Summary Judgment Re Defendant Allan's Affirmative Defenses, Ct.Rec. 185; Plaintiffs' Motion for Partial Summary Judgment Re Defendant Whitener–Moberg's Affirmative Defenses, Ct.Rec. 190; Plaintiffs' Motion for Partial Summary Judgment Re Defendants Grant County, Fancher, Allison and Snead's Affirmative Defenses, Ct.Rec. 188; Defendant Allan's Motion for Summary Judgment of Dismissal and for Statutory Costs, Ct.Rec. 178; Defendant Whitener–Moberg's Motion for Summary Judgment, Ct.Rec. 174; and Defendants Grant County, Allison, Fancher and Snead's Motion for Summary Judgment, Ct.Rec. 200.

At hearing without oral argument, plaintiffs ("Keenan" and "Daniel Keenan", collectively "the Keenans") were represented by Robert A. Dunn and Keller W. Allen of McCormick, Dunn & Black, P.S., Spokane, Washington. Defendant Allan was represented by John Francis Kennedy of Tacoma, Washington. Defendant Whitener–Moberg was represented by Sheryl J. Willert of Williams, Kastner & Gibbs, Seattle, Washington. Defendants Grant County ("the County"), Fancher, Allison and Snead (collectively "the County Defendants") were represented by Daniel E. Huntington of Richter–Wimberley, P.S., Spokane, Washington.

### CONTENTS

A. SUMMARY ......................................................... 1335
B. LITIGATION BACKGROUND ....................................... 1335
C. STANDARD FOR SUMMARY JUDGMENT ........................... 1335
D. AGREED FACTS ................................................... 1336

E. DISPUTED FACTS .......................................... 1351
F. COUNT I: WRONGFUL DISCHARGE/BREACH OF CONTRACT .......... 1356
G. COUNT II: FIRST AND FOURTEENTH AMENDMENT (DUE PROCESS, FREE SPEECH AND SEXUALLY HOSTILE WORK ENVIRONMENT) ... 1360
H. COUNT III: CONSPIRACY TO VIOLATE CIVIL RIGHTS .............. 1364
I. COUNT IV: WHISTLEBLOWER TERMINATION ...................... 1365
J. COUNT V: RETALIATORY DISCHARGE ................................ 1366
K. COUNT VI: SEXUAL HARASSMENT (HOSTILE WORK ENVIRONMENT) 1370
L. COUNT VII: AGE DISCRIMINATION ................................. 1376
M. COUNT VIII: FAILURE TO PAY WAGES .............................. 1378
N. COUNT VIII: FAILURE TO PAY WAGES ............................. 1382
O. COUNT X: CONSUMER PROTECTION ACT ............................ 1382
P. COUNT XI: DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL ...... 1383
Q. COUNT XII: NEGLIGENT MISREPRESENTATION ...................... 1385
R. COUNT XIII: DEFAMATION ........................................ 1386
S. COUNT XIV: OUTRAGE ........................................... 1389
T. COUNT XV: INFLICTION OF EMOTIONAL DISTRESS.................. 1390
U. COUNT XVI: VICARIOUS LIABILITY OF THE COUNTY ................ 1391
V. COUNT XVII: NEGLIGENCE ....................................... 1391
W. COUNT XVIII: INVASION OF PRIVACY/FALSE LIGHT ................ 1392
X. COUNT XIX: LOSS OF CONSORTIUM ................................ 1393
Y. CONCLUSION ................................................... 1393

## A. SUMMARY

A summary of the disposition of motions and claims is provided in the final pages of this Order. All claims are dismissed.

## B. LITIGATION BACKGROUND

The Keenans filed suit on March 4, 1994. They state as causes of action:

· I: wrongful discharge/breach of contract;

· II: First and Fourteenth Amendment violations under 42 U.S.C. § 1983;

· III: conspiracy to violate civil rights under 42 U.S.C. § 1985(3);

· IV: whistleblower termination under RCW 42.41.010;

· V: wrongful discharge in violation of state public policy;

· VI: sexual harassment under RCW 49.60 and 42 U.S.C. § 2000e–3;

· VII: age discrimination under 42 U.S.C. § 2000e, 29 U.S.C. § 623, RCW 49.60 and RCW 49.44.090;

· VIII and IX: failure to pay wages under 29 U.S.C. § 201, RCW 49.52.050 and RCW 49.48.010;

· X: Consumer Protection Act violation under RCW 19.86;

· XI: detrimental reliance/promissory estoppel;

· XII: negligent misrepresentation;

· XIII: defamation;

· XIV: outrage;

· XV: infliction of emotional distress;

· XVI: vicarious liability of the County;

· XVII: negligence;

· XVIII: invasion of privacy/false light; and

· XIX: loss of consortium (for Daniel Keenan).

Keenan seeks compensatory damages (and/or reinstatement), punitive damages, injunctive relief and attorneys fees.

Trial is set for June 26, 1995.

## C. STANDARD FOR SUMMARY JUDGMENT

██ A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The party seeking summary judgment must show that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law by "pointing out" to the Court that there is an absence of evidence to support the nonmov-

ing party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325–26, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982). The Court must construe all facts in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553; *Claar v. Burlington Northern R. Co.,* 29 F.3d 499, 502 (9th Cir. 1994) (experts cannot rely on unsupported conclusions); *Marks v. United States,* 578 F.2d 261, 263 (9th Cir.1978) (genuine issues are not raised by mere conclusory allegations). The nonmoving party may do this by use of affidavits (including his own), depositions, answers to interrogatories and admissions. *Celotex* 477 U.S. at 323, 106 S.Ct. at 2552–53. Summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

## D. AGREED FACTS

According to the parties' statements of material facts, the following facts are agreed under LR 56(c).[1] The citation following the fact designates where the fact is found: in the Keenans' ("K"), Allan's ("A"), Whitener–Moberg's ("W"), the County Defendants' ("C"), or joint defendants' ("D") statements of material facts, and the paragraph number of the fact.

As an initial matter, it should be noted that most of the recited facts are not material. It may be that Hinojosa was not qualified for her position, or that the Judicial Commission breached its promise of confidentiality to Keenan.[2] However, such immaterialities (even when disputed) are insufficient to get to a jury. Rather, Keenan must allege facts *supporting her claims,* against *these defendants.* To the extent the facts are undisputed and sufficient to determine the validity of a claim or defense, the Court will decide it on summary judgment. To the extent the facts are disputed or insufficient, the jury will decide them. For the benefit of the parties

---

1. The parties' material fact statements are:

 · Plaintiffs' Statement of Facts in Support of Plaintiff's [sic] Partial Summary Judgment Motion [sic] Seeking Dismissal of Defendants' Affirmative Defenses, Ct.Rec. 187 ("K" ¶¶ 1–184); and in response:
 · Allan's Statement of Facts in Support of Defendant Allan's Opposition to Plaintiffs' Partial Summary Judgment Motion, Ct.Rec. 223 ("A");
 · Defendant Whitener–Moberg's Statements of Material Facts in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Ct.Rec. 213 ("W");
 · Defendants County and Commissioners' Statement of Facts in Support of Defendants' Memorandum of Authorities in Opposition to Plaintiffs' Motion for Partial Summary Judgment Dismissing Affirmative Defenses, Ct.Rec. 217 (not cited in Sections C or D);
 · Defendants' [Joint] Statement of Material Facts, Ct.Rec. 181 ("D"); and in response:
 · Plaintiffs' Statement of Material Facts in Opposition to Defendants' Summary Judgment Motions, Ct.Rec. 220 ("K" ¶¶ 185–1161); and in partial reply (to K ¶¶ 1152–1161 only):

 · Defendants County and Commissioners' Statement of Facts in Reply to Plaintiffs' Statement of Material Facts in Opposition to Defendants' Summary Judgment Motions, Ct.Rec. 242 ("C").

 Note that some responsive asserted facts do not respond to any particular assertion in an initial statement of facts, and are not themselves responded to. *See* Ct.Rec. 223, at ¶ 39; Ct.Rec. 217, at ¶¶ 1–18; Ct.Rec. 220 (almost in entirety). These asserted facts are neither agreed nor disputed facts, and are not addressed herein. The Court does not strike the majority of Ct.Rec. 220, as requested by the County Defendants; setting the irrelevant and unsupported forth as such seems a better approach in this case.

 Note also that Anthony Menke, the Washington Commission on Judicial Conduct and others are not parties to this suit. They have had no opportunity to respond to the facts alleged by the parties. Therefore, these facts have no collateral estoppel effect against them (in potential, subsequent other suits).

2. The Court explicitly makes no findings on these immaterialities.

and a potential reviewing court in determining the extent to which Keenan supports her claims or merely raises immaterialities, this Court itemizes all agreed and disputed facts, whether or not material.

*Background of plaintiff Shirley Keenan.* Keenan was born on October 16, 1947. D1.

Keenan never had a position of major responsibility or authority before being hired as Court Administrator. D21.

On October 2, 1989, Keenan was hired as the Temporary Office Manager for Grant County District Court. K7; D2. At the time she was hired, Keenan's employer was Grant County, by and through the district court, Allan and Judge Carl N. Warring. K15.

In October, 1989, Keenan applied to become the Grant County District Court Administrator. K8. She was hired for that position in December, 1989, at the age of 42. K8. Her appointment was effective January 1, 1990. D3.

Keenan was neither the youngest nor the oldest person employed at Grant County District Court. D44.

*Background of defendant Allan.* Allan became a Grant County District Court Judge on April 1, 1982. K1. He was appointed by the Grant County Commissioners to fill the position and was re-elected twice. K1. He served from 1983 until December 31, 1994. D9.

*Background of defendant Whitener–Moberg.* In November, 1990, Warring's re-election bid was unsuccessful and he was replaced by Whitener–Moberg, who ran against him. K27; D10. At the time of taking office on January 1, 1991, Whitener–Moberg replaced Warring as one of Keenan's employers. K28; D10.

*Background of defendant Fancher.* Fancher began her service as a Grant County Commissioner on January 1, 1991. D11.

*Background of defendant Allison.* Allison began his service as a Grant County Com-

missioner on July 19, 1993. D12. At the time of the elimination of the district court administrator position, Allison had not yet begun his term. D77.

*Background of defendant Snead.* Snead began his service as a Grant County Commissioner on January 1, 1993. D13. At the time of the elimination of the district court administrator position, Snead had not yet begun his term. D77.

*Employment policies/contract.* Since October, 1985, Grant County has had an affirmative action and equal employment policy against discrimination in employment. K3 [3]; D105.

At the time Keenan was employed, Grant County had an Employee Policy–Procedures Information Handbook. K4.

On April 3, 1990, after consultation with Keenan, Warring drafted an employment contract for Keenan's position. K10; D15; K489; K533; K706; K1039.[4] It provided in relevant parts:

2. TERMINABLE AT WILL EMPLOYMENT: The employment relationship between the Employer and Employee shall be one of terminable at will and the relationship may be terminated by either party at any time. This agreement is not a promise of continued employment and either party may terminate the employment relationship either for cause or without cause.

. . . .

6. REIMBURSEMENT OF EDUCATIONAL EXPENSE: . . . . The Employee agrees that in the event that the employment relationship is terminated for any reason during the next five (5) years commencing on January 1, 1990 the Employee agrees to reimburse the Employer for all Employer funds expended pursuant to this agreement. After the five (5) years of continuous employment commencing on January 1, 1990 the Employee will not be required to reimburse the Employer for these funds.

---

3. The Keenans refer to a "policy against nondiscrimination"; the Court considers that to be a clerical error.

4. Keenan states at different times that Warring and Allan each drafted the contract; only Warring's drafting is supported in the record.

*Id.* The contract was presented to Keenan and to the Grant County Prosecuting Attorney. K10. When it was presented to Keenan, it varied from her understanding of the terms of the agreement. K11. Specifically, she objected to the contract's inclusion of "terminable at will". D16. Keenan so informed Allan. K11. The contract was never signed.

The parties never signed any written contract for Keenan's employment as the District Court Administrator. D22.

Allan, Warring and Keenan dispute whether any oral promises were made (by Allan) that guaranteed Keenan's employment for a five-year term. D17; K1051. Allan and Warring contend that Keenan was hired as an at-will employee. D18; K493; K899. Judge Evan Sperline testified that all Grant County Superior Court employees, including the administrator, serve at the will and pleasure of the superior court judges. D28.

Former Grant County Commissioners did not make any representations to Keenan regarding the terms and conditions of her employment. D24.

Allan offered to provide Keenan with additional training at Grant County expense and would not require reimbursement if Keenan were to remain with the district court for five years. D19; K403; K492; K717; K1040; K1052.

In February, 1991, Keenan and Allan prepared a Position Information Questionnaire which stated that the position of Administrator was "a non-union position, and therefore any job security is based strictly on performance and the re-election of the judges." K12; D25. Keenan did not disagree with Allan's written response, in his capacity as supervisor, to the completed questionnaire. D26. Allan stated that he expected Keenan

> to deal with a large number of employees in the court in a skillful tactful manner, within the constraints of public employment law and common sense ... someone who is not only responsible, knowledgeable and efficient, but who can recognize when they have authority to proceed and implement their decisions and when they need to consult with judges.... The most im-

portant qualification is the ability to work with people.

D27.

In February, 1991, the district court issued a press release indicating that case filings had increased to record levels. K16. The press release indicated that if the case load continued to increase at the same pace, additional help would be needed. K16. Allan stated that the court was "stretched to the limit." K16.

In October, 1991, Keenan provided Allan and Whitener–Moberg with a comparison of the staffing requirements of Grant County versus King County District Court, which reflected that there were five supervisors in King County for the same number of employees as at Grant County. K126.

Grant County negotiated and had in place a working agreement with Local Union No. 760 pertaining to the district court's employees. K5; D97. Keenan's Clerk II position (in 1992 and 1993) was covered by this agreement. D97. Article XVII of the agreement provided that district court clerks could be disciplined inclusive of termination for just cause. D98. Article XXII of the agreement provided for a three-step formal grievance procedure. D99.

In mid-February, 1993, Grant County passed Resolution No. 93–5CC "to encourage reporting by its employees of improper governmental action taken by Grant County officials or employees" and "to protect Grant County employees who have reported improper governmental actions." K160 ("February 16"); D101 ("February 25"). It provided:

> "Improper governmental action" does not include personnel actions, including employee grievances, ... reassignments, ... suspensions, demotions....
>
> Grant County employees who become aware of improper governmental actions should raise the issue first with their supervisor.... Where the employee reasonably believes the improper governmental action involves his or her supervisor, the employee may raise the issue directly with the Grant County Board of Commissioners ("the Commissioners"), or such other per-

son as may be designated by the Commissioners to receive reports....

The supervisor, the Commissioners, or the Commissioners' Designee, as the case may be, shall take prompt action to assist Grant County in properly investigating the report.... After an investigation has been completed, the employee reporting the improper governmental action shall be advised of a summary of the results....

K161, K163.

*Keenan's duties.* Keenan's responsibility as Administrator was for all non-judicial functions of the district court, including planning, implementing and managing the daily operations of the Court. K13. Among other things, Keenan was responsible for supervising district court employee performance, disciplinary actions and termination of district court employees when necessary. K14.

*Keenans' involvement in Allan's campaigns.* The year 1990 was the first time Allan was required to campaign (because he had never before been opposed). K23.

Keenan worked on Allan's campaign (to a degree that is disputed). She was one of only two people honored with a private thank-you dinner and Allan's home, after the election. K46.

*Hinojosa's involvement in Allan's campaigns.* In August, 1990, Delores Hinojosa assisted Allan on his re-election campaign. K26. She assisted at the Grant County fair by blowing up balloons and handing out brochures. K26.

*Hinojosa.*[5] Delores Hinojosa states that she first met Allan in 1989 when she accompanied a Spanish-speaking defendant who was appearing in front of Allan. K30. Hinojosa was acting as interpreter for the defendant. K30. There is a question whether Hinojosa may have previously appeared before Allan as a defendant. K31.

Hinojosa worked as a volunteer interpreter from 1989 through 1990. K32. Allan had asked her to be a volunteer interpreter. K33. Hinojosa worked as a volunteer until she began getting paid for her work in district court. K34.

Hinojosa applied for the position of Deputy Clerk I. K35. At the time of her application, the position required the

> ability to type a minimum of 55 words-per-minute. Accuracy is extremely important. (Requirement may be waived depending upon qualifications.)

K35. Minimum requirements to be a Deputy Clerk I were the ability to use a 10–key adding machine; the ability to alphabetize and to file with speed and accuracy; knowledge of spelling, punctuation and grammar; the ability to report accurately and log different cases of other agencies; the ability to process case files, filings and court-related documents; and the ability to conform to the direction of the court in the performance of duties. K35.

At the time of her application for employment as a district court clerk, Hinojosa was unable to type 55 words-per-minute. K36. On her application, Hinojosa stated that she had completed 12 years of schooling. K38. Also on her application, Hinojosa stated that she possessed a valid Washington driver's license. K40. However, as of August, 1990, she neither had a license nor drove. K40.

Hinojosa became a District Court Clerk effective September 1, 1990. K37.

Numerous complaints were made to Keenan alleging discriminatory preferential treatment by Allan towards Hinojosa. K44.[6] Keenan received numerous complaints about Hinojosa's disruptive and poor job performance. K45.

*Allan's stressors.* During the first part of 1991, Allan's father became sick. K49. Allan started taking trips to Newport, Wash-

---

**5.** Keenan also contends that Allan reportedly gave money to a District Court Clerk to give to Hinojosa, K94 and K95. The proffered support is Hinojosa's deposition. This is double hearsay: what Hinojosa says a clerk says Allan said or did. The second hearsay (what the clerk says Allan said) is permissible under the party-admission exception, but the first hearsay (what Hinojosa says the clerk says) is not permissible. It is ignored.

**6.** Keenan also contends that complaints were made to Whitener–Moberg, K44, but this is hearsay and is ignored.

ington, where his father and mother resided. K49. Allan estimated eight such trips. K49.

Allan's wife complained about how much time he was spending going to Newport. K50. During this time, Allan was observed as not being as congenial as he had been previously. K51. Allan also was suffering from weight loss and was diagnosed with illness. K52. Area lawyers also expressed their concern to Allan that he looked tired and haggard. K52.

Keenan expressly attributes Allan's behavioral changes in the summer and fall of 1991 to the deaths of his parents. D62; K638 ("and perhaps [also] [Keenan's] good rapport with defendant Whitener–Moberg"); K910.

*Allan's alleged infidelity.* In approximately June, 1991, Whitener–Moberg and Keenan had a conversation regarding allegations that Allan was having an extra-marital affair with at least one of the district court's employees. K54.

Darla Cagle is a District Court Clerk I, hired by Allan in December, 1991. K56–57; A7.

*Particular incidents: Hinojosa's walk-off.* On about June 14, 1991, Hinojosa said to Keenan, "You can have this fucking job because there's not enough dollar signs in there to put up with your bullshit and I go, am going home." K64; D63. Hinojosa then went into the courtroom, got her purse and went home. K65; D63.[7]

Allan learned of the situation, immediately left court and stated that he was going to find out what was wrong with Hinojosa. K66; D66; K298–301; K780; K904. Allan walked the few blocks to Hinojosa's home. D66. When Hinojosa got home, she called Darlene Cox, another district court clerk. K65. While they were on the phone, Allan arrived at Hinojosa's door. K67. Allan got on the phone to talk with Cox. K67. Allan then told Hinojosa to stay at home: "You've got a headache. I will see you tomorrow, no problem." K67.[8] Allan returned to the courthouse within a few minutes. D66; K884 ("10–15 minutes"). The timing of Al-

lan's absence is confirmed by the contemporaneous memorandum written by court clerk Cheryl Gantenbein. D67.

Keenan has no personal knowledge of when Allan left the office or when he returned. D65; K608; K951. Daniel Keenan admitted his wife's account of the incident was inaccurate. D68.

Afterward, Keenan called Hinojosa asking Hinojosa what she was doing at home. Hinojosa said, "I got a fucking headache and you gave it to me and I hung up the phone. And that is what I did and that's how Judge Allan came to me house." K68

At some point Allan appeared angry with Keenan and told her to stay out of his business. K70; A10.

Based on the verified allegations in the Keenans' complaint, the Spokane *Spokesman Review* newspaper printed an article on March 15, 1994, repeating Keenan's allegation that "the 56–year–old judge actually left the bench in his robes one day to chase after his alleged sweetie, who stormed out of the building in a huff." D64.

*Particular incidents: Hinojosa's hospital visit.* In about June, 1991, Hinojosa injured her ankle. K75. Allan took Hinojosa to the hospital where she was treated. K75.

*Keenan's performance in the first position.* Keenan was loyal to Allan both in and outside of the workplace. K20.

On June 14, 1991, Allan told Keenan that Allan and Whitener–Moberg were disappointed with Keenan's failure to familiarize herself with the requirements of each of the functions performed by the various clerks. D29. On that same day, Allan also conveyed to Keenan the animosity some of her subordinates harbored towards her. D30. Allan also complained that Keenan did not listen to the judges. D31.

Both Whitener–Moberg and Allan had several ongoing concerns about Keenan's ability to handle personnel including hiring, firing, discipline, and morale. D32.

---

7. Whether Hinojosa screamed "Fuck off" at Keenan, K63, is hearsay and is ignored.

8. Allan's statement is hearsay, permitted as a party admission.

Keenan incurred capital expense obligations without prior approval, failed to submit necessary budget extension requests, and failed to bill municipalities for .district court services. D33.

Keenan consistently attempted to exercise authority in excess of the scope granted to her by the district court judges. D34.

Keenan had an overly strong sense of ownership in her job that extended to the personnel files of her employees. D35.

Whitener–Moberg lost trust in the accuracy of Keenan's reports of district court activities. D36.

*Particular incidents: Allan's notes to Keenan.* At some point in 1991, Allan sent Keenan "green notes" of reprimand. K53, K86; A4; D43; K265–266; K346–347; K408; K413; K476–477; K592–593; K855–856; K894–895; K898; K997–999.

*Particular incidents: Allan's threat to Keenan.* At some point, Allan told Keenan never to speak to his wife again, and that he had advised his wife never to speak to Keenan again. K76.

*Particular incidents: Allan's conduct towards Keenan.* Allan made numerous verbal attacks upon Keenan and criticized her job performance. K77, K78. About June or July, 1991, Hinojosa observed that Keenan did something (Hinojosa didn't know what) to make Allan mad. K79. Hinojosa observed that Allan and Keenan were (non-physically) fighting. K80. Hinojosa indicated that Allan would refer to Keenan as an "airhead". K81.

Allan's conduct toward Keenan included screaming, throwing papers and files at her, and calling her names ("including "stupid," "idiot," and "bimbo") in front of her subordinates. K92 (all); D49 ("bimbo"); K1108 ("bimbo").

Allan. stated to others regarding Keenan, outside of Keenan's presence, "I would really like to slap her," and "I would like to grab her by the short hairs and see if she's really a true blond." K93; D50; K391; K471; K1110. The Commission investigator told Keenan that Allan used the words "stupid" and "idiot" when referring to Keenan. D52;

K1109. Allan allegedly told certain jailers, outside of Keenan's presence, "that he only hired good-looking women in his court." D51; K926.

Keenan alleges a sexually hostile work environment was created (in part) by Allan's use of "vulgar language", but Keenan has not provided any specific examples of "vulgar language." D53. The district. clerks who have testified claim never to have heard Allan use any profanity or otherwise inappropriate language. D61.

Keenan was allegedly offended by Hinojosa's touching of Allan's arm, shoulder and waist. D54; K954–955; K1094. Allan did not offensively touch Keenan. D58. Keenan did not notice whether Hinojosa touched other people in the same manner as she touched Allan. D59. Clerk Maureen Haker testified that Hinojosa touched both men and women in district court the same way she touched Allan. D60.

Keenan alleges that there was a common perception, shared by all the clerks, that Allan and Hinojosa were having an affair. D55; K255–256; K258–259; K270–279; K326–329; K331; K364–365; K367; K384; K393; K481–484; K498–499; K504; K505; K517; K658; K735; K876; K917–918; K930–931; K1090. Keenan speculated to others that Allan might be having an affair with Hinojosa. D56; K658; K876; K953; K1092; K1099.

Keenan alleges that Hinojosa received preferential treatment from Allan in the form of limited work assignments, greater toleration of work errors, and restrictions on Keenan's ability to discipline Hinojosa. D57.

*Particular incidents: letter from district court personnel to Allan.* In late June, 1991, district court employees who worked for Keenan wrote Allan a letter:

> We feel that there is a lot of unjust criticism of Shirley and we as District Court employees would like to express our support for her.... We feel that in all fairness to Shirley, she should be given the opportunity to express her side of the situ-

ation, if employees who have a grievance have brought it to you.

K82; A14.

The letter was written after Allan had screamed at Keenan in her office and Keenan had cried. K83. The letter was discussed with Whitener–Moberg before it was given to Allan. K84.

In response to the letter, on July 2, 1991, Allan told the other employees:

Mrs. Keenan works for me at my will and pleasure. I am, therefore, not interested in your opinion as to how she does her job. I will decide that.

K85.

*Reduction of Keenan's duties.* On September 20, 1991, Allan and Whitener–Moberg advised Keenan that certain of her job duties were being curtailed, effective immediately. K89. The judges removed Keenan's powers regarding all personnel matters and directed her to attend a course in personnel management offered by the Institute for Court Management. D4; D37; K702; K703.

On September 26, 1991, Keenan wrote Allan and Whitener–Moberg that their action of curtailing her duties was a "material breach of the contract between myself and Grant County." K90.

*Keenan's attendance at the Denver seminar.* On September 27, 1991, Allan and Whitener–Moberg requested funding from the defendant Commissioners to send Keenan to Denver for training. K91; D39. Keenan attended the seminar from October 6–11, 1991. D38.

At the seminar, Keenan took notes and specifically learned about litigation against judges, exceptions to the employment at-will doctrine, and the importance of documentation to the success of an employee's claims. D40. While at the seminar, Keenan wrote down an Illinois case where a plaintiff alleged that sexual discrimination motivated plaintiff's demotion by a judicial officer. D41.

Upon her return from the seminar, Keenan told Allan that if judges participated in management decisions they could be personally sued. D42.

*Keenan's complaint to Whitener–Moberg.* On November 26, 1991, Keenan wrote Whitener–Moberg:

This will confirm our conversation this date, wherein I asked you why Judge Allan had not approved my leave slips.

You indicated to me that he had questioned you yesterday as to the number of days I "really" had available....

I consider this harassment towards me by Judge Allan and the implication that I am not being honest about my recordkeeping with respect to my leave time is not only insulting, but, uncalled for....

K87; A16.

*Allan's complaint about Keenan's poster.* At some point (which date is disputed), Allan sent Keenan a note:

Shirley—

Sexual harassment is a two way street.— this is offensive to me.

Besides it doesn't belong in a public work place.—

Please give it back to whomever it belongs to.—

If I put up a female in a bikini like this in my office, the women around here wouldn't stop talking about me for a year.

K88; A17.

*Keenan's consultations with attorneys.* Keenan sought advice and legal counsel from Whitener–Moberg and from Anthony Menke. K96.

Menke, pursuant to his agreement with Grant County, represented all the elected officials of Grant County for matters related to labor and personnel relations. K97. In 1991, Menke served as an attorney for the district court with respect to helping district court employees with employment law issues. K98.

In his dealings with the district court, in either telephonic or written communications, Menke treated Keenan as a representative of the district court in employment law matters for the court (but not personal matters). K99. There were occasions when Menke considered Keenan to be liaison to his client, the District Court, on employment law matters. K100. That is, Menke believed that at

times during her tenure, Keenan acted·as a representative of the judges and the attorney/client privilege attached. K101.

Menke thought he and Keenan worked well together. K127, K128. They exchanged many telephone calls during her tenure as Administrator. K127. Prior to December 31, 1991, Menke was never critical of Keenan's abilities to perform as the district court Administrator. K129.

On several occasions in the fall of 1991, Whitener–Moberg and Menke told Keenan to file a formal complaint with the Washington Commission on Judicial Conduct ("the Commission") about Allan's conduct. K102.[9] They pointed out to Keenan the specific rules of judicial conduct that they believed Allan had violated. K103. They discussed with Keenan how Allan's conduct should be addressed. K104.

Keenan told Whitener–Moberg that she was reluctant to make a complaint to the Commission because Allan was one of her employers. K105. Both Whitener–Moberg and Menke assured Keenan that her complaint would be kept confidential, and that Keenan would be protected from any reprisals by Allan. K106. Whitener–Moberg and Menke told Keenan that Allan would be removed from the bench once the Commission completed its investigation. K107.

*Keenan's complaint to the Commission.* Keenan alleges she first contacted the commission in fall, 1991. D84 ("November, 1991"); K1003 ("fall of 1991"). Keenan's fall, 1991 contact was not the first time she had dealt with the Commission in its investigatory capacity. D85 (citing telephone calls in September and October, 1990).

In December, 1991, Keenan filed a·complaint against Allan with the Commission. K108; K1030. Keenan testified that she reported Allan to the Commission to provide him with psychological help. D95.

In January, 1992, Keenan provided the Commission with several documents, includ-

ing 41–page handwritten journal prepared by Keenan in December of 1991. K109; D86. Keenan provided copies of the documents to Menke, at Menke's request. K110. On the page dated October 16, 1991, Keenan says that she has already spoken to an attorney about her employment with Grant County. D87. On the page dated December 5, 1991, Keenan anticipates the possibility of a lawsuit. D88.

Keenan cooperated with the Commission at all times. K121.

Keenan knew Whitener–Moberg had no decisionmaking role in the Commission's investigation and that she was only a witness. D94.

*Keenan's leave of absence.* About December, 1991, Keenan learned she was going to need surgery which would require a leave of absence from January, 1992 through mid-February, 1992. K122.

Whitener–Moberg encouraged Keenan to take as much time off as was needed, advising that a side benefit would be that Keenan could avoid contact with Allan while the Commission conducted its investigation. K123.

*Keenan's first termination.* The implementation of the state-wide computer system for the district court, DISCIS, prompted a re-evaluation of court personnel needs. D47; K559; K690–691. Then Judge Evan Sperline approached the Grant County Commissioners offering the services of Superior Court Commissioner Brown if the district court would pick up half the cost. D70; K211.[10]

Allan and Whitener–Moberg formally notified Keenan of the impending elimination of the Administrator position effective April 30, 1992, by letter of March 3,.1992. K130; D5; D71. The judges noted· that the district court had run very well in Keenan's absence, that Commissioner Brown was working half-time in district court thereby allowing the

---

9. Menke may be a representative of the County Defendants and/or other defendants, and it is not disputed that he was within his authority in making these representations to Keenan. His statements therefore fall within the party-admission exception to the hearsay rule. .

10. This is hearsay, accepted as the admission of a party agent acting in the scope of his authority.

presiding judge more time for administrative duties, and that the budgetary savings from the elimination of the position could be applied to fill the need for an additional clerk. D74. The judges offered Keenan a lower-paying, subordinate clerk's position in the district court, created from the savings associated with the elimination of the administrator position. K130; D5; D75. Allan had urged that Keenan be offered the newly-created clerk's position. D76.

Keenan knew that Whitener–Moberg signed the March 3, 1992 letter. D72; K479. *See also* K742; K1117. At the time, Keenan knew that Whitener–Moberg had been a judge "not very long." D73.

Keenan's only assertion of breach of her understanding of her employment agreement occurred when the Administrator position was eliminated. D23.

In the subordinate position, Keenan worked for younger, less experienced employees whom she had supervised only days before. K132. The subordinate position was accorded a rate of pay lower than that of these younger employees. K133.

Keenan has no evidence that her Administrator duties were reassigned to younger employees. D48. Since the elimination of the Administrator position, management and supervisory duties have been allocated among the district court judges and the half-time Commissioner. D69. *See also* K210; K640.

*Keenan's consultations with attorneys, continued.* On the afternoon of March 3, 1992, Keenan placed two telephone calls to the offices of Hempovich, Nappi, the attorneys who eventually responded to the March 3, 1992, letter. D78. The telephone number for Hempovich, Nappi is (509) 624–3233. D79.

Between March 3, 1992 and March 30, 1992, Keenan called the offices of Hempovich, Nappi sixteen times. D80.

*Tape-recording.* Sometime in March, 1992, Keenan taped a telephone conversation. D82.

*Representations after first termination.* After receiving the March 3, 1992 letter, Keenan had a number of meetings and con-

versations with Whitener–Moberg and Menke. K134. The communications took place both at Keenan's workplace, and after hours over the telephone. K139.

Keenan complained that her termination was retaliation (for the complaint to the Commission), and breached promises Whitener–Moberg had made to protect Keenan. K134, K135.

Whitener–Moberg and Menke advised Keenan to accept the lower position, repeatedly representing that it would only be a short time before Allan would be removed from the bench. K137; K1023; D83. Whitener–Moberg assured Keenan that this would occur because of the mental and emotional instability and other health problems from which Allan was suffering. K138. Whitener–Moberg also represented to Keenan that as soon as Allan was removed from office, Keenan's employment as Administrator would be reinstated. K138.

*Keenan's acceptance of the lower position.* Keenan accepted the lower district court position on March 30, 1992, by letter from her attorney. K140. Keenan began as a Clerk II effective May 1, 1992. D6. Keenan's attorney wrote Allan and Whitener–Moberg:

> The elimination of the position of Court Administrator is in direct contravention to the promise and agreement that we had made for $mu = y$ permanent employment. The elimination of the Court Administrator position and the transfer to Clerk II violates the agreement that we had made at the time that I was first hired.
>
> I want to make it unequivocally clear that my acceptance of the Clerk II position should not be construed as a waiver of any rights or remedies that I have for the violation of my Employment Agreement. It is solely my attempt to mitigate any damages . . .

K140; D81.

*Keenan's performance in the second position.* Allan continued to act hostile toward Keenan after Keenan complained to the Commission. K145.

*Allan's discovery of the Commission complaint.* Keenan does not know when Allan learned of the Commission complaint. D89.

Keenan's only proffer (besides inadmissible speculation) is the testimony of Dedra Osborn, who believes it was sometime after April, 1992. K486. Allan contends that it was June 17, 1992. D90.

Sometime later, after Keenan had leaked information to the press about a possible court consolidation, Allan was at the Commissioners' office looking for a document when Peggy Grigg told Allan that "a lady from Olympia" had come to Ephrata and spoken to a number of people, none of whom she recognized except Osborn and Keenan. D91; K750.[11] From Grigg's comment, Allan deduced that Keenan had filed the Commission complaint against him. D92; K750.

*Fancher's discovery of the Commission complaint.* Fancher first learned of the Commission complaint from the (second) grievance filed by Keenan in December, 1992. D93; K190.

*First union grievance.* On June 26, 1992, Keenan wrote a memorandum to Al Hobart, her union secretary-treasurer:

Jack Harum represented to me that he had filed formal grievances on my behalf and on behalf of Darla Cagle.... However, I have been advised by Peggy Grigg that nothing has been filed as of this date. This performance reflects a failure to provide adequate Union representation.

K142. The memorandum was copied to Whitener–Moberg and Allan. K142.

On July 23, 1992, Keenan wrote Jack Harum, her union business agent:

As Shop Steward for Grant County District Court, I have been asked to file the following grievance on behalf of the District Court Clerks (more than one to be named at a later date)....

DISCRIMINATORY: Because the Clerk (Dolores) in the Moses Lake office is not required to travel to Ephrata (District Court's *main* office), then clerks based in the Ephrata office should not be required to travel to the Moses Lake office.

INCOMPETENCE: Because of the incompetence of the clerk (Dolores) in the Moses Lake office and because she is not

able to perform her job duties it is unfair practice to require Ephrata clerks to fall behind in their work to have to drive to Moses Lake to "help" Dolores do her job, and because of her unique relationship with the Judge....

K143. The letter was copied to Whitener–Moberg and the Grant County Commissioners. K143.

*Keenan's performance in the second position, continued.* On July 29, 1992, Whitener–Moberg wrote Keenan:

There are several circumstances which have come to my attention which may constitute a basis for serious disciplinary action up to and including discharge.... [Y]ou are directed to attend a pre-disciplinary action meeting on August 3, 1992.... The facts which have come to my attention regarding potential just causes and misconducts are described in the following paragraphs.... After this meeting the District Court Judges will reach a decision with respect to whether or not disciplinary action will be administered and if so will determine the severity of the disciplinary action.

K144.

Shortly before she was suspended, Keenan told Hinojosa that she had not begun to fight. D106.

On September 10, 1992, Whitener–Moberg and Allan wrote Keenan:

After careful consideration of the responses received from you at the Pre–Disciplinary hearing on August 17, 1992 we have determined that your responses do not satisfactorily explain the alleged acts of misconduct.... We find your conduct constitutes acts of insubordination, incompetence, insolence, gross misconduct, violation of District Court directive, work rules and regulations, policies and procedures and breach of confidentiality.... You are hereby suspended without pay commencing September 21, 1992 through September 25, 1992 and from October 19, 1992 through October 23, 1992. Any further misconduct will result in further disciplinary action inclusive of termination....

---

11. Keenan also proffers speculation and hearsay, K443, K1058 and K1059; these are ignored.

K148. Allan and Whitener–Moberg advised Grant County of this action. K149.

*Second union grievance.* In mid-December, 1992, Maureen Haker filed a grievance against her reassignment to Clerk II (a lower-paying position). K151. Haker alleged that the reasons for the reassignment included age discrimination, preferential treatment, retaliation for filing grievances, and retaliation for testifying to the Commission. K151.

On December 17, 1992, Keenan wrote to Al Hobart:

> Maureen B. Haker and the undersigned hereby request the Union to pursue a grievance on our behalf.... Ms. Haker and I would also request the Union, on our behalf, to file an unfair labor practices action against Grant County, Judge Whitener–Moberg and Judge Allan.... Please also understand that the retaliation issues apply equally to Judge Janis Whitener–Moberg, who participated in and encouraged our's and other's testimony to the Judicial Conduct Commission in connection with charges of misconduct against Judge Allan.

K152. The letter was copied to Whitener–Moberg, Allan and the Board of County Commissioners. K152.

*Keenan's performance in the second position, continued.* On January 7, 1993, Keenan wrote Allan and Whitener–Moberg:

> I would respectfully request that any further changes to my DISCIS [computer system] user status be communicated to me in person or in writing to avoid further embarrassment to me....
>
> If you have appointed a DISCIS coordinator, without giving every employee the opportunity to train or apply for that position, and of course consider experience, I would appreciate your communicating this to me as the shop steward, so that I may inform the union in connection with the unfair labor practices action they intend to file.
>
> I find it very difficult if not impossible to perform at any level in this office due to the lack of communication between the judges and the staff.... I certainly hope you can open the lines of communication in

this office so that everyone is at least half advised as to what is going on from day to day.

> Further, I am hereby requesting that I be allowed an equal amount of overtime for the time spent fooling around unnecessarily with this mess today.

K153.

On January 11, 1993, Keenan wrote Whitener–Moberg and Allan:

> In answer to your allegations of January 8, 1193, please be advised that I consider this continued harassment my both Judges, to the point it is almost impossible for me to continue to perform my job....
>
> If you are looking for incidences of misconduct, let me point out the following situations [regarding other employees] upon which you have taken no action whatsoever: .... Do these clerks have letters in their files? .... Given the incidences cited, I believe that the accusations leveled against me are unfounded and frivolous and therefore suggest that they be summarily dismissed....

K155.

On January 13, 1993, Dedra J. Osborn, the Grant County Clerk, wrote to Fancher, Sid Winzler (Allison's predecessor), Snead, Whitener–Moberg and Allan:

> I would like you to read this attached response and statement before Shirley Keenan's pre-disciplinary hearing on Thursday, January 14th....
>
> Since Judge Allan found out the people who testified [to the Commission],.... he demoted Shirley Keenan from Court Administrator to a Deputy Clerk II—using the excuse he felt there was not a need for that position in District Court and the judges could run the office themselves.... [T]he short time Mrs. Keenan was Court Administrator, that office ran the most efficient it ever has. You could actually get an answer from anyone you called in District Court.... *Before* and *since* Shirley was in the position of Court Administrator, Judge Allan has created an office that is intolerable. No one can answer your questions, because they do not know or have not been on that particular desk

long enough, they are not courteous and I personally have stood at their front counter numerous times waiting for someone to acknowledge I was there....

I will even make District Court a proposition to show my faith in Shirley's capabilities—transfer the funds for a Deputy II to my budget and on final approval from ... our county commissioners, I will hire Shirley back to work in my office that minute....

The kind of complaints that are attached to the judges' letter regarding Shirley Keenan, should never have made it as far as they did. They should have been filed, talked over with Shirley and then the employees told if they were doing *their* own job (and not joining in with Judge Allan's harassment on Shirley) they should not be concerned with others. Why is this allowed—it is pure harassment?!....

I am quite concerned about the kind of treatment Shirley Keenan and other deputy clerks are being given in District Court by Judge Allan—this kind of open harassment is going to cost the county—not only the credibility of the department heads and county commissioners for allowing this, but monetarily in lawsuits.

K157, K158.

*Third union grievance.* In mid-February, 1993, Keenan filed another grievance on behalf of unnamed clerks:

Employees being afforded opportunity to attend seminar; educational opportunity in Moses Lake on Thursday, February 11, 1993; without giving opportunity to employees with more experience and seniority with District Court. Michele Jaderlund is being given the opportunity to attend when other employees have not even been asked, i.e., Missy Hatch, Wanda Stratton etc.

K159.

*Keenan's performance in the second position, continued.* On February 22, 1993, eleven district court employees wrote to Whitener–Moberg and Allan:

We have all become witnesses to actions and verbal statements made by a Mrs. Shirley Keenan that we feel are unprofessional, disrespectful, unproductive and are

a direct violation of working hours. These actions have been going on well over the past year and are continuing to occur daily.... Listed below are a few of the complaints.... The situation has escalated to a point where it is now intolerable.... Our only recourse is to alert you to the severity of the situation and demand that something be done.

K164.

*Fourth complaint (to Human Rights Commission).* On March 18, 1993, Keenan complained to the Washington State Human Rights Commission that she was demoted based on her age. K165; D45. The complaint was forwarded to the district court and the Commissioners on March 31, 1993. K166.

On April 30, 1993, Stephen Hallstrom, a County prosecuting attorney, responded to the Human Rights Commission:

Complainant was not demoted.... this position was eliminated by the Court, via a reduction in force action.... When Complainant's position, i.e., Administrator, was eliminated, she was permitted to apply for an existing opening as a Deputy Clerk II. She was essentially rehired in this position around May of 1992, a position she holds to this day. By way of summary, the Ephrata judge had more time to supervise the Clerk's office due to the acquired services [of] Judge Brown and DISCIS....

K167.

*Keenan's performance in the second position, continued.* On June 30, 1993, Fancher and Snead wrote to Allan and Whitener–Moberg:

The Grant County Commissioners respectfully request that the on going Shirley Keenan matter be brought to a conclusion immediately. We respect and appreciate your desire to handle the situation within the union guidelines and parameters, but it is obvious that the system failed you, the County, and your other employees.

Yesterday, the majority of your other employees spent their lunch hour in the Commissioner's office, begging us to do something to end what they portray as an untenable situation. It is affecting their

working conditions, morale, and even their health, to a point they feel compelled to quit if this problem isn't resolved.... [T]hese complaints are coming on top of repeated complaints from the public about the rude employee....

Apparently, the agreement to trade Mrs. Keenan for an employee in the Clerk's office is not going to work. Mrs. Osborn ... has also been shown the trade proposal, by Mrs. Keenan herself, but she maintains that none of her employees is willing to make the trade.

K168.

On July 6, 1993, Allan and Whitener–Moberg wrote Keenan:

This is a follow up to our letter of September 10, 1992, indicating our decision to suspend you without pay for ten days. After several months of attempting to resolve this amicably, it is apparent that settlement is not possible.

You are hereby directed not to report for work for ten days commencing July 7, 1993....

K170; D7.

*Keenan's third (temporary) position.* Dedra Osborn hired Keenan for ten days, beginning July 7, 1993, to work at superior court. K171; D127; K461. Osborn requested the Commissioners to approve a pay rate of $8.00 per hour. K171. The Commissioners notified Osborn they would not approve payment of Keenan's salary in the superior court clerk's office while Keenan was suspended from employment in district court. D128.

Keenan worked 80 hours for Osborn. K172. Keenan was paid $83.53. K172; K359.

Keenan filed a grievance seeking payment for overtime work in district court. D129. The grievance was decided in a Step 2 grievance procedure by the Commissioners under the collective bargaining agreement. D129. The overtime claim that was adjudicated in the grievance procedure is the same claim for which Keenan seeks recovery in this federal litigation. D130.

*Keenan's consultations with attorneys, continued.* On July 9, 1993, Keenan's attorney wrote the County prosecutor, contending that Keenan's ten-day suspension was illegal retaliation in violation of the state whistleblower act. K173; D102. The attorney specified the requested relief and asked for an immediate hearing. D102.

The County's attorney, Stephen Hallstrom, responded to that letter on July 17, 1993. D103.

Keenan's attorney responded to Hallstrom's letter on July 22, 1993. D104. Keenan's attorney failed to request an administrative hearing in that letter or any subsequent time. D104.

*Keenan's performance in the second position, continued.* On July 2, 1993, Keenan had an encounter with co-worker Jennifer Gunderson. D107. Gunderson filed a complaint with the Ephrata police department. D108. After an extensive hearing, an administrative law judge for the Employment Security Department concluded that Keenan had assaulted Gunderson. D109.

On July 15, 1993, Whitener–Moberg and Allan wrote Keenan:

As you know, Mr. Menke, our attorney and Mr. Pedersen, the Teamster's attorney, have attempted in good faith to resolve issues involving a prior disciplinary action of suspension without pay. Out of respect for that attempted settlement process, we have held in abeyance further disciplinary action based on many instances of misconduct by you during and since the original written issuance of notification of suspension without pay. Since the attorneys' attempts to resolve the suspension without pay issues have failed we must now proceed to address those additional instances of your misconduct.... The facts supporting the additional misconduct and just causes for potential discharge or termination are as follows....

[Y]ou are directed to attend a pre-discharge or termination meeting on July 21, 1993.... [S]ubsequent to the pre-discharge or termination meeting, the District Court judges shall make a determination as to whether to proceed with discharge or termination or some less severe disciplinary action. You will remain on suspended

without pay status ... until a determination is made regarding disciplinary action. K174. The discharge hearing was held on August 11, 1993, and attended by Whitener–Moberg. K175.

On August 20, 1993, Whitener–Moberg and Allan wrote Keenan:

> [E]ach and every act of misconduct constitutes just cause for termination and when considered along with all of the prior acts of misconduct support a decision to terminate your employment....
>
> The facts supporting your termination are again summarized as follows: ....
>
> Your employment with Grant County District Court is hereby terminated.

K176; D8.

*Post-termination public statements.* Keenan contends Whitener–Moberg defamed her because Whitener–Moberg allegedly was the person who characterized Keenan's body-check of Gunderson as an assault and encouraged the witnesses to label the conduct assaultive as well. D110; K1055. Keenan relies on inadmissible hearsay and inferences she personally drew from the witnesses' testimony about the assault before the administrative law judge. D111; K1055 (speculation); K1057 (hearsay). The administrative law judge concluded Keenan intentionally ran into Gunderson. D112. Gantenbein, one of the eyewitnesses to Keenan's encounter with Gunderson, first described Keenan's conduct as an "assault" to Whitener–Moberg. D113. Whitener–Moberg did not encourage the witnesses to describe Keenan's conduct as assaultive; Gantenbein was the first person to characterize Keenan's conduct as an assault. D114. Whitener–Moberg had a reasonable basis upon which to believe Keenan had assaulted Gunderson, as she received reports from Gunderson and three eye witnesses. D115.

Webster's *New World Dictionary* defines "harpy"—a word used in the *Spokesman Review* article, outside of quotation marks—as "a relentless, greedy, or grasping person" or "a shrewish woman." D116.

On February 15, 1994, Fancher, Snead and Allison wrote a letter to the citizens of Grant County about Keenan's claims against the County. K177. On February 17, 1994, the *Grant County Journal* published it as a letter to the editor. K177; D117. Keenan identifies the Commissioners' letter as the basis for her defamation claim against the County. D118; K1125, K1126.

By the time the Commissioners published their letter, there had been numerous newspaper articles regarding Keenan's and Osborn's claims against the County. D119; K226, K229, K247. Prior to publishing their letter, the Commissioners had reviewed the judges' documentation of reasons for Keenan's suspension. D120. The judges had documented the reasons for Keenan's suspension in correspondence dated July 29, 1992; September 10, 1992; July 6, 1992; and July 15, 1992. D121.

Prior to publishing their letter, the Commissioners had reviewed documentation from district court indicating Keenan had assisted Osborn's request to have Osborn's son's DWI case heard by a particular judge chosen by Osborn. D122. Keenan admitted it was inappropriate for a district court clerk to circumvent the affidavit of prejudice procedure and schedule a hearing in front of a particular judge at the request of a defendant. D123.

Prior to publishing the letter, Fancher had received complaints about Keenan's conduct from the public. D124. Prior to publishing their letter, the Commissioners had received letters from the district court clerks complaining about Keenan's conduct, and Fancher had met with the clerks who threatened to walk off the job if something wasn't done regarding Keenan. D125.

Prior to publishing their letter, the Commissioners reviewed a report concerning an incident where Keenan ran into another district court clerk (Gunderson) who filed an assault charge. D126.

*Fifth complaint (to County).* On August 24, 1993, Keenan's attorney filed a Notice of Claim for Damages with the County:

> Shirley D. Keenan and Daniel E. Keenan ... present you with this claim for damages against the County of Grant ... pursuant specifically to RCW 36.45.020 and RCW 4.96.020....

The injuries are described as follows: ... income loss to claimant Shirley D. Keenan; such loss of income having led directly to claimant's consequential damages including moratory interest, finance charges, and losses related to a forced bankruptcy. The County's breach of employment contract, its retaliatory conduct, harassment, creation of a hostile work environment, libel and slander, tortious interference with a business relationship, and conspiracy to deprive Mrs. Keenan of her civil rights....

K179.

Keenan sought two continuances of the arbitration of her grievance before ultimately withdrawing her claim. D100.

*Sixth complaint (to the EEOC).* On March 4, 1994, Keenan's attorney wrote to the Equal Employment Opportunity Commission:

a formal charge of sex, hostile work environment, and age discrimination against the County of Grant.... This charge is filed under Title VII of the Civil Rights Act ... and the Age Discrimination in Employment Act.... Shirley D. Keenan desires to pursue the above-referenced claims in her action in U.S. District Court. Accordingly, she would request that the EEOC issue a Right to Sue letter for these claims right away in lieu of any investigation by the EEOC.

K180; D46.

*Seventh complaint (to the Court).* Also on March 4, 1994, the Keenans filed this suit.

*Conclusion of Commission investigation.* On May 3, 1994, Allan and the Commission entered into a Stipulation:

1. The Commission has determined ... A. During the years 1988–1990, Respondent [Allan] engaged in intemperate behavior toward his benchmate, Judge Carl Warring, consisting of written notes and verbal comments witnessed by other persons....

3. With regard to Allegation A, intemperate behavior towards his benchmate, the Respondent agrees and stipulates to accept the Reprimand imposed by the Commission and will not contest the Commission's

determination as to the facts set forth above and imposition of the Reprimand.

4. The Respondent agrees that he will resign from office effective December 31, 1994....

K181; A38; D96. The Commission determined that Allan committed other acts of misconduct, but Allan denied these. K183; A38. The Commission had investigated the other allegations. K184.

On June 3, 1993, the Commission entered an Order of Reprimand and Closure in its investigation. K182.

*Menke's subpoenaed files.* When subpoenaed in October, 1994, Menke had in his possession certain documents (# AFM 030 to 095) about which he had no specific recollection of their origin. K111–116, K120. These documents include Keenan's handwritten journal, received by Menke in December, 1991. K111, K114. Menke also had documents (# AFM 001 to 029), which he is "very, very" certain that he received in December, 1991 from Allan. K117. Menke also believed that he received documents # AFM 096–132 in December, 1991 from Allan. K118–119.

*Keenan's emotional distress claims.* Keenan allegedly has suffered from rashes, itching, and uncontrollable crying. D131; K891–894.

*County's litigation positions.* Grant County, Fancher, Allison and Snead are appellants in a pending state court appeal of *Dedra J. Osborn, Grant County Clerk v. Grant County, by and through the Grant County Commissioners,* App. No. 13833-0-III. K1152. (Argument was heard on May 2, 1995; a written opinion is expected in about three months.)

In the appeal, the County and Commissioners are represented by John D. Knodell of the Grant County Prosecutor's Office, in Ephrata. In litigation here, they are represented by private attorney Daniel E. Huntington of Richter–Wimberley, P.S., in Spokane. Each counsel alleges that it is unaware of the representations of the other. C1–C2. Osborn in her appeal is represented by the same attorney who represents Keenan

in the litigation here. C4, adopted by judicial notice.

In briefing on the appeal, the County and Commissioners stated that the Commissioners are an employer of all district court employees. K1155 and K1158, citing Supplemental Brief of Appellant, at 28–29, 29–30; K1161, citing Reply Brief at 18–19. However, Fancher had filed a certification with the trial court stating that the Commissioners did not have any authority to hire, fire or discipline district court employees. C3, citing Certification of Helen I. Fancher in Support of Defendant's Motion to Dismiss, at 3, adopted by judicial notice. Further, in briefing here, the County and Commissioners stated that

> The relationship between Shirley Keenan as a district court employee and Grant County through its Commissioners is limited to wage bargaining under the employment bargaining agreement between the County and district court clerks and the Commissioners' role as arbiters between the clerks and district court judges in the second step of the grievance procedure set out in the bargaining agreement. The county and commissioners do not have the requisite employer status necessary to create any liability for the Keenans' employment-based claims.

K1154, citing Memorandum in Support of Summary Judgment, at 5–6.

In briefing on the appeal, the County and Commissioners stated that

> district and superior court judges have the option of overruling *Zylstra v. Piva*, 85 Wash.2d 743, 539 P.2d 823 (1975), which held the county commissioners did not have the right to negotiate non-wage related matters directly with the district and superior court employees.

K1157, citing Brief of Appellant, at 29. In briefing here, the County and Commissioners stated that

> Pursuant to *Zylstra*, the district court clerks are employees of the state judiciary with respect to hiring, firing, and all working conditions in the district court.

K1156, citing Memorandum in Support of Summary Judgment, at 6.

In briefing on the appeal, Osborn's attorney contended that the Commissioners have no authority to dictate the terms of employment for employees in another elected official's office. C4, citing Brief of Respondent, adopted by judicial notice. Osborn's attorney contends the opposite in this litigation. Plaintiffs' Memorandum in Opposition to Defendant Grant County, Fancher, Allison and Snead's Motion for Summary Judgment, at 2–3.

### E. DISPUTED FACTS

According to the parties' statements of material facts, the following alleged facts are disputed. The citation following the alleged fact designates where the disputed contentions are found: in the Keenans' ("K"), Allan's ("A"), Whitener–Moberg ("W"), the County Defendants' ("C"), or joint defendants' ("D") statements of material facts, and the paragraph number of the fact.

*Employment policies/contract.* The parties dispute whether Keenan was hired as a permanent, full-time employee with the express understanding that her position was for a minimum five-year term, terminable for cause only. K9; A1. *See also* D20; K1045. This is a legal conclusion, not a fact.

The parties dispute whether there was a written contract in existence when Keenan accepted the offer of employment as Grant County District Court Administrator and began working. D14; K1038–1039. The parties agree that Warring prepared a draft contract; they dispute the legal conclusion of whether that constituted an enforceable employment contract.

The parties may dispute whether Keenan objected to other portions of the contract, besides the "terminable at will" provision. D16; K712; K716. This is immaterial.

Defendants contend that Resolution No. 93–5CC covers whistleblower claims under RCW 42.41.050. D101. This is a legal conclusion, not a fact.

Keenan contends that Peggy Grigg was the Commissioners' designee under the County's whistleblower policy. K162. However, Keenan's proffer—the whistleblower

resolution—does not support this contention. Therefore, it is not a fact.

*Keenan's performance in the first position.* The parties dispute whether Keenan performed satisfactorily as the Grant County District Court Administrator, between October, 1989 and June, 1991. K17; A2. This is merely a disputed categorization. The parties agree on specific conduct (*e.g.,* failure to bill municipalities).

The parties dispute whether the relationship between Keenan and Allan was "excellent" between October, 1989 and June, 1991. K18; A2. This is immaterial, especially as it is Keenan who alleges the lack of conflict. Defendants' allegedly wrongful conduct, not their lack of conduct, is at issue.[12]

The parties dispute whether, between October, 1989 and June, 1991, Allan was highly complimentary of Keenan's work and included his support for a pay raise for Keenan. K19; A2. Keenan supports her contention with her affidavit (stating the same), a 1990 Christmas card from the Allans to the Keenans ("We've greatly appreciated all of the work and support you've given us in the past year"), a pre-printed card following the death of Allan's father ("The family of Jack Allan acknowledges with deep appreciation your kind expression of sympathy") and an April 23, 1990 letter from Allan to the Board (criticizing the Board's grant of retroactive pay raises to certain elected officials and department heads; noting that department heads not directly answerable to the Board, including District Court Administrator and Juvenile Court Administrator, did not; stating that the public defender position merited far more than what it was paid). It is difficult to see how most of these support Keenan's contention at all, but at least based on her affidavit the Court assumes Keenan's contention to be true for purposes of summary judgment. Note, however, that this is irrelevant to the period of early 1992, when the Administrator position was eliminated.

*The Keenans' involvement in Allan's campaigns.* The parties dispute whether Allan asked Keenan to aid his 1990 re-election effort as his campaign co-chairperson, and whether she did so. K21; A3. This is immaterial for the reasons discussed in the previous two paragraphs.

The parties dispute whether Allan asked Daniel Keenan to take photos, draft flyers and propose letters to the editor, and whether he did so. K22; A3. This is immaterial for the reasons discussed in the previous three paragraphs, and also because any relationship between Allan and Daniel Keenan is completely irrelevant to the latter's only claim here, of loss of consortium.

The parties dispute whether Keenan used accrued comp-time and vacation time to help Allan's campaign by door-belling, placing advertisements and by ordering and paying for campaign materials. K24; A3. This is immaterial for the reasons discussed in the previous four paragraphs (except regarding Daniel Keenan).

The parties dispute whether Keenan assisted Allan in compiling information used to file campaign complaints on Allan's behalf against Allan's 1990 opponent. K25; A3. This is immaterial for the reasons discussed in the previous five paragraphs (except regarding Daniel Keenan).

The parties dispute whether Keenan worked closely with Allan throughout his 1990 campaign. K46; A3. This is immaterial for the reasons discussed in the previous six paragraphs (except regarding Daniel Keenan).

The parties dispute whether Allan considered Keenan to be a friend. K47; A3. This is immaterial for the reasons discussed in the previous seven paragraphs (except regarding Daniel Keenan).

The parties dispute whether Allan was appreciative of Keenan's campaign efforts. K48; A3. This is immaterial for the reasons discussed in the previous eight paragraphs (except regarding Daniel Keenan).

---

12. The Keenans may be claiming that this excellent relationship, followed by a poorer one, somehow evidences that Allan discovered Keenan's complaint to the Commission. However, the parties agree that Allan did not discover the existence of the complaint until at least April, 1992.

*Hinojosa.* The parties dispute whether Allan instructed Keenan to hire Hinojosa. K29; A4. This is immaterial. Allan's decision to hire her is not at issue.

The parties dispute whether Hinojosa was to serve as Allan's assistant. K29; A4. Similarly, the parties dispute whether Keenan was preparing to terminate Hinojosa when Allan instructed Keenan to revise Hinojosa's job description, waive certain job requirements, and to assign Hinojosa to be Allan's personal clerk. K42, K43; K4. Hinojosa's exact job position is immaterial, considering the undisputed facts that she did not replace or supervise Keenan.

The parties apparently dispute whether Hinojosa worked as a volunteer interpreter through 1990, or through 1991. K32; A4. However, Keenan admits that Hinojosa volunteered only until she began getting paid, and that she began getting paid in September, 1990. K34, K37. Therefore, "1991" appears to be a typographical error or a misremembrance. In any event, it is immaterial.

The parties dispute whether Hinojosa had 12 years of education (because she completed only the eleventh grade). K39; A4. This is immaterial. Neither Hinojosa's truthfulness on her employment application, nor Allan's decision to hire her, are at issue here.

The parties dispute whether Hinojosa was qualified to hold any position with the district court. K41; A4 (contending that Hinojosa has carpal tunnel syndrome, restricting her ability to type). This is immaterial. Neither Hinojosa's competence, nor Allan's decision to hire her, are at issue here (because Keenan does not raise the Equal Pay Act).

The parties dispute whether Keenan received complaints that Hinojosa spent significant amounts of time with Allan in his locked chambers. K45; A4. This is immaterial. While actual office sexual behavior might be relevant to Keenan's sexually hostile work environment claim, speculation or complaints about it is too remote to cause a hostile work environment.

The parties dispute whether Hinojosa (alone, or within an alleged relationship with Allan) was disruptive of the Administrator's office. K62; A8. This is immaterial. Only sexual conduct, not other job misconduct, is at issue.

*Allan's alleged infidelity.*[13] The parties dispute, regarding the conversation between Whitener–Moberg and Keenan, whether Keenan or Whitener–Moberg was the one to advise the other of the allegations that Allan was having an extra-marital affair with at least one of the district court's employees. K54; A5; W1. This is immaterial; whether Allan was having an affair is not at issue. (At most, Keenan's contention demonstrates a one-time conversation with brief sexual content, that is not alleged to be unwanted or harassing.)

The parties dispute whether Allan's wife phoned Keenan regularly (at work and at home) to inquire about Allan's whereabouts and to express her suspicions concerning Allan's infidelity. K55; A6. This is immaterial. Neither the conduct of Allan's wife nor Allan's possible affair is at issue.

The parties appear to dispute whether there was an improper relationship between Hinojosa and Allan. K62; W1–4. However, Keenan does not support her contention of a relationship. This is not a genuine dispute.

*Particular incidents: Allan's notes to Keenan.* The parties dispute whether Allan's "green notes" of reprimand to Keenan were written while Allan's father was ill. K53; A4. This is immaterial. Only the existence of sexual harassment, not the cause of it, is at issue here.

The parties dispute whether Allan's "green notes" and other memoranda created a sexually hostile work environment. K86; A15. This is not a fact, but a legal conclusion.

*Particular incidents: Hinojosa's walk-off.* The parties dispute what time of day Hinojo-

---

**13.** Whether Darla Cagle was aware of rumors around the District Court about a relationship between Hinojosa and Allan, K58 and A7, is hearsay and is ignored. Where Cagle heard the rumors, K59 and K60, is hearsay and is ignored.

Whether Cagle heard other District Court personnel complain that Hinojosa was getting special treatment as an employee, K61 and A7, is hearsay and is ignored.

sa screamed "Fuck off" at Keenan and left the court. K63; A9. This is immaterial.

The parties dispute whether Keenan later confronted Allan about the appearance of an inappropriate and unacceptable relationship with Hinojosa which was affecting and disrupting the workplace environment. K69; A10. The Court assumes the Keenans' contention, that there was such a confrontation, for the purpose of summary judgment. This dispute is not material, as the law does not protect such speech.

Regarding Allan's statement to Keenan to stay out of his business, the parties dispute the exact words Allan used, whether Allan became physically threatening, and whether Keenan cried. K70, K71, K72; A10. This is immaterial, as the parties agree the conversation occurred.

The parties dispute whether Hinojosa was disciplined for her insubordination and walk-off. K73; A11. The parties dispute whether Allan refused to permit Hinojosa to be disciplined. K74; A11. The Court assumes the Keenans' contentions for the purpose of summary judgment. However, this dispute is not material; as Keenan does not raise an Equal Pay Act claim, and her age discrimination claim is limited to her own discharge, this alleged favoritism is irrelevant.

*Particular incidents: Allan's threat to Keenan.* The parties appear to dispute whether Allan made the threat. K76; A12. However, Allan does not proffer any evidence for his position. This is not a fact.

*Particular incidents: Allan's conduct towards Keenan.* The parties dispute whether Allan's verbal attacks upon Keenan constituted a "campaign". K77; A13. This is an immaterial categorization, not a fact.[14]

The parties may dispute whether Allan remarked in Keenan's presence (in addition to his comment to the jailers) "that he only hired good-looking women in his court." D51; K927. The Court assumes Keenan's contention for the purpose of summary judgment.

The parties dispute whether Keenan has supported her allegation that a sexually hostile work environment was created (in part) by Allan's "general demeanor, behavior". D53; K1131. This is a legal conclusion.

The parties dispute whether other witnesses testified that Allan used profanity. D61; K510–511 (Warring), K513 (Warring); K515–516 (Warring); K1139 (Keenan, hearsay); K1141 (Keenan, hearsay); K1142 (Keenan, hearsay). However, they agree that no clerk so testified.

*Particular incidents: letter from district court personnel to Allan.* The parties dispute the categorization of the letter district court employees wrote to Allan. K82; A14. This is an immaterial categorization, not a fact.

*Allan's complaint about Keenan's poster.* The parties dispute the timing of this note. K88; A17. However, there is no support for Keenan's contention that it was written "in response to" or following Keenan's complaint to Whitener–Moberg. The fact of the note's date is not genuinely disputed, but rather without support.

*Keenan's complaint to the Commission.* The parties dispute whether Keenan's handwritten journal was labeled as a "complaint". K109–111, K114, K116; A19, A20. This is immaterial.

*Retaliation.* The parties appear to dispute whether Allan learned of the Commission complaint during Keenan's leave of absence. K124; A22. However, Keenan does not support her contention. Therefore, there is no dispute; there is no fact.

The parties appear to dispute whether Allan eliminated Keenan's position of District Court Administrator in retaliation for her complaint to the Commission complaint. K125; A22. Again, Keenan does not support her contention. There is no dispute; there is no fact.

*Keenan's first termination.* The parties appear to dispute whether after Keenan's termination, Keenan's former duties were reorganized and reassigned to younger and less

---

14. Allan contends that Keenan's position is unsupported, but it is supported by Keenan's affidavit.

Allan refers to "Allan's Fact 4", which concerns Hinojosa and is irrelevant to this contention.

experienced women who earned less than Keenan. K131; A23. However, Keenan does not support her contention. (The proffered evidence is Keenan's speculation and an exhibit to Menke's deposition, which does not address the matter.) There is no dispute; there is no fact.

The parties dispute the categorization of Keenan's termination as a "discharge" or "elimination of position." K132; A24. This is a conclusion of law, not a fact.

*Representations after first termination.* The parties dispute who (Whitener–Moberg or Allan) decided to give Keenan another position rather than terminate her altogether. K136; A26.[15] This is immaterial.

*Keenan's acceptance of the lower position.* The parties dispute whether Keenan's acceptance of the lower district court position was made "based on" the representations of Menke and Whitener–Moberg. K140; A28. To a certain extent, this is a fact (which no defendant disputes). However, to the extent that it is an element of promissory estoppel, it is a legal conclusion for the Court to decide.

The parties appear to dispute whether Keenan accepted the lower position "with a clear understanding that in doing so she was not waiving any rights or remedies." K140; A28. However, any "clear understanding" among the parties is not supported. The only supporting evidence is Keenan's letter, which speaks for itself as *Keenan's* understanding.

Keenan contends that

All of the defendants in this case, including the defendants' lawyer, Anthony Menke, were aware of Ms. Keenan's objections to the breach of her employment agreement, before her position elimination was to take effect on May 1, 1992.

K141. However, Keenan does not support this alleged fact. (Keenan proffers "Exhibit 75—Menke Dep.", which does not exist in Keenan's exhibits to Ct.Rec. 187.) Therefore, there is no fact.

*Keenan's performance in the second position.* The parties appear to dispute whether Allan acted hostile toward Keenan after Keenan complained to the Commission. K145; A30. However, Allan does not support his position; there is no dispute.

Keenan contends that "It became obvious in District Court that everyone was fighting with Shirley after she came back from her surgery early in 1992." K146, K147. However, Keenan does not support her contention. She proffers only hearsay, and two exhibits dated mid 1993. Therefore, this is not a fact.

The parties dispute whether Whitener–Moberg's July 29, 1992 letter to Keenan constituted an attempt to wrongfully terminate Keenan. K144; A29. This is a legal conclusion, not a fact.

Keenan contends that on October 9, 1992, she learned from someone that the defendants were "trying to get rid of her." K150. This is supported only by hearsay, and so is not a fact.

Keenan contends that "A second attempt to discipline and terminate Ms. Keenan from her position came the next day, January 8, 1993." K154. This is not supported, and so is not a fact.

Keenan contends that "[t]he overt, hostile and harassing nature of defendants' conduct toward plaintiff ... was known to the defendants as well as others outside court." K156. This is supported only by hearsay, and so is not a fact.

Keenan contends that "Allan and Whitener–Moberg's efforts to terminate Ms. Keenan's employment persisted despite having learned that defendant Allan's conduct was considered to be harassment against plaintiff Keenan." K169. Keenan proffers handwritten (by an unknown person) notes of her January 14, 1993 disciplinary hearing, and the June 30, 1993 letter to the judges from the Commissioners. Neither of these supports Keenan's contention that the judges attempted to terminate Keenan after her January 11, 1994 statement to them. At

---

**15.** Keenan's contention (what Menke said Whitener–Moberg said) is double hearsay, each time excepted as a party admission. (Whitener–Mo-berg and the County Defendants do not object to Keenan's characterization of their statements.)

most, they suggest that the judges considered certain charges and would respond in two weeks, and that the Commissioners requested "a conclusion." Therefore, Keenan's contention is not a fact.

The parties dispute whether Keenan's encounter with co-worker Jennifer Gunderson on July 2, 1993 was an assault. D107; D109; K647; K1056.[16] This is immaterial. At issue is only whether defendants were reasonable in publishing a reference to "assault," and in terminating Keenan (in part) because of the incident.

*Post-termination public statements.* Keenan contends that the Commissioners' public statement included the disclosure of private facts in a false light. K178. This contention is not supported by the proffer of the statement alone. Further, it is a legal conclusion. Therefore, it is not a fact.

The parties may dispute whether Keenan in fact assisted Osborn's request to have Osborn's son's DWI case heard by a particular judge chosen by Osborn. D122; K313–317, K429–431, K583. However, that is immaterial; this lawsuit does not determine whether Keenan provided such assistance. The only material issue is whether the Commissioners saw documentation of Keenan's assistance before they wrote their letter, and that is an agreed fact.

*Conclusion of Commission investigation.* The parties dispute whether Allan "agreed" to an allegation of misconduct. K181; A38. However, neither Keenan's proffer nor the Stipulation itself supports her position. (The Stipulation says only that Allan agrees to the Reprimand.) Keenan's contention is not a fact.

### F. COUNT I: WRONGFUL DISCHARGE/BREACH OF CONTRACT

The Keenans contends that the elimination of the Administrator position breached Keenan's employment contract, violating state common law. (The Keenans do not raise this claim against Fancher, Allison or Snead.)

■ *Standard.* An employment agreement providing a period of employment in excess of one year must be in writing and signed by the party to be charged with enforcement of the agreement, or the employment agreement is invalid under the statute of frauds. RCW 19.36.010; *Greaves v. Medical Imaging Sys.,* 124 Wash.2d 389, 395–97, 879 P.2d 276 (1994).

■ In the absence of a contract specifically stating the duration of employment, an employer has the right to discharge an employee at will: for any reason, fair or unfair, or no reason at all. *Burnside v. Simpson Paper Co.,* 123 Wash.2d 93, 104, 864 P.2d 937 (1994); *Roberts v. ARCO,* 88 Wash.2d 887, 891, 568 P.2d 764 (1977).

■ There are four narrow exceptions to the at-will doctrine:

> An employment contract indefinite as to duration, is terminable at will by either the employee or employer. But such a contract is terminable by the employer only for cause if (1) there is an expressed or implied agreement to that effect or (2) the employee gives consideration in addition to the contemplated service. Moreover, (3) promises of specific treatment in specific situations found in an employee manual or handbook issued by an employer to his or her employees may, in appropriate situations, obligate the employer to act in accord with those promises. Lastly, (4) an employer can be liable in tort if he or she discharges an employee for a reason that contravenes a clear mandate of public policy.

*Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 233, 685 P.2d 1081 (1984) (internal citation omitted).[17]

*Analysis.* Keenan proffers five possible employment contracts: an alleged oral agreement between Keenan and Warring (made just prior to Warring's drafting the Employment Contract), the draft Employment Contract, an alleged oral agreement

---

16. The Keenans also proffer speculation by a non-witness, K355; this is ignored.

17. The first exception can include promissory estoppel. *See Havens v. C & D Plastics,* 124 Wash.2d 158, 171–75, 876 P.2d 435 (1994).

between Keenan and Allan (made just after Warring's drafting the Employment Contract), Allan's alleged offer regarding Keenan's educational expenses, and the Position Information Questionnaire.

■ The first proffer, the alleged oral agreement between Keenan and Warring, is not an employment contract. As Keenan contends it was for a five-year term[18], it is invalid under the statute of frauds.[19]

■ The second proffer, the draft Employment Contract, is not an employment contract. It is unsigned. It also specifically includes a "terminable at will" provision.

The third proffer, the alleged oral agreement between Keenan and Allan, is not an employment contract. As Keenan contends it was for a five-year term[20], it is invalid under the statute of frauds.

■ The fourth proffer, Allan's offer regarding Keenan's educational expenses, is not an employment contract. To the extent Keenan contends the offer is in the draft Employment Agreement, it is unsigned and provides for at-will termination. To the extent Keenan contends it was an oral agreement, as Keenan contends it was for a five-year term[21], it is invalid under the statute of frauds. Furthermore, it is clearly not a promise (or even expectation) of five-year employment, but merely a promise that after five years of employment Keenan would not have to reimburse the employer for its educational expenses for her.

■ The fifth proffer, the Position Information Questionnaire, is not an employment contract. It is not a handbook or contract given by the employer to the employee, but an employee self-review: a questionnaire prepared by Keenan herself (with an additional "supervisor's section" insert by Allan) for use by the district court's personnel office. The statement "any job security is

based strictly on performance ..." was written by Keenan, not any of the defendants. Allan did not sign Keenan's section, even to acknowledge that he agreed with it. The questionnaire specifically instructed that he was not to "alter or eliminate any portion" of Keenan's response. Just as employee completing a self-review as part of her annual supervisory review cannot unilaterally give herself a raise, Keenan cannot give herself tenure.

■ Therefore, there is no employment contract. Unless excepted, the at-will doctrine applies. The Court reviews the four possible exceptions.[22]

■ The first exception, expressed or implied agreement for cause termination, does not apply. Keenan proffers only her own opinion as to the alleged oral agreement. Warring and Allan deny the agreement, and the draft written agreement states that termination is at will, so there is no evidence of an understanding by them. Given the agreed circumstances that Warring had drafted a written contract, the intent of the parties was mere negotiation en route to a written contract, which was never agreed to or signed. Business custom, even as expressed by Keenan's own explanation in the questionnaire and her frequent deposition references to her employment "at the will and pleasure of the judges, was that union positions might have certain union-negotiated protections, but other, professional positions (including Administrator) were strictly at-will. The nature of the employment was service to elected officials, who reasonably would not bind their successors to cause-only terminations. The situation of the parties—administrator to elected judges, who themselves may only serve a four-year term so that interpretation of an oral contract for a longer term would be impossible—would require a written instrument for Keenan's al-

---

18. K9, K1038–1054.

19. Keenan here and in section P (promissory estoppel) challenges application of the statute of frauds. This argument is discussed (and rejected) in section P.

20. K9, K1038–1054.

21. K9, K1038–1054.

22. The Keenans contend that there is an exception for breach of the covenant of good faith and fair dealing. However, such an exception has been explicitly rejected in Washington. *Thompson*, 102 Wash.2d at 227, 685 P.2d 1081.

leged five-year agreement. Thus, Keenan's "understanding" cannot create the implied agreement exception:

> Looking first at whether appellant had an implied employment agreement that was not terminable at will, we note the rule that such an agreement cannot be established solely by an employee's subjective understanding or expectations as to his employment. Even an assurance of "steady" employment is not sufficient. The courts will look at the alleged "understanding", the intent of the parties, business custom and usage, the nature of the employment, the situation of the parties, and the circumstance of the case to ascertain the terms of the claimed agreement. In light of the foregoing considerations, we have reviewed the record and find no evidence of an implied agreement. At best, appellant points only to his own personal understanding that he would be employed so long as he did his job in a satisfactory manner. As noted above, such an understanding is insufficient.

*Roberts v. ARCO,* 88 Wash.2d at 894–95, 568 P.2d 764 (internal citations omitted). (To rule otherwise would be to allow this narrow exception to eliminate the at-will doctrine altogether.) Finally, regardless of this analysis, as Keenan contends the agreement was for a five-year term, it would be invalid under the statute of frauds.

■ The second exception, additional consideration to prevent termination at will, does not apply. "[C]onsideration sufficient to prevent termination of the employment at the employer's will must be in addition to the required service and must result in a detriment to the employee and a benefit to the employer." *Malarkey Asphalt Co. v. Wyborney,* 62 Wash.App. 495, 505, 814 P.2d 1219, 821 P.2d 1235 (1991) (the only Washington case ever to find that the additional consideration exception might apply, for purchase of a minority interest in the employer corporation). Keenan contends that the additional

consideration is her agreement to attend an educational program. However, as Keenan acknowledges, the cost of Keenan's Denver seminar—the only program proffered—was paid by the district court.[23] Moreover, in her questionnaire Keenan states that the Administrator position—not just Keenan, but anyone in the position (page 1)—was required to "[a]ttend[ ] schools and seminars to update knowledge and skills in areas of responsibility" (pages 5, 8). Keenan also stated that her replacement would "need" a masters degree or fellowship degree and two years experience (page 16), which Keenan herself did not have. Thus, the exception is inapplicable both because the Administrator position required certain education, and also because Keenan did not incur a detriment to the court's benefit. (Instead, the court incurred a detriment, the cost of the seminar, to put itself in exactly the status quo of having an Administrator with certain education.)

■ The third exception, handbook promises, does not apply.[24] The Employee Policy–Procedures Information Handbook does not contain "promises of specific treatment in specific situations". *See Thompson,* 102 Wash.2d at 230, 685 P.2d 1081, quoted in *Swanson v. Liquid Air Corp.,* 118 Wash.2d 512, 520, 826 P.2d 664 (1992). The only relevant provision is:

> *Reduction in Force.* Very few Grant County employees have ever been laid off because of lack of funds, curtailment of a particular work activity or a departmental reorganization. To date, the county has minimized laying off employees by freezing vacancies and/or not filling vacancies because of retirements and resignations.
>
> If layoff was to occur, the county would, if at all possible, give the employee a thirty day notice.

Grant County Employee Policy–Procedures Information Handbook, Exhibit E to Affidavit of Robert A. Dunn, at 22. This is not a

---

**23.** The Keenans seem to contend that Keenan's mere promise to attend other future seminars was consideration. It is a legal axiom that a promise to pay is not itself payment; Keenan did not incur a present detriment by promising future seminar attendance.

**24.** Because of the absence of material fact disputes, to the extent reasonable minds would not differ the Court can decide the factual issue of whether specific promises were made. *Burnside,* 123 Wash.2d at 104–05, 864 P.2d 937; *Swanson,* 118 Wash.2d at 522, 826 P.2d 664.

promise, either against layoff or of 30–day notice.[25]

The fourth and last exception is discharge in violation of public policy. The Keenans proffer three such reasons for discharge: Keenan's complaint to the Commission, Keenan's alleged confrontation with Allan about his alleged affair, or Keenan's sex. However, Keenan pleads only the first.[26] There is no right to complain to the Commission, and so no public policy against retaliation for such complaints. This is discussed further in section J.

In summary, Keenan's employment as Administrator was at-will, and she could be discharged for any reason (or no reason), *provided* that she was not discharged in violation of public policy. The Court examines this contention in section J below. As discussed in that section, Keenan has failed to make the required proffer. Keenan was not wrongfully discharged, so this claim must be dismissed.

*Estoppel.* The Court notes that the issue of whether the County was an employer of Keenan is moot. However, because the County is also litigating this issue in state court, this Court clarifies the effect of the County's apparently inconsistent positions on this issue. Specifically, does judicial estoppel preclude the County from asserting in this Court that it is not an employer, when it has contended the opposite in state court? [27]

"[T]he doctrine of judicial estoppel bars a party from taking inconsistent positions in the same litigation." *Morris v. California,* 966 F.2d 448, 452 (9th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992) (citing other authority). There are two versions of the doctrine:

**25.** In any event, note that the March 3, 1992 letter terminating the Administrator position made the termination effective more than 30 days later.

**26.** The Court does not condone or permit the Keenans' eleventh-hour to amend their complaint through briefing (both here, and on other counts). *See ACRI v. International Ass'n of Machinists,* 781 F.2d 1393, 1398 (9th Cir.1986), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986) ("Late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action"); *Roberts v. Arizona Board of Regents,* 661 F.2d 796 (9th Cir.1981). The Court references such attempted amendments in footnotes, as a courtesy to any reviewing court.

In any event, the confrontation is not protected by public policy; there is no clearly mandated right to confront another—even one's supervisor—about an affair, even when the confronter believes herself to act in the best interest of the workplace. *See Thompson,* 102 Wash.2d at 232, 685 P.2d 1081 (public policy must be legislatively or judicially recognized); *Roberts,* 88 Wash.2d at 897, 568 P.2d 764 (public policy exception cannot apply in absence of stated public policy in statute or caselaw).

There *are* clear public mandates against termination on the basis of sex. *See* 42 U.S.C. § 2000e–3, 29 U.S.C. § 623, RCW 49.60 and RCW 49.44.090. However, Keenan neither pleads this claim, nor produces any evidence to rebut defendants' showing of legitimate reasons for the elimination of the Administrator position.

**27.** Equitable estoppel clearly does not apply. "Estoppel prevents a party from showing the truth contrary to a representation of facts after another has relied upon the representation." *United States v. Hall,* 974 F.2d 1201, 1205 (9th Cir.1992) (citing other authority). More specifically,

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Watkins v. U.S. Army,* 875 F.2d 699, 709 (9th Cir.1989), *cert. denied,* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990) (citing other authority). A court "can refuse to apply the doctrine when policy considerations so demand." *Hall,* 974 F.2d at 1205.

Here, Keenan cannot demonstrate that the County "knew the facts," *i.e.* that it was her employer. That is a legal conclusion, not a fact. Second, Keenan cannot demonstrate that the County acted with intent or so as to justify her reliance. Not only Keenan's acceptance of employment, but her termination and even the filing of this suit was concluded before the County ever made its state court representations. Third, Keenan cannot demonstrate that she was ignorant of the true facts. She was as knowledgeable about the facts regarding her relationship with the County as was the County, and her counsel presumably is as knowledgeable about employment law as is the County's counsel. Fourth, Keenan cannot demonstrate that she relied upon the County's assertions to her detriment. The County's assertions followed all relevant facts in Keenan's suit.

The majority of circuits recognizing the doctrine hold that it is inapplicable unless the inconsistent statement was actually adopted by the court in earlier litigation.... The minority view, in contrast, holds that the doctrine applies even if the litigant was unsuccessful in asserting the inconsistent position, if by his change of position he is playing "fast and loose" with the court.

*Id.,* 966 F.2d at 452–53 (internal citations omitted). While the Ninth Circuit has adopted the principle of judicial estoppel, it has not yet specifically adopted either of the majority or minority positions. *Id.,* 966 F.2d at 453; *Yanez v. United States,* 989 F.2d 323, 326 (9th Cir.1993).

The conduct at issue in *Morris* and *Yanez* was the plaintiffs' adoption of case positions that were apparently inconsistent with their earlier positions. Morris stated at her criminal trial that she did not use methamphetamine prior to her arrest; she then filed a habeas corpus petition contending that her trial counsel was ineffective in failing to recognize the legality of her use of methamphetamine prior to her arrest. The district court found that Morris was judicially estopped from taking her second position. The Ninth Circuit reversed, holding that "the doctrine of judicial estoppel may not be invoked where its use would serve to keep a conviction in effect regardless of the innocence or guilt of the defendant." *Morris,* 966 F.2d at 453.

In *Yanez,* Yanez filed a state court personal injury suit against a private defendant, alleging that she had suffered injuries when an explosion occurred at a munitions factory where she was employed. In her state court complaint, she contended that defective lead azide (the initiating explosive) supplied by the private defendant proximately caused her injuries. While that suit was pending, Yanez filed a federal court suit against the United States. In that complaint, she contended that the United States was negligent in inspecting and enforcing contractual safety regulations, proximately causing her injuries. The district court found that Yanez was judicially estopped from taking her second position. The Ninth Circuit reversed, finding

that the two positions were not necessarily inconsistent, that the second position did not mislead anyone to their detriment, and that for jurisdictional reasons Yanez had no choice but to split her claims.

Here, the County has not taken inconsistent positions in its factual allegations; employer status is a legal conclusion rather than fact. Further, the County never adopted contrary legal claims, but rather makes contrary legal arguments; that is not unknown in this Court. The arguments even relate to different time periods: it is consistent that (as the County contends, but is not decided here) the County did not employ Keenan while she was supervised by the judges as Administrator and Clerk II, but that (as the County incorrectly contended in state court) the County did employ Keenan while she was supervised by Osborn as Temporary Clerk. Finally and most importantly, this suit is not the same litigation as in state Court. The two suits have different plaintiffs, different judges, different claims and different defense counsel. As in *Yanez,* the County is not estopped from presenting its legal theories to two different courts.

*Conclusion.* Keenan was not unlawfully discharged. She had no employment contract, and her at-will status was not modified by any implied agreement, additional consideration, handbook provision, or violation of public policy. Furthermore, the County's arguments are not estopped. Count I must be dismissed, against defendants Allan, Whitener–Moberg and the County. (It was not pled against Fancher, Snead or Allison.)

G. COUNT II: FIRST AND FOURTEENTH AMENDMENT (DUE PROCESS, FREE SPEECH AND SEXUALLY HOSTILE WORK ENVIRONMENT)

The Keenans claim that the elimination of the Administrator position violated Keenan's due process and free speech rights (Fourteenth Amendment; First Amendment) because it was done in retaliation for Keenan's Commission complaint. The Keenans further contend that defendants violated Keenan's equal protection rights (Fourteenth Amendment) by permitting a sexually hostile

work environment. The Keenans contend that defendants are liable under 42 U.S.C. § 1983 for these constitutional violations. The Court examines the three claims sequentially.

 *Standard: due process.* An employee has a property interest in her employment position only when one is created under state law. *Bishop v. Wood,* 426 U.S. 341, 344 n. 7, 96 S.Ct. 2074, 2077 n. 7, 48 L.Ed.2d 684 (1976) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1976)), *overruled on other grounds, Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 539, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). In Washington,

> [A] due process property interest may arise if "there are such rules or mutually explicit understandings that support [an individual's] claim of entitlement to the benefit and that he may invoke at a hearing." While public employment alone does not create constitutionally protected property interests, protected property interests can arise from express or implied contracts for continued employment, objective representations of tenure, or even collective bargaining agreements providing for continued employment.

*Danielson v. Seattle,* 108 Wash.2d 788, 796, 742 P.2d 717 (1987) (internal citations omitted; brackets original to *Danielson* ). To have a constitutionally protected property interest in continued employment, an employee "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

 *Analysis: due process.* Here, the only proffers of "understandings" are those purported employment contracts that the Court rejected in the previous section F. Therefore, Keenan had no due process rights, and the Keenans' claim for violation of due process must be dismissed.[28]

 *Standard: free speech.* To establish a 42 U.S.C. § 1883 claim of wrongful retaliation under the First Amendment, a public employee must prove:

> (1) the statement that brought on the retaliation is one of "public concern," (2) the constitutionally protected expression is a "substantial" or "motivational" factor in the employer's adverse decision or conduct; and (3) the interests of the plaintiff/employee in commenting on the matter of public concern outweigh the state's interest in maintaining efficient public services.

*Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1038 (9th Cir.1990), *cert. denied,* 502 U.S. 957, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991).[29] Courts determine whether the statements address a matter of public concern by evaluating the content, form, and context of the employee's speech. *Connick v. Myers,* 461 U.S. 138, 146, 147, 103 S.Ct. 1684, 1689–90, 1690, 75 L.Ed.2d 708 (1983).

 *Analysis: free speech.* Keenan cannot prove that defendants violated her free speech rights with respect to the speech

**28.** The Court does not reach the moot issue of whether Keenan's due process rights were violated. *See Blaylock v. Schwinden,* 862 F.2d 1352, 1354 (9th Cir.1988) ("To establish a violation of substantive due process, the plaintiff[ ] must prove that the government's action was 'clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals, or general welfare' "), quoting *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926).

**29.** The County addresses other case authority, which requires the first two *Sanchez* elements to create a rebuttable presumption of retaliatory discharge. *See Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Erickson v. Pierce County,* 960 F.2d 801, 804 (9th Cir.1992), *amended,* 1992 U.S.App. LEXIS 9029, 92 C.D.O.S. 3881, 92 Daily Journal D.A.R. 6136, *and cert. denied,* —— U.S. ——, 113 S.Ct. 815, 121 L.Ed.2d 687 (1992). While both analyses are valid law, the *Sanchez* analysis is more useful in this case, where causation rather than availability of reasons for discharge is the crux of the claim. *See O'Connor v. Chicago Transit Authority,* 985 F.2d 1362, 1368 (7th Cir.1993) ("[T]he mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision.") (Note that defendants have rebutted any presumption with legitimate non-discriminatory reasons for the elimination of position: budgetary concerns and that Keenan's duties could be performed by the judges and DISCIS.)

act of a complaint to the Commission.[30] Keenan admits that her position was eliminated on March 3, 1992, but Allan did not learn of the Commission complaint until after April 1992. Fancher did not learn of it until December, 1992. Snead and Allison were not even Commissioners in March of 1992. Keenan cannot prove the second element of causation as to any of them. The only defendant who Keenan alleges knew of the Commission complaint prior to March 3, 1992, is Whitener–Moberg. However, Keenan alleges that Allan, not Whitener–Moberg, decided to eliminate the position:

> Ms. Keenan told Ms. Osborn that she believed it was defendant Allan who made the decision to eliminate the position of District Court Administrator. Ms. Keenan told Ms. Osborn that she felt that defendant Whitener–Moberg had a role in the decision as well.
>
> . . . .
>
> In defendant Allan's mind, the decision to eliminate the District Court Administrator position was made sometime around January 15, 1992. Defendant Allan suggested to defendant Whitener–Moberg that she think about his notion to eliminate the District Court Administrator position. Defendant Whitener–Moberg took a week or ten days to get back to Defendant Allan.
>
> . . . .
>
> Defendant Whitener–Moberg and attorney Tony Menke told Ms. Keenan that it was defendant Allan who eliminated the position of District Court Administrator as opposed to the District Court Judges jointly taking an action. Defendant Whitener–

Moberg told Ms. Keenan that right after she received the letter advising that the District Court Administrator position had been eliminated.

K479; K742; K1117. Assuming Keenan's allegations to be true, a reasonable jury could not find that Whitener–Moberg was the initiator of the decision to eliminate the position. Therefore, the Commission complaint—which only Whitener–Moberg knew about—could not have been the "substantial" or "motivational" factor in the elimination.[31] Keenan therefore fails in an least the second element of her claim against Whitener–Moberg.

Keenan cannot prove that the elimination of the Court Administrator position was retaliation for protected speech; the Keenans' claim for violation of free speech rights must be dismissed.

■■■■ *Standard: sexually hostile work environment.* Harassment claims based on § 1983 share with Title VII (and RCW 49.60) the requirement that plaintiff prove a sexually hostile work environment. *Trautvetter v. Quick,* 916 F.2d 1140, 1149 (7th Cir.1990). However, a Fourteenth Amendment claimant has an additional and higher burden. "[A] plaintiff wishing to sustain an equal protection claim of sexual harassment must show both 'sexual harassment' and an 'intent' to harass based upon that plaintiff's membership in a particular class of citizens—i.e., male or female." *Id.*

*Analysis: sexually hostile work environment.* Here, as discussed in section K below,

---

30. In the instant briefing, Keenan appears to address two incidents of speech: first, her alleged confrontation with Allan about his alleged affair, and second, her complaint to the Commission. However, "retaliation for confrontation of affair" was *not* pleaded in the complaint. *See* Ct.Rec. 1, at ¶ XXXVIII. Keenan therefore cannot raise this theory.

Even if Keenan could raise this theory, it would fail on at least the first and third elements. The alleged confrontation is not a statement of public concern. The public is not affected by, and has no right to know of, a judge's private sexual relationships. It is of no consequence that the alleged affair was with one of Keenan's co-workers, a subordinate to Allan. Even assuming that Keenan's work environment were a pub-

lic concern, "[a] co-worker's romantic involvement with a supervisor does not by itself create a hostile work environment." *Candelore v. Clark County Sanitation Dist.,* 975 F.2d 588, 591 (9th Cir.1992).

31. Note that in some "mixed motive" cases, the motivation issue should be reserved to the trier of fact. *See, e.g., Peacock v. Duval,* 694 F.2d 644, 646 (9th Cir.1982), and cases cited in *Thomas v. Douglas,* 877 F.2d 1428, 1433 n. 6 (9th Cir.1989). However, "[s]ummary judgment usually is inappropriate only when 'questions of motive *predominate* in the inquiry about how big a role the protected behavior played in' the employment decision." *Thomas,* 877 F.2d at 1433, quoting *Mabey v. Reagan,* 537 F.2d 1036, 1045 (9th Cir. 1976) (emphasis in *Thomas* ).

Keenan cannot prove a sexually hostile work environment. She also cannot prove an intent to harass based on her sex; she never even alleges such an intent. Therefore, the Keenans' claim for violation of equal protection must be dismissed.

*Vicarious liability.* Because the parties raise it, the Court also addresses the issue of whether the County can be held liable under § 1983. The Court finds that it cannot, providing another ground for dismissal of Count II as against the County.

 Local government bodies such as counties can be sued directly under § 1983 for monetary, declaratory or injunctive relief where the allegedly unconstitutional act (here, elimination of the Administrator position as violative of due process, elimination of the position as retaliation for Keenan's Commission complaint, or maintenance of a sexually hostile work environment) executes an official policy of the county. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). The county itself must cause the constitutional deprivation; a county cannot be held liable under § 1983 on a *respondeat superior* theory. *Id.*, at 691, 98 S.Ct. at 2036.

The Ninth Circuit has set forth three types of county policies which may create § 1983 liability:

First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." Second, a plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official governmental policy.... Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993) (internal citations omitted). Keenan cannot prove any of these three.

 First, Keenan does not proffer any County policy of lack of due process, retaliatory discharge, or sexually hostile work environment; Keenan even admits that the County has a policy *against* discrimination.

Second, no individual with "final policy-making authority" for the County committed the challenged acts. Allan and Whitener–Moberg are officers of the state, not the County. Wash. Const., Art. IV, § 1 ("The judicial power of the state shall be vested in ... justices of the peace"); RCW 3.30.030 ("The judges of each district court district shall be the justices of the peace"). The Commissioners, even assuming such authority[32], did not eliminate the Administrator position; they neither sent the March 3, 1992 letter nor directed the elimination. They could not therefore have violated due process. They also could not have had any retaliatory motive: Snead and Allison were not even serving at the time, while Fancher was serving but did not yet know of the Commission complaint. Finally, the Commissioners did not maintain the environment of the district court. They were not even in the same location, or have any direct, everyday supervision of the office.

Third, Keenan cannot prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. Note that Keenan argues only that the Commissioners should have stopped the alleged improper conduct; § 1983 requires more: an affirmative ratification. *Gillette*, 979 F.2d at 1348, citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (requiring that an official policymaker make a deliberate choice from among various alternatives to follow a particular course of action). Even assuming the Commissioners had authority to ratify the judges' actions[33], the Commissioners did not ratify the alleged

---

**32.** The Court does not determine this issue.

**33.** The Court does not determine this issue.

improper basis for those actions. Regarding the elimination of the Administrator position, there is evidence that Fancher knew of only legitimate reasons for elimination of the position. *See* D74. (Snead and Allison were not even serving at the time.) Regarding the work environment, there is no evidence that the Commissioners ratified the alleged improper acts: Allan's calling Keenan a "bimbo" and his statement in her presence that he only hired good-looking women in his court. (There is also no evidence that the Commissioners ratified Allan's alleged screaming, throwing of files, criticisms, or affair, or other employees' unneighborliness, none of which comprise a sexually hostile work environment anyway.)

*Conclusion.* All of Count II, against all defendants, must be dismissed. Keenan's due process rights were not violated, because she had no such rights. Her free speech rights were not violated. Her equal protection right to be free from a sexually hostile work environment also was not violated. Furthermore, as against the County, no § 1983 liability can attach. Therefore, Count II must be dismissed, against all defendants.

## H. COUNT III: CONSPIRACY TO VIOLATE CIVIL RIGHTS

The Keenans contend that defendants conspired among themselves and others to deprive Keenan of her equal protection and/or privileges and immunities rights, by terminating her employment (twice).[34] The Keenans contend that this violates 42 U.S.C. § 1985(3).

■■■ *Standard.* A civil rights conspiracy claim includes four elements:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any

right or privilege of a citizen of the United States.

*Carpenters v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983). The second element is two-pronged; a plaintiff must identify a legally protected right and "demonstrate a deprivation of that right motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action'." *Sever v. Alaska Pulp Corp.,* 978 F.2d 1529, 1536 (9th Cir.1992), quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

■■■ *Analysis.* Regarding the first prong of the second element, Keenan contends that her protected class is that of women. Whitener–Moberg's reply brief generously interprets the Keenans' response brief at pp. 4–5 as also contending the class of "persons who complain about sexual harassment". However, "persons who complain about sexual harassment" is not a qualifying class. *See Sever,* 978 F.2d at 1538 (holding that "individuals who wish to petition the government" is not a judicially designated suspect or quasi-suspect group). *See also, Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, ——, 113 S.Ct. 753, 759, 122 L.Ed.2d 34 (1993) (holding that "women seeking abortion" is not a qualifying class):

Whatever may be the precise meaning of a "class" for purposes of *Griffin*'s speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) merely by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid. *Ibid.* As Justice Blackmun has cogently put it, the class

---

**34.** The complaint does not specify "termination" as either the elimination of the Administrator position, or Keenan's termination as Clerk. *See* Ct.Rec. 1, at ¶XLIII. The Court therefore addresses both.

"cannot be defined simply as the group of victims of the tortious action."

*id.,* quoting *Carpenters,* 463 U.S. at 850, 103 S.Ct. at 3367. Although Congress protects against sexual harassment, there is no indication from it or the courts that Congress protects these same people also against retaliation for reporting such harassment.[35] This Court declines to create such a class.

■■■ Regarding the second prong of the second element, Keenan has failed to produce any evidence of the required animus: that either the elimination of the Administrator position or her later termination as Clerk was made for "a purpose that focuses upon women *by reason of their sex*". *Bray,* ―― U.S. at ――, 113 S.Ct. at 759. (Allan's alleged references to "bimbo" or "good-looking women" cannot constitute proof of animus; at most they suggest animus towards Keenan in particular, unintelligent people, or homely women, not the required animus towards all women *qua* women.)

Keenan also fails on the third element. She demonstrates that she is a woman, and that she was twice terminated; she suggests that defendants conspired to "get her" personally. She does not proffer any evidence that defendants intended by the terminations to "get women".

*Conclusion.* The Keenans cannot prove that defendants conspired among themselves and others to deprive Keenan of her rights as a woman. Count III must be dismissed, against all defendants.

## I. COUNT IV: WHISTLEBLOWER TERMINATION

The Keenans contend that defendants issued letters of reprimand and unsatisfactory performance evaluations to Keenan, demoted her, reduced her pay, suspended her, and ultimately terminated her, in retaliation for her complaint to the Commission. They contend that this violates the state whistleblower statute, RCW 42.41.010.

*Standard.* Washington's Local Government Whistleblower Protection Act was enacted in 1992. Its relevant provisions became effective January 1, 1993. RCW 42.41.901.

The Act contains a conditional exemption:

Any local government that has adopted or adopts a program for reporting alleged improper governmental actions and adjudicating retaliation resulting from such reporting shall be exempt from this chapter if the program meets the intent of this chapter.

RCW 42.41.050. The intent of the Act is two-fold:

The purpose of this chapter is to protect local governmental employees who make good-faith reports to appropriate governmental bodies and to provide remedies for such individuals who are subjected to retaliation for having made such reports.

RCW 42.41.010.

*Analysis.* Some of the conduct challenged here took place before the effective date of the statute. The only acts that can create liability are those after 1992: Keenan's suspension on July 6, 1993; the July 15, 1993 letter continuing her suspension and ordering a pre-discharge meeting; and her (second) termination on August 20, 1993.

■■■ However, even the post–1992 acts cannot create liability, because the County is exempt from the Act. Grant County Resolution No. 93–5CC clearly meets the intent of the Act. Besides specifically referencing the Act and paralleling much of its language, the resolution protects whistleblowing employees (§ C) and provides remedies for retaliation (§ D, adopting remedies from the Act).[36] It is irrelevant whether non-party County employees complied with the resolution, as Keenan contends; the exemption provision requires merely a *program* rather than a *program whose procedures were in fact fol-*

---

**35.** Note that some states have chosen such protection; this is analyzed in the next section I. Obviously, *Washington's* creation of such a class does not broaden *Congress'* protections.

**36.** The resolution does not merely cite to the Act; it explicitly provides for the remedies in the Act. This is permissible legislative shorthand.

*lowed.*[37] Keenan's remedy for alleged violations of the resolution lies elsewhere, not under RCW 42.41.010.[38]

■ The Court notes Whitener–Moberg's contention that this claim must be dismissed on another ground: failure to exhaust the union grievance procedure, regarding Keenan's discipline and discharge. However,

> The rule requiring the "exhaustion of remedies" prior to suit is narrowly applied: "Before an action *to obtain the benefits of a collective bargaining contract* can be maintained, the plaintiff must exhaust his contractual remedies through the grievance procedure provided for in the contract."

*Morales v. Westinghouse Hanford Co.,* 73 Wash.App. 367, 371, 869 P.2d 120, *review denied,* 124 Wash.2d 1019, 881 P.2d 254 (1994) (internal citations omitted; italics original to *Morales* ). *Morales'* holding was limited to RCW 49.60 discrimination claims, but the same reasoning should apply to the statutorily-based whistleblower claims. While statutory claims may seek employment or wages *discussed* in the collective bargaining

contract, the claims are not premised on *rights* (benefits) provided in the contract. Rather, statutory claims seek vindication of rights provided by legislatures: freedom from discrimination (provided by Congress and the state), and the right to blow a whistle on one's employer without retaliation (provided by the state). Keenan's failure to exhaust her administrative remedies does not bar her whistleblower claim.

*Conclusion.* Some of the challenged conduct predates the whistleblower act, and the remainder is exempt from it. (The Court notes that failure to exhaust administrative remedies is not a bar to the Keenans' claim.) Count IV must be dismissed, against all defendants.

## J. COUNT V: RETALIATORY DISCHARGE

■ The Keenans contend that Keenan's termination(s) were made in retaliation for her complaint to the Commission, violating state public policy and therefore state common law (*i.e.,* breach of employment contract).[39]

---

**37.** Conceivably, a county program that is obviously a pretense and is never followed would not except the county from the Act, but that is neither evidenced nor alleged here.

**38.** Neither does Keenan's remedy lie in this action. Although Keenan appears to charge violations of both the resolution and the previous county anti-discrimination policy in her briefing, it is nowhere in her complaint. *Compare* Plaintiffs' Response Memorandum of Authorities in Opposition to Defendant Allan's Motion for Summary Judgment, at 36, *with* the Keenan's complaint, Ct.Rec. 1. The Court therefore does not address the County Defendants' contention that Keenan failed to exhaust administrative remedies provided in the resolution.

**39.** The complaint does not specify "termination" as either the elimination of the Administrator position, or Keenan's termination as Clerk. *See* Ct.Rec. 1, at ¶ LI. The Court therefore addresses both.

Note that Keenan seems to contend in the instant briefing that she was also retaliated against in violation of 42 U.S.C. § 2000e–3(a) because her Commission complaint sought to protect her Title VII rights. This claim was not pleaded. Further, it is not supported in the evidence. In her Commission complaint, Keenan attributes Allan's behavioral changes to the death of his parents and the DISCIS conversion,

not her sex. *See* Exhibit 37 to Ct.Rec. 181, at 059, 061. Her complaint alleges only conduct that may violate the Canons of Judicial Conduct; she does not even suggest Title VII. Keenan therefore does not even make out a prima facie case, let alone rebut defendants' proffer of legitimate non-discriminatory reasons for the position elimination.

Keenan also seems to contend in the instant briefing that she was retaliated against for confronting Allan about the alleged affair. Again, this was not pleaded. Further, Keenan fails to make out even a prima facie case for such retaliation, because such confrontation is not a protected legal right. (No one, not even Keenan, describes the confrontation as her complaint that she was being sexually harassed or subjected to a sexually hostile work environment; Keenan states only that she informed Allan because the affair was "inappropriate and unacceptable" behavior.) Note also that Keenan does not mention this confrontation in her complaint to the Commission.

Keenan also seems to contend that the retaliation consisted of not only discharge, but retaliatory sexual harassment, after confronting Allan about the alleged affair. Again, this neither was pleaded nor is a protected legal right. Further, Washington limits common-law retaliation claims to claims of discharge. *See Wilmot v. Kaiser Aluminum and Chem. Corp.,* 118 Wash.2d

*Standard.* In Washington, the claim of "discharge in violation of public policy" exists only as a narrow exception to the at-will doctrine; there is no such claim in cause-only employment.

To state a cause of action, prima facie, the employee must show the three elements of retaliatory discharge: (1) that the plaintiff exercised a statutory right or communicated to the employer an intent to do so, (2) that she was thereafter discharged, and (3) that a causal link exists between the exercise of the legal right and the discharge. *Wilmot v. Kaiser Aluminum and Chem. Corp.,* 118 Wash.2d 46, 68–69, 821 P.2d 18 (1991). *See also, Wallis v. J.R. Simplot,* 26 F.3d 885, 891 (9th Cir.1994), citing *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987), *cert. denied,* 498 U.S. 939, 111 S.Ct. 345, 112 L.Ed.2d 309 (1990) (interpreting federal law; used by analogy).

For the first element, the plaintiff "must plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened." *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 232, 685 P.2d 1081 (1984). In wrongful discharge cases premised on whistleblowing activities, courts "will consider whether the employer's conduct constituted either a violation of the letter or policy of the law," so long as in reporting the alleged wrongdoing "the employee sought to further the public good, and not merely private or proprietary interests." *Dicomes v. State,* 113 Wash.2d 612, 617, 782 P.2d 1002 (1989).

For the third element, the plaintiff must proffer (at least) competent evidence that her employer knew of the protected activity. *See Wilmot,* 118 Wash.2d at 69, 821 P.2d 18. *See also, Lewis v. Gillette Co.,* 22 F.3d 22, 24 (1st Cir.1994); *Miller v. Alumi-*

*num Co. of America,* 679 F.Supp. 495, 504 (W.D.Pa.), *aff'd without op.,* 856 F.2d 184 (3d Cir.1988).

There is a shifting burden of proof similar to federal retaliation claims. *Compare Wilmot,* 118 Wash.2d at 70–73, 821 P.2d 18, *with Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464–65 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995). Once the plaintiff has made out a prima facie case, the burden of production shifts to the employer to advance legitimate, non-retaliatory reasons for any adverse actions taken against the employee. The burden then shifts to the plaintiff to prove either that the employer's proffered reasons are pretextual, or that the whistleblowing activity "was nevertheless a substantial or important factor motivating the discharge." *Wilmot,* 118 Wash.2d at 73, 821 P.2d 18.

*Analysis.* As an initial matter, the Court defines the conduct at issue. The Keenans discuss two terminations: the elimination of the Administrator position (when Keenan was an at-will employee) and later Keenan's termination as Clerk (when Keenan was covered by a collective bargaining agreement providing that termination could be done only for cause). However, only the first is subject to *Thompson*'s public policy exception. The second termination occurred while Keenan was *not* an at-will employee.[40]

Regarding the first termination, the Keenans cannot make a prima facie showing. It is not obvious that there is a stated public policy prohibiting retaliation against Commission complainants. The constitution and statutes refer only to the confidentiality of proceedings and immunity from suit, and not any other public interest. *See* Wash. Const., Art. IV, § 31 (creating the Commission

---

46, 68–69, 821 P.2d 18 (1991). Whether there was a sexually hostile work environment is addressed in section K, regarding Keenan's *pleaded* Count VI.

Keenans also seems to contend that the retaliation consisted of the reduction in duties and later discipline. Again, this is neither pleaded, nor encompassed within Washington's common law of wrongful discharge. Further, Keenan cannot prove her case. The reduction in duties occurred on September 20, 1991, *before* the com-

plaint or any defendant's knowledge of it. Similarly, Keenan's own exhibit, at K53, evidences that strong notes of reprimand preceded both the alleged confrontation and the complaint.

**40.** Even if the second termination could be at issue, Keenan has not rebutted defendants' showing of legitimate, non-retaliatory reasons for the second termination (*e.g.,* poor performance and assault). Keenan proffers only her speculation that these reasons were pretextual.

whose "investigation and initial proceedings shall be confidential"); RCW ch. 2.64.[41] There are only ten cases that mention the Commission; only two discuss any public policies attached to the Commission.[42] One case discusses the confidentiality of the Commission's proceedings, including complainants, but does not discuss retaliation against the complainant. *Garner v. Cherberg*, 111 Wash.2d 811, 765 P.2d 1284 (1988). The second case states:

> [the Commission's] dual function is not only to protect the public from judges who violate the Code of Judicial Conduct, but also to protect judges from harassment and meritless complaints.

*In re Deming*, 108 Wash.2d 82, 736 P.2d 639, *corrected*, 744 P.2d 340 (1987). (*Deming* thus suggests that individuals have no right to file complaints, especially frivolous ones or ones that disturb the court workplace.[43])

There is a stated public policy on the related issue, that governmental employees who blow the whistle in good faith should not be subject to retaliation. RCW 42.41.010. In Keenan's case, because she is a governmental employee, she is covered by this policy. (Other people are not; a complainant who is not a governmental employee does not have a protected right to complain to the Commission, and presumably may be discharged if she makes a complaint.) But this merely collapses into the analysis of the previous section.

■■■■■ Even if there were a stated public policy prohibiting retaliation against Commission complainants, the Keenans cannot prove a claim for retaliatory discharge. Despite Keenan's *prima facie* proffer that the elimination of the Administrator position followed her complaint to the Commission, she cannot rebut defendants' legitimate, non-retaliatory reasons for the elimination (*i.e.*, that her job duties were performed by DISCIS and the judges, and dissatisfaction with Keenan's performance).[44] Keenan cannot

**41.** The mere provision for a Commission, mechanism to report judicial misconduct and confidentiality provision does not create a "stated public policy" against retaliation for reporting. Washington also provides for mutual savings banks, RCW title 32, penalizes false reports of the banks, RCW 32.04.100, and provides for confidentiality of state examination of their reports, RCW 32.04.220, but no one would seriously argue that there is a stated public policy against retaliation for reporting falsifications. It appears that the legislature has chosen only the preemptive protection of confidentiality, rather than the remedy of prohibiting retaliatory discharge, to protect complainants in both instances.

**42.** The other cases are *State v. Garrett*, 124 Wash.2d 504, 523 n. 84, 881 P.2d 185 (1994) (short reference to Commission proceedings regarding the trial judge); *In re Ritchie*, 123 Wash.2d 725, 870 P.2d 967 (1994) (disciplinary proceeding); *In re Stoker*, 118 Wash.2d 782, 827 P.2d 986 (1992) (disciplinary proceeding); *In re Niemi*, 117 Wash.2d 817, 820 P.2d 41 (1991) (disciplinary proceeding); *In re Blauvelt*, 115 Wash.2d 735, 801 P.2d 235 (1990) (disciplinary proceeding); *In re Kaiser*, 111 Wash.2d 275, 759 P.2d 392 (1988) (disciplinary proceeding); *Buckley v. Snapper Power Equipment Co.*, 61 Wash. App. 932, 938 n. 3, 813 P.2d 125, *review denied*, 118 Wash.2d 1002, 822 P.2d 287 (1991) (short reference to Commission proceedings regarding the trial judge); and *State v. Osloond*, 60 Wash. App. 584, 805 P.2d 263, *review denied*, 116 Wash.2d 1030, 813 P.2d 582 (1991) (holding that a judicial decision was not invalidated by the later determination of the Commission that the trial judge had violated the Code of Judicial Conduct). There are no federal cases.

**43.** The First Circuit notes that even in protected discrimination complaints,

> Congress certainly did not mean to grant sanctuary to employees to engage in political activity for women's liberation on company time, and an employee does not enjoy immunity from discharge for misconduct merely by claiming that at all times she was defending the rights of her sex by "opposing" discriminatory practices. An employer remains entitled to loyalty and cooperativeness from employees. . . .
> [T]he competing interests that weigh against granting employees carte blanche protection are the same in the NLRA and Title VII contexts: the employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare.

*Hochstadt v. Worcester Foundation*, 545 F.2d 222, 230 (1st Cir.1976) (citing a House Report on Title VII).

**44.** Keenan makes seven proffers of pretext; all fail. (Keenan contends pretext, not "substantial motivating factor." *See* Plaintiffs' Response Memorandum of Authorities in Opposition to Defendant Allan's Motion for Summary Judgment, at 29–31.)

First, Keenan contends that it was only after Whitener–Moberg and Menke knew of the complaint, that defendants began discussing the elim-

prove causation, because (as discussed in section G above) the only defendant who Keenan alleges knew of the Commission complaint prior to the elimination is Whitener–Moberg, and Keenan alleges that Allan, not Whitener–Moberg, decided to eliminate the position. Thus, the Keenans' retaliation claim must be dismissed.

■ Whitener–Moberg contends that this claim must be dismissed on another ground: that Keenan did not file her complaint to assist the public, but to provide Allan with psychological help and/or as part of a long-term plan to sue the judges. The second reason is not an agreed fact, and the first

could be interpreted as indirect assistance to the public (who would benefit from the improved psychological health of a public official). This is not ground for dismissal of the claim.

■ Allan contends that this claim must be dismissed because the Washington Employment Security Department administrative law judge ("ALJ") found that Keenan had committed an assault that justified her second termination. This argument fails for several reasons. First, the second termination is not at issue. Second, Washington does not permit use of the ALJ's findings in later litigation. RCW 50.32.097.[45] Finally,

ination of the position. This might be sufficient to make a prima facie case, but not to rebut defendants' showing of legitimate reasons for the elimination. Given defendants' showing, it is mere coincidence. Correlation of events does not prove causation.

Second, Keenan contends that immediately prior to the complaint, the position had been approved in the 1992 budget for District Court. Again, this makes out (at most) only a prima facie case. The budget was drafted before DISCIS and the half-time commissioner were effected.

Third, Keenan contends that after eliminating the Administrator position, the judges had misgivings about offering Keenan the Clerk position. This does not even address retaliatory animus for the first termination; it may well indicate continuing budgetary concerns or the judges' concerns regarding Keenan's poor performance. It (unlikely) might make a prima facie case regarding the second termination, but the second termination is not at issue (and any prima facie case has been rebutted).

Fourth, Keenan speculates that Allan might have known of the complaint from Menke, who was the district court attorney for personnel matters, whom Allan met with in December 1991, and who had a copy of Keenan's Commission complaint in December, 1991. Menke had stated that he doesn't know the origin of the complaint, whether it was sent to him by Allan or Keenan. (However, Keenan admits that she, not Allan, sent the complaint to Menke.) Again, inferences of a causal connection might be appropriate for a prima facie showing, but are insufficient to carry Keenan's rebuttal burden.

Fifth, Keenan contends that defendants' proffered reasons are at odds with the public assertions defendants had made prior to December, 1991, about how busy the district court was. (These "statements" in fact are only one: Allan's press release of February, 1991. The post-elimination statement of a fellow clerk to Keenan that "she felt the court needed an administrator" is irrelevant to *defendants'* alleged animus.) The

two events of press release and position elimination are ten months apart, probably not making even a prima facie showing of causation. The correlation certainly does not rebut defendants' legitimate reasons; it even supports their contention that DISCIS was necessary (and so effective as to, with Commissioner Brown, eliminate the need for an Administrator).

Sixth, Keenan contends that the judges could not capably assume her job duties, because Whitener–Moberg had no experience and Allan was irrational. (Note that Keenan had no prior experience as Administrator, and admits to fits of crying while employed.) While this questions the judges' judgment in eliminating the position, it does not show that their reasons were pretextual. That is, Keenan questions the decision, but not the asserted reasons for it. She certainly does not rebut the reasons.

45. [W]hen a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," [*United States v.*] *Utah Construction & Mining Co.*, [384 U.S. 394], at 422 [86 S.Ct. 1545, at 1560, 16 L.Ed.2d 642] [1966]; federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.
*University of Tennessee v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986). *See also, Astoria Federal Sav. & Loan Assn. v. Solimino*, 501 U.S. 104, 111, 111 S.Ct. 2166, 2171, 115 L.Ed.2d 96 (1991) ("federal [age discrimination] proceedings would be strictly *pro forma* if state administrative findings were given preclusive effect");
It is well settled that 28 U.S.C. § 1738 requires federal courts to give state court *reviewed* administrative adjudications the same full faith and credit that the adjudications would have in the state's own courts. Section 1738, however, does not require federal courts to apply preclusive effect to a state agency decision that

the issues presented here and to the ALJ are slightly different. The ALJ considered whether Keenan had engaged in "misconduct" prohibiting her from collecting unemployment compensation. This Court considers whether her discharge was retaliatory (*i.e.*, whether the proffered reasons for discharge of assault, poor performance, etc., were pretextual or nonetheless that retaliation was a substantial factor in the discharge). The Court does not conduct a *de novo* review of whether the misconduct merited discharge, as the ALJ may have done, but rather examines whether defendants' reasons for the discharge were legitimate.

*Conclusion.* The Keenans cannot prove retaliatory discharge. First, there is no stated public policy prohibiting retaliation against Commission complainants. Second, even if there were, the Keenans have not rebutted defendants' legitimate, non-retaliatory reasons for the elimination of the Administrator position. Count V must be dismissed, against all defendants.

## K. COUNT VI: SEXUAL HARASSMENT (HOSTILE WORK ENVIRONMENT)

The Keenans contend that Allan's sexually harassing conduct and "coarse, vulgar comments" directed toward Keenan created a sexually hostile work environment, in violation of RCW 49.60 (Washington's Law Against Discrimination) and 42 U.S.C. § 2000e (Title VII). The Keenans further contend that Whitener–Moberg caused or condoned the sexually hostile work environment, so that she is liable. The Keenans finally contend that the County knew or should have known of the environment, but failed to act, so it is liable. (The Keenans do not raise this claim against the individual Commissioners.)

**■** *Standard: time-bar (federal claim only).* Federal law imposes a predicate requirement to filing a Title VII claim:

> [B]efore Title VII actions may be prosecuted in federal court the plaintiff must have filed a charge with the EEOC within 180 days after the occurrence of the unlawful employment practice or, if the plaintiff had initially instituted proceedings with an appropriate state agency, within 300 days after the occurrence.

*Mueller v. Los Angeles Fire Dep't,* 637 F.2d 616, 617 (9th Cir.1980), citing 42 U.S.C. § 2000e–5(e). Not only must a plaintiff file with the EEOC, but also she must file with her state agency. *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 923 n. 2 (9th Cir.) ("when there is a qualified state agency, a complaint must first be filed there"), citing 42 U.S.C. § 2000e–5(c), *modified and reh'g denied,* 28 Fair Empl.Prac.Cas. (BNA) 1820, *and cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982).[46] However, the statute is satisfied when the EEOC refers the complaint to the state agency on behalf of the person aggrieved. *Love v. Pullman Co.,* 404 U.S. 522, 525, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972). Thus,

> the effect of [42 U.S.C. § 2000e–5(c) ] is to render untimely any charge originally filed with the EEOC more than 240 days after the act complained of, unless the state agency actually disposes of the referred charge before a total of 300 days has elapsed.

*Williams,* 665 F.2d at 923 n. 2, citing *Mohasco v. Silver,* 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 2491 n. 16, 65 L.Ed.2d 532 (1980).

There is an exception to the EEOC time-bar:

> "Under the continuing violation doctrine, 'a systematic policy of discrimination is ac-

has not been judicially reviewed. In instances where section 1738 does not require preclusive effect, federal courts, however, may still apply res judicata and collateral estoppel under federal common law rules.
*Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1283 (9th Cir.1986) (footnote and internal citations omitted; emphasis original to *Mack*). Note that the ALJ's findings are yet unreviewed; appeal # 14513–8–III is pending before the state court of appeals.

The Court does not address the moot issue of whether the ALJ's findings met *Utah Construction*'s requirements for preclusion; there are insufficient facts on this issue.

**46.** No one disputes that Washington is a deferral state, having adopted RCW 49.60, and that its qualified stated agency is the Washington Human Rights Commission. *See* RCW 49.60.120(4).

tionable even if some or all of the events evidencing its inception occurred prior to the limitations period.'" *Sosa v. Hiraoka,* 920 F.2d 1451, 1455 (9th Cir.1990) (citation omitted). The doctrine is applied because "'the continuing system of discrimination operates against the employee and violates his or her rights up to a point in time that falls within the applicable limitations period.'" *Id.* (citation omitted). When the doctrine is applicable, "no part of a continuing violation *which persists into the period within which suit is allowed* is time-barred." *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989) (continuing violation doctrine in 42 U.S.C. § 1981 claims).

*EEOC v. Local 350, Plumbers and Pipefitters,* 982 F.2d 1305, 1308 (emphasis in *Malhotra*), *amended in other part, reh'g, en banc, denied,* 1992 U.S.App. LEXIS 37,363 (9th Cir. Dec. 22, 1992), *and amended in other part, remanded,* 998 F.2d 641 (9th Cir. 1992).

■ When does the continuing violation doctrine apply? It may "be established not only by demonstrating a company wide policy or practice, but also by demonstrating a series of related acts against a single individual." *Green v. Los Angeles County Superintendent of Schools,* 883 F.2d 1472, 1480 (9th Cir.1989). In the latter instance, the question is whether sufficient evidence supports a determination that the "alleged discriminato-

ry acts are related close enough to constitute a continuing violation." *Id.* at 1481, quoting *Berry v. Board of Supervisors,* 715 F.2d 971, 981 (5th Cir.1983), *cert. denied,* 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986).[47]

■ *Analysis: time-bar.* Keenan filed a "a formal charge of sex, hostile work environment, and age discrimination against the County of Grant" with the EEOC on March 4, 1994. Keenan did not provide an exact date in her letter to the EEOC, instead attaching the complaint in this Court—which referred to incidents only through April, 1992. She never filed any sex-discrimination charge with the Washington Human Rights Commission, and that agency never conducted an investigation (let alone conclude an investigation).[48]

Counting back 240 days from March 4, 1994, Keenan normally could challenge only conduct on or after July 7, 1993. Her claim, which was expressly limited to conduct through April, 1992, is entirely time-barred.

Even if Keenan's letter to the EEOC is interpreted as having no date limitation, her claim is still limited to conduct on or after July 7, 1993.[49] Because Keenan was suspended between July 7 and July 20 (by decision of July 6), and was terminated on August 20, Keenan normally could challenge only conduct between July 21 and August 20, 1993. There is no evidence of sexually hos-

---

47. In *Berry,* the Fifth Circuit enunciated three factors to consider when deciding application of the continuing violations doctrine: "(1) identity of subject matter; (2) frequency of incidents alleged; and (3) quality of permanence." 715 F.2d at 981. The first factor can be satisfied if all the claims arose out of sexual harassment. *Waltman v. International Paper Co.,* 875 F.2d 468, 475 (5th Cir.1989). Regarding the second factor, the Circuit inquired whether a reasonable person would feel the environment was hostile throughout the period forming the basis of the complaint. *Id.* at 476. The Circuit noted incidents of harassment are not isolated simply because of large gaps of time between incidents; involvements of different harassers; no evidence of a conspiracy among harassers; or lack of a company policy permitting sexual harassment. *Id.* Finally, regarding the third factor the Circuit considered whether the act would or should trigger an employee's awareness of a violation and accompanying duty to assert her rights. *Id.*

48. Keenan did file an age discrimination charge, regarding her first termination, on March 18, 1993. That is not at issue.

49. Incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are "'like or reasonably related to the allegations contained in the EEOC charge.'" In determining whether an allegation under Title VII is like or reasonably related to allegations contained in a previous EEOC charge, the court inquires whether the original EEOC investigation would have encompassed the additional charges.
*Green,* 883 F.2d at 1475–76 (internal citations omitted). Here, although post-July 7, 1993 incidents of an alleged sexually hostile work environment are likely "like" the ones reported to EEOC, it is difficult to understand how an EEOC investigation could encompass incidents occurring a year ·after the EEOC charge was made.

tile conduct during this period, so her claim must be dismissed.

Keenan contends that the continuing violations doctrine applies, so as to bring in as evidence conduct before July 7, 1993. Keenan is incorrect. The doctrine applies only if *some* conduct persisted into the period within which suit is allowed (*i.e.,* on or after July 7). The only conduct Keenan contends occurred in that period is her second termination.[50] Termination is not part of a sexually hostile work environment; it is its own claim (of sexually discriminatory discharge, which Keenan does not plead.) Furthermore, the second termination would not support a claim of sexually discriminatory discharge.[51] Thus, because no conduct asserted to be part of the sexually hostile work environment occurred in the period within which suit is allowed, the continuing violations doctrine does not apply, and Keenan's Title VII claim is entirely time-barred.

■■■ Finally, Keenan contends that she should be excused from Title VII's time limits under the doctrine of equitable tolling. She contends that she relied on promises that she would be restored to her position as Administrator once Allan was removed from office. This excuse fails.

> We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or when the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

*Irwin v. Department of Veteran's Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 457–58, 112

L.Ed.2d 435 (1990), *reh'g denied,* 498 U.S. 1075, 111 S.Ct. 805, 112 L.Ed.2d 865 (1991). *See also, Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 1725–26, 80 L.Ed.2d 196, *reh'g denied,* 467 U.S. 1231, 104 S.Ct. 2691, 81 L.Ed.2d 885 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence"); *Scholar v. Pacific Bell,* 963 F.2d 264, 267 (9th Cir.), *cert. denied,* ── U.S. ──, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992) (applying the doctrine "sparingly" and only in "extreme cases" such as when a plaintiff timely filed defective pleadings, was tricked by an adversary into letting the time period elapse, or when the EEOC's notice was inadequate). Here, Whitener–Moberg's reassurances to Keenan, especially given Keenan's admitted recognition that Whitener–Moberg had no part in the Commission's decisionmaking, cannot constitute the "adversarial trickery" triggering equitable tolling.[52]

■■■ *Standard and analysis: prerequisite of "right to sue" letter.* A plaintiff's failure to obtain a right-to-sue letter from the EEOC to her bars her Title VII action in federal court. *See* 42 U.S.C. § 2000e–5(f)(1); *Karim–Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 626 (9th Cir.1988). Keenan proffers only a Notice of Charge of Discrimination from the EEOC to the County, and a Transmittal to Department of Justice of Request for Notice of Right to Sue from the EEOC to the Department of Justice. Exhibit 66 to Ct.Rec. 181; Exhibit K to Ct.Rec. 187. (Apparently, Keenan intended to circumvent the Congressionally-mandated EEOC intervention by filing simultaneously with the EEOC and this Court.) Keenan's Title VII claim must also be dismissed on this ground.

■■■ *Standard: merits (both claims).* The Keenans plead violations of both federal and state law, but the analysis is the same:

---

**50.** Keenan alleges that the other challenged conduct, *e.g.* Allan's alleged affair with Hinojosa and the derogatory comments, occurred in 1990–1991.

**51.** Keenan proffers no evidence to suggest that her sex was the reason for her second termination; she herself claims the reason was retaliation and that she was treated favorably (*e.g.,* with a thank-you dinner at Allan's home) before she complained to the Commission. Even if Keenan

could make out a prima facie case of sex discrimination, she has not rebutted defendants legitimate non-discriminatory reasons for her discharge (*e.g.* the assault, poor performance).

**52.** Whitener–Moberg also notes that Keenan could not have relied on her reassurances, given that Keenan sought legal advice the day she received notice of the elimination (and frequently thereafter), and retained her present counsel in October 1992 (within the statutory time period).

Our state antidiscrimination law closely parallels Title VII.... We therefore look to interpretations of federal law when construing RCW 49.60.

*Graves v. Department of Game*, 76 Wash. App. 705, 712, 887 P.2d 424 (1994) (citing other authority). *See also, Glasgow v. Georgia–Pacific*, 103 Wash.2d 401, 406 n. 2, 693 P.2d 708 (1985). *Compare* the elements of federal claim stated below *with Glasgow*, 103 Wash.2d at 406–07, 693 P.2d 708 (elements of a state claim: the harassment was unwelcome, because of sex, affected the terms or conditions of employment, and is imputed to the employer because it failed to take action).

 The elements of the claim are: (1) "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' " or " '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature' "[53]; (2) such conduct is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' " where "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct"[54]; (2b) a reasonable woman would find the environment "hostile or abusive"[55]; (2c) the conduct is "unwelcome", that is, the victim "subjectively perceive[s] the environment to be abusive"[56]; (2d) the conduct "pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position"[57]; and (3) the employer failed to take "sufficient and remedial action in response to [the employee's] complaints"[58].

 *Analysis: merits.*[59] For the first element, Keenan must show discriminatory or sexual conduct. Mere unpleasantness or hostility, by Allan or any of Keenan's coworkers, is not enough; Congress has not elected to protect against the personality conflicts endemic to any workplace.[60] Con-

---

**53.** The first quotation is *Harris v. Forklift Systems, Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). The second quotation is *Meritor Savings Bank, id.*, quoting 29 C.F.R. § 1604.11(a) (EEOC Guidelines defining sexual harassment).

Note that the supervisor need not himself perform this conduct. "[E]mployers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1515–16 (9th Cir.1989). *See also, Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), discussed in *Ellison*, 924 F.2d at 881.

**54.** The first quotation is *Harris*, —— U.S. at ——, 114 S.Ct. at 370, quoting *Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at 2402–05. The second quotation is *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.1991).

**55.** *Harris*, —— U.S. at ——, 114 S.Ct. at 370. The reasonable woman standard was adopted in the Ninth Circuit by *Ellison*, 924 F.2d at 878 ("conduct that many men consider unobjectionable may offend many women").

The Supreme Court emphasizes that there is no mathematically precise test for this element: [W]hether an environment is "hostile" or "abusive" can be determined only by looking at the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, —— U.S. at ——, 114 S.Ct. at 371.

**56.** The first quotation is *Jordan v. Clark*, 847 F.2d 1368, 1373 (9th Cir.1988), *cert. denied sub nom.*, *Jordan v. Hodel*, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989). The second quotation is *Harris*, —— U.S. at ——, 114 S.Ct. at 370.

**57.** *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995). The conduct need not cause a tangible psychological injury. *Harris*, —— U.S. at ——, 114 S.Ct. at 370. It may, however, be relevant to whether the employee actually found the environment abusive. *Id.*, —— U.S. at ——, 114 S.Ct. at 371.

**58.** *Steiner*, 25 F.3d at 1464, citing *Intlekofer v. Turnage*, 973 F.2d 773, 779–80 (9th Cir.1992); *Ellison*, 924 F.2d at 881–82.

**59.** This analysis would apply equally to the untimely Title VII claim, although the Court analyzes only the state law claim.

**60.** *See, Miller v. Aluminum Co. of America*, 679 F.Supp. 495, 502 (W.D.Pa.), *aff'd without op.*, 856 F.2d 184 (3d Cir.1988) ("Hostile behavior that does not bespeak an unlawful motive cannot support a hostile work environment claim") (citing other authority); *McCollum v. Bolger*, 794 F.2d 602, 611 (11th Cir.1986), *cert. denied, sub*

gress did not intend to protect non-discriminatory hostility, even when it is directed against a member of a protected class. *See Steiner*, 25 F.3d at 1463 ("It is one thing to call a woman 'worthless,' and another to call her a 'worthless broad' "). In evaluating the merits of Keenan's claim, the Court must "take account of the lawful prerogatives of the employer in the usual course of its business." *McKennon v. Nashville Banner Publishing Co.*, —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). While hostility is nowhere encouraged, neither Congress nor the courts have taken away from an employer's range of permissible conduct such activities as Allan exercised (*e.g.*, yelling, throwing files, criticizing performance, and calling Keenan "stupid"; and failing to suppress Keenan's co-workers' dislike of Keenan).[61] So long as such conduct is not discriminatory, employers are not held to utmost civility at all times. Similarly, so long as their inaction is not discriminatory, supervisors need not ensure that their employees use the utmost civility with each other. Courts cannot police the incidents of unneighborliness universal to workplaces, any more than they can such incidents in a marriage. The Constitution is far better served by permitting unneighborliness, in the pursuit of free expression, than it is by outlawing it and rendering every working citizen mute.

Thus, to be actionable as a "sexually hostile work environment" conduct must either be motivated by Keenan's sex, or be sexual in nature. The only such conduct proffered by Keenan is: (1) Keenan's speculation that serving "at [Allan's] will and pleasure" meant that she was "his woman"; (2) Allan's alleged affair with Hinojosa; (3) Allan's permitting Hinojosa to be hired although she did not type; (4) Allan's not disciplining Hinojosa after her walk-off; (5) Allan's greater toleration of Hinojosa's work errors; (6) Hinojosa's touching of Allan's arm, shoulder and waist in front of Keenan; (7) Allan's once calling Keenan "bimbo" in front of others; (8) Allan's "true blond" comment to Osborn, outside of Keenan's presence; (9, 10) Allan's "good-looking women" comments (once outside Keenan's presence, to the jailers, and once within Keenan's presence); and (11) Allan's criticizing Keenan's bikini poster as sexual harassment.[62,63] Most of these fail to support a claim of hostile work environment: 1 is mere speculation [64], 2 is mere speculation and in any event not

---

nom. *McCollum v. Tisch*, 479 U.S. 1034, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987) ("personal dislike is not sex discrimination and is not proscribed by Title VII"); *Petrosky v. Washington–Greene County Branch*, 663 F.Supp. 821, 825 (W.D.Pa.1987) (employee's inability to get along with board members, not sex, was the reason for her termination), *aff'd without op.*, 845 F.2d 1014 (3d Cir.1988); *Devlin v. Federal Reserve Bank of St. Louis*, 634 F.Supp. 389, 398 (E.D.Mo.1986) ("The most common mistake in discrimination cases is to deem a personality conflict or similar circumstances to be discrimination actionable under Title VII").

**61.** Of course, the state courts protect against assault and battery; Keenan does not contend that Allan's "throwing files" rose to this level.

**62.** Keenan also proffers Allan's calling her "stupid", "airhead" and "idiot"; Allan's throwing files at her; Allan once yelling at her; Allan's criticizing her work performance (especially through "green notes"); and other co-workers disliking her. This conduct is neither sexual nor evidently directed because of her sex. Keenan in fact alleges that Allan's conduct was done either because Allan was suffering from the death of his parents, or retaliating against her for her Commission complaint; she does not contend that

her co-worker's dislike was discriminatory but merely mean-spirited. All of these events, except the dislike by Keenan's coworkers which occurred after Keenan's first termination, occurred during an eight-month period in 1991 when the new DISCIS computer system was installed and required undue attention, and when Allan's parents both died: legitimate reasons excusing such conduct, even if excuses were required.

**63.** The Court in fact casts a wider net for challenged conduct than does Keenan, who contends that the sexual harassment consisted (only) of "Allan's abusive language, his conduct with respect to other female court employees, and the intimidation with respect to that." K1131. Upon specific deposition questioning, the only incidents Keenan raised were the "bimbo" comment (to Keenan), the "true blonde" comment (to Osborn, not Keenan or her co-workers), and the "good-looking women" comment (to the jailers, not Keenan or her co-workers). Later in her deposition, she contended that the "good-looking" comment (or another one) was made in her presence.

**64.** It also is objectively unreasonable. The phrase "at my will and pleasure" is a term of art common in non-unionized civil service positions.

actionable [65], 3–5 are not actionable under the instant claim [66]; 6 is not actionable [67]; 8 and 9 did not occur in Keenan's presence (or even are alleged to be known by Keenan until this litigation) [68]; and 11 is not actionable [69]. Remaining are only two comments by Allan: that Keenan was a "bimbo", and that he "only hired good-looking women in his court." [70]

■ For the second element, Keenan must show that the challenged conduct polluted her workplace, changing the conditions of her employment, under both an objective and subjective standard.[71] As a matter of law, the infrequency of the challenged conduct (i.e., two comments over several years) and their relatively low severity (i.e., comments that did not include profanity, threats, sexual references or body part descriptions)

cannot make a "pervasive" environment of sexual hostility or abuse. The two comments are mere isolated epithets that do not support a Title VII claim. *See Glasgow,* 103 Wash.2d at 406, 693 P.2d 708 ("Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law"); *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 863 (3d Cir.1990) (plaintiff must demonstrate "continuous period of harassment, and two comments do not create an atmosphere"); *Caleshu v. Merrill, Lynch,* 737 F.Supp. 1070, 1082–83 (E.D.Mo.1990) (two incidents of unwelcome touching and off-color jokes "clearly" insufficient proof of hostile environment), *aff'd without op.,* 985

---

**65.** "A co-worker's romantic involvement with a supervisor does not by itself create a hostile work environment." *Candelore v. Clark County Sanitation District,* 975 F.2d 588, 590 (9th Cir.1992). It is only manifestations of the alleged affair, such as sexual horseplay in the office to an egregious and/or frequent degree, or preferential treatment of the co-worker that prevents the plaintiff from being evaluated on grounds other than her sexuality, that are actionable. *Id.* While Keenan alleges these (Hinojosa's touching Allan, and Hinojosa's preferential treatment), she does not show that they create a hostile work environment.

**66.** Preferential treatment on the basis of a consensual relationship between a supervisor and an employee does not constitute a cognizable sex discrimination claim under Title VII for other employees. *See, e.g., De Cintio v. Westchester County Medical Center,* 807 F.2d 304 (2d Cir. 1986), *cert. denied,* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987); *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853 (3d Cir.1990); *Autry v. North Carolina Dep't of Human Resources,* 820 F.2d 1384, 1386–87 (4th Cir.1987); *Candelore v. Clark County Sanitation Dist.,* 975 F.2d 588, 590 (9th Cir.1992); *Thomson v. Olson,* 866 F.Supp. 1267, 1271–72 (D.N.D.1994); *Ayers v. American Tel. & Tel. Co.,* 826 F.Supp. 443, 445 (S.D.Fla.1993). *See also,* EEOC "Policy Guidance on Employer Liability under Title VII for Sexual Favoritism", N–915–048, January 1990.

Keenan does not raise an Equal Pay Act, sexual discrimination or *quid pro quo* sexual harassment claim (e.g., that Hinojosa and she were similarly situated but Hinojosa was compensated, hired or disciplined differently because Hinojosa was a man and Keenan was a woman; that Allan treated all women employees poorly while being lenient with men employees like Hinojosa; or that Allan expected all women employees to sleep with him as a condition of employment).

(The Court hypothesizes the effect if Hinojosa were a man; the parties admit that Hinojosa is a woman.)

**67.** Touching a supervisor on the arm, shoulder and waist is hardly "sexually abusive"; it is likely not even sexual (except from the perception of someone who believes the two are having an affair). *See Jordan v. Clark,* 847 F.2d 1368, 1374–75 (9th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989) (abusive environment not created where men and women told "off-color" jokes at work).

**68.** Keenan cannot rely on statements made to others, especially non-employees, to defeat summary judgment. *See Stafford v. Missouri,* 835 F.Supp. 1136, 1141 (W.D.Mo.1993); *Halasi–Schmick v. Shawnee,* 759 F.Supp. 747, 752 (D.Kan.1991) (citing other authority).

**69.** While Keenan speculates that Allan objected as his own means of harassing her, there is no such evidence. Surely Allan is as entitled as Keenan is to challenge what he perceives as sexual harassment. To hold otherwise would render a ridiculous and inequitable result, chilling legitimate harassment complaints.

**70.** The Court presumes for the purpose of this motion that "bimbo" is a term referring only to women. *But see* Webster's Third New International Dictionary 216 (15th ed. 1966) (providing two definitions of "bimbo": a disparaging term for either men or women).

**71.** Note that the focus is *Keenan's* workplace and *Keenan's* conditions of employment. If other co-workers were bothered by Allan's conduct, as Keenan alleges, they must file their own complaint.

F.2d 564 (8th Cir.1991), *reported in full,* 985 F.2d 564, 1991 WL 439244, 1991 U.S.App. LEXIS 33,745 (Oct. 1, 1991), *and cert. denied,* 504 U.S. 918, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992).

▮ The third element is sufficient remedial action. Regardless of whether Whitener–Moberg and the County knew or should have known of Allan's comments, they had no duty to rectify this isolated epithets. Note that Washington holds only "employers" liable for failure to correct harassment of which they knew or should have known. *Glasgow,* 103 Wash.2d at 407, 693 P.2d 708. The Court does not determine whether the County was Keenan's employer.

*Conclusion.* Keenan's Title VII claim is time-barred. It also must be dismissed for failure to obtain a right-to-sue letter. The other claim under Count VI, RCW 49.60, fails on the merits. Count VI must be dismissed, against defendants Allan, Whitener–Moberg and the County. (It was not pled against Fancher, Snead or Allison.)

## L. COUNT VII: AGE DISCRIMINATION

The Keenans contend that the termination of the Administrator position was done for the purpose of reassigning Keenan's job duties to younger women, in violation of 42 U.S.C. § 2000e (Title VII), 29 U.S.C. § 623 (the Age Discrimination in Employment Act,

"ADEA") and RCW 49.60 (Washington's Law Against Discrimination).[72]

*Standard: time-bar.* ADEA provides that before an age discrimination action can be prosecuted in federal court, a plaintiff must file a charge with the EEOC within 300 days of the alleged unlawful employment practice, or within thirty days of receipt of notice of termination of state agency proceedings, whichever is earlier. 29 U.S.C. § 626(d).[73] The Ninth Circuit "treats this notice requirement as a statute of limitations." *Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 675 (9th Cir.1988) (citing other authority).

*Analysis: time-bar.* The only conduct Keenan challenges in Count VII is the elimination of the Administrator position.[74] This occurred on March 3, 1992. The date 300 days later is December 28, 1992.[75] As Keenan filed untimely with the EEOC (on March 4, 1994), her ADEA claim is time-barred.[76]

▮ Keenan responds to this analysis (by defendants) with only a three-line statement raising the continuing violations doctrine. However, as with a Title VII claim (analyzed in the previous section K), the continuing violations doctrine can apply only where there are at least two alleged discriminatory acts, at least one of which falls inside the applicable statute of limitations period. Here, the only challenged act is the elimination of position, which occurred previous to

**72.** Note that 42 U.S.C. § 2000e *et seq.* prohibits employment discrimination on the bases of race, color, religion, sex or national origin. It does not provide a cause of action for age discrimination. The Court therefore ignores this claim.

In their briefs, the Keenans appear to claim also age discrimination under RCW 49.44.090. This was not pleaded. Further, it is inapplicable to the elimination of the Administrator position. The statute applies only to positions subject to a collective bargaining agreement, which the Administrator position was not.

**73.** The parties agree that Washington is a deferral state, with its qualified agency the Human Rights Commission.

**74.** Similarly, because Keenan's EEOC complaint merely attached her complaint here, Keenan

challenged only the elimination of the Administrator position with the EEOC.

**75.** An alleged discriminatory discharge occurs, and therefore commences the filing limitations period, when the decision is communicated to the employee. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). Thus, the effective date of the elimination (April 30, 1992) is irrelevant. Even if April 30 and not March 3 commenced the filing period, the period would end February 24, 1993. Keenan's EEOC complaint would still be untimely.

**76.** Keenan filed with the HRC on March 18, 1993. There is no evidence when, if ever, the HRC sent Keenan a notice of termination of state agency proceedings.

the statutory period.[77,78] Keenan's ADEA claim must be dismissed.

■ *Standard and analysis: prerequisite of "right to sue" letter.* "No civil action under the ADEA may be commenced until sixty days after a charge alleging unlawful discrimination has been filed with the EEOC." *Pejic,* 840 F.2d at 674 (citing 29 U.S.C. § 626(d)); *see also, id.* at 675 (EEOC complaint must allege *age* discrimination to satisfy the prerequisite for ADEA litigation). Keenan filed her charge with the EEOC on the same day as she sued here: March 4, 1994. This is another ground requiring dismissal of Keenan's ADEA claim.

*Standard: merits.* Washington's Law Against Discrimination, RCW 49.60, prohibits covered employers from discriminating in hiring or the terms or conditions of employment because of the age of the employee (or employee-applicant). Because the statute does not provide any criteria for establishing age discrimination, Washington courts have looked to federal-court interpretations of ADEA for guidance. *See Grimwood v. University of Puget Sound,* 110 Wash.2d 355, 361–62, 753 P.2d 517 (1988); *Roberts v. ARCO,* 88 Wash.2d 887, 892, 568 P.2d 764 (1977). *Compare Pejic,* 840 F.2d at 674 (elements of ADEA claim and shifting burden of proof) *with Grimwood,* 110 Wash.2d at 362–63, 753 P.2d 517 (elements of state law age discrimination claim and shifting burden of proof).

■ To make out a prima facie age discrimination case, a plaintiff must show: (1) that the employee was within the statutorily protected age group; (2) was discharged; (3) was doing satisfactory work; and (4) was replaced by a younger person. *Grimwood,* 110 Wash.2d at 362, 753 P.2d 517 (citing other authority). *See also, Hatfield v. Columbia Federal Savings Bank,* 68 Wash.

App. 817, 822, 846 P.2d 1380, *review denied,* 121 Wash.2d 1030, 856 P.2d 382 (1993) (defining the protected age group as 40 to 70 years of age); *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 891 (9th Cir.1994) (defining the fourth element as replacement "by a substantially younger employee with equal or inferior qualifications"). Once a prima facie case is established, the burden shifts to the employer to produce sufficient evidence to support a finding that plaintiff was discharged for a nondiscriminatory reason. *Grimwood,* 110 Wash.2d at 364, 753 P.2d 517. If the employer satisfied this burden, the presumption raised by the prima facie case is rebutted and the plaintiff must come forward to show the employer's articulated reasons are mere pretext for discharge motivated by age discrimination. *Grimwood,* 110 Wash.2d at 364, 753 P.2d 517. The plaintiff may show this directly or indirectly by demonstrating the explanation is "unworthy of credence". *Carle v. McChord Credit Union,* 65 Wash. App. 93, 102, 827 P.2d 1070 (1992).

■ *Analysis: merits.*[79] Keenan fails to make out a prima facie claim. The first element is at least suspect, because Keenan was within the protected age group both at hire and when the position was eliminated, with both acts performed by Allan. *See Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173 (8th Cir.1992) (affirming grant of directed verdict in age discrimination case):

> The most important fact here is that plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing, and that the same people who hired him also fired him. If plaintiff had been forty when he was hired, and sixty-five when he was fired, obviously this fact would not be so compelling. But here, the lapse of time was less than two years. It is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the company officials who hired

---

**77.** Whether Keenan continued to feel the effects of the single act within the statutory period is immaterial. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). "The key to recovery is for the plaintiff to show a violation, and not just the effects of a violation, extended into the statutory period." *Bruno v. Western Elec. Co.,* 829 F.2d 957, 960 (10th Cir.1987). To rule otherwise would render meaningless the statute of limita-

tion, because a discharged plaintiff could sue at any later time when she was not employed by the employer: presumably, until her death.

**78.** Equitable tolling also does not apply, as discussed in section K.

**79.** This analysis would apply equally to the untimely ADEA claim, although the Court analyzes only the state law claim.

him at age fifty-one had suddenly developed an aversion to older people less than two years later.

963 F.2d at 174–75 (internal citation omitted). *See also, Rand v. CF Indus.,* 42 F.3d 1139, 1147 (7th Cir.1994); *LeBlanc v. Great Amer. Ins. Co.,* 6 F.3d 836, 847 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991).

The second element, discharge, is likely established, although the Court notes difference between "discharge" of an employee in a position and "elimination" of the position altogether. For the purpose of this case, on this motion, the Court assumes it to be a merely semantic difference.

The third element, satisfactory work, is not met. Keenan cannot meet her burden of production by proffering the agreed fact that she was loyal to Allan both in and outside of the workplace; loyalty is not equivalent to work performance. She also cannot meet her burden by proffering the (disputed) fact that between October, 1989 and June, 1991, Allan was highly complimentary of Keenan's work and included his support for a pay raise for Keenan. The relevant time frame is early 1992, before the Administrator position was eliminated. There are numerous agreed facts questioning Keenan's performance at that time.

The fourth element also is not met. Keenan not only has no evidence that her Administrator duties were re-assigned to younger employees, but also she admits that these duties have been allocated among the district court judges and the half-time Commissioner. (These are neither "employees", nor alleged to be younger than Keenan.)

■ Even if Keenan made out a prima facie claim, defendants have rebutted it with legitimate reasons for eliminating the position: Keenan's poor performance, the greater efficiency of the office due to DISCIS, and the ability of the judges to assume more administrative duties (due to the hiring of Commissioner Brown). Keenan does not rebut these reasons with any showing (or even allegation) of pretext.

The Court does not address Allan's contention that he cannot be individually liable. *See Miller v. Maxwell's Intern., Inc.,* 991 F.2d 583, 587–88 (9th Cir.1993), *cert. denied, sub nom. Miller v. La Rosa,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372, *and reh'g denied,* —— U.S. ——, 114 S.Ct. 1585, 128 L.Ed.2d 226 (1994) ("individual defendants cannot be held liable for damages under Title VII" or "suits under the ADEA"). The Court does not determine whether the judges or the County was Keenan's employer.

*Conclusion.* Keenan's ADEA claim is time-barred. It also must be dismissed for failure to first file with the EEOC. The other claim under Count VII, RCW 49.60, fails on the merits. Count VII must be dismissed, against all defendants.

## M. COUNT VIII: FAILURE TO PAY WAGES

■ The Keenans contend that defendants have withheld wages and overtime compensation from Keenan, in violation of 29 U.S.C. § 201 (Fair Labor Standards Act, "FLSA"), RCW 49.48.010 (wage collection act) and RCW 49.52.050 (creating misdemeanor for wilful deprivation of wages). They seek double wages and attorneys fees under all three statutes.[80]

*Standard: collateral estoppel.* As an initial matter, the Court must determine whether it can hear this claim. (Both sides contend that collateral estoppel applies.)

---

80. Note that RCW 49.48.010 is a criminal statute, which presumably can be raised only by a state prosecuting attorney. RCW 49.48.030 impliedly permits a civil action, but the Keenans do not plead RCW 49.48.030. However, other courts have labeled civil suits as arising under RCW 49.48.010. *See, e.g., Martinez v. Shinn,* 992 F.2d 997, 999 (9th Cir.1993). Therefore, this Court permits the Keenans to bring an RCW 49.48.010 claim.

Similarly, RCW 49.52.050 is a criminal statute, paralleling the civil action permitted by RCW 49.52.070. However, other courts have labeled civil suits as arising under RCW 49.52.050. *See,* *e.g., Pope v. University of Washington,* 121 Wash.2d 479, 482, 852 P.2d 1055 (1993), and cases cited therein at 489–90, 852 P.2d 1055, *cert. denied,* —— U.S. ——, 114 S.Ct. 1061, 127 L.Ed.2d 381, *and corrected,* 871 P.2d 590 (1994). Therefore, this Court permits the Keenans to bring an RCW 49.52.050 claim.

Note that the FLSA and RCW 49.52.050 each permit recovery of double wages and attorneys fees. 29 U.S.C. § 216(b), RCW 49.52.070. RCW 49.48.010 permits recovery of only single wages and attorneys fees. RCW 49.48.030; *Martinez,* 992 F.2d at 1001 ("the actual damages awarded").

Under the doctrine of collateral estoppel, or claim preclusion, "[a] party that has once litigated a factual or legal issue and lost may be precluded from relitigating the same issue in a subsequent proceeding." *See Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); *Connors v. Tanoma Mining Co.,* 953 F.2d 682, 684 (D.C.Cir.1992). In order for a claim to be precluded, the following must be shown:

First, the same issue *must have been actually litigated, that is, contested by the parties and submitted for determination by the court.* Second, the issue must have been *actually and necessarily* determined by a court of competent jurisdiction in the first trial. Third, preclusion in the second trial must not work an unfairness.

*Id.* (emphasis added). *See also, Hanson v. Snohomish,* 121 Wash.2d 552, 562, 852 P.2d 295 (1993); *Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1320 (9th Cir.1992):

To foreclose relitigation of an issue, "(1) the issue *must be identical* to the one alleged in the prior litigation; (2) the issue must have been *actually* litigated ...; (3) the determination of the issue in the prior litigation must have been a *critical and necessary part of the judgment* in the earlier action."

(emphasis added). The Ninth Circuit has been cautious in its application of the doctrine. *See Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391 (9th Cir.1992) ("The doctrine of collateral estoppel applies only when the issues presented in each matter are identical. The doctrine is inapplicable if the issues are merely similar"). "If a decision could have been rationally grounded upon an issue other than that which the defendant seeks to foreclose from consideration, issue preclusion does not prohibit relitigation of the asserted issue." *Operating Engineers Pension Trust v. A–C Co.,* 859 F.2d 1336, 1339, *modified, reh'g denied, en banc,* 1988 U.S.App. LEXIS 15,919, 110 Lab.Cas. (CCH) para. 10,895 (9th Cir.1988); *Clark,* 966 F.2d at 1321.

*Analysis: collateral estoppel.* The state court in *Dedra J. Osborn, Grant County Clerk v. Grant County, by and through the Grant County Commissioners* considered whether Osborn had the authority to hire Keenan, whether the County could interfere with that hire, and whether Osborn was entitled to seek outside legal representation to assist her in resolving the matter. The relevant conclusions of law of the state court were:

8. Under state law, the Office of County Clerk is wholly independent of any administrative intervention involving the hiring or firing of employees by County Commissioners.

9. The Grant County Commissioners violated that law by interfering with the internal administration of the business and affairs of the County Clerk.

. . . .

10. So long as the County Clerk stays within the approved budgetary confinements, the County Commissioners have no authority to interfere, intervene, or involve themselves in any form or fashion with the hiring, promotion, disciplining or discharge of the employees of the Grant County Clerk's office.

. . . .

12. The County Commissioners owe and are legally obligated to pay outstanding wages to the temporary employee [Keenan] who had been hired by the County Clerk, and shall pay such wages owing.

Court's Findings of Fact and Conclusions of Law, Exhibit F to Affidavit of Dunn, Ct.Rec. 221. The Judgment of January 18, 1994 included:

the defendant Grant County, by and through the Grant County Commissioners, is directed to pay the earned wages of any temporary employee of the Grant County Clerk which are presently outstanding.

Judgment, Exhibit G to Ct.Rec. 221, at 3.

The state court therefore determined whether the County and Commissioners could interfere with the hiring decisions of the County Clerk, under state law. The issue here is the different one of whether the County and Commissioners did interfere, to a degree violative of statutory state or federal law. The issue here is not identical to that resolved in the state court, was not actually

litigated or determined there, was not necessary to the state court judgment, and would therefore cause injustice if estopped by the state court judgment.

■ The state court also determined the nature of the employment relationship between Keenan and the County (namely, none, unless the County Clerk exceeds the County's approved budgetary confinements). This is the same issue as that presented here.[81] This issue was actually litigated and actually determined; it is conclusion of law # 10. The issue was necessary to the state court's determination of whether the County could interfere with Osborn's hiring decision. Finally, application of collateral estoppel would cause no injustice. As evident from the state court briefing, both sides knew that Keenan was the "temporary employee" referred to in the state court's conclusions of law. The conclusions of law were drafted by Keenan's current counsel (as evident from the state court's cross-out of "Plaintiff's" and substitution of "Court's"), who at that time represented Keenan. Thus, while the state court did not determine whether Keenan was "employed" by the County for purposes of FLSA, RCW 49.48.010 and RCW 49.52.050, the state court explicitly defined the parameters of that employment relationship, which estops the parties from relitigating the issue here.

Thus, the Court can hear the wage claims brought here, but it defers to the state court's conclusions on the issue of the employment relationship between Keen and the County (through its Commissioners).

*Standard: merits.* Under the first state claim, "[i]t shall be unlawful for any employer to withhold or divert any portion of an employee's wages...." RCW 49.48.010. "Employer" includes persons and municipal corporations, but is not otherwise defined. RCW 49.48.115.

■ Under the second state claim, "[a]ny employer and any officer, vice principal or agent of any employer who"

[w]ilfully and with intent to deprive the employee of any part of his wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract

"shall be liable in a civil action by the aggrieved employee ... to judgment for twice the amount of the wages unlawfully ... withheld ..., together with costs of suit and a reasonable sum for attorney's fees ..." RCW 49.52.050(2) and .070. "Employer" is not defined. Nonpayment of wages is willful and made with intent

when it is the result of knowing and intentional action and not the result of a bona fide dispute as to the obligation of payment....

*Chelan County Deputy Sheriffs' Ass'n v. County of Chelan,* 109 Wash.2d 282, 300, 745 P.2d 1 (1987). "A finding of intentional nonpayment by a party who is not an individual requires the organization to reach a consensus regarding the action taken." *Pope v. University of Washington,* 121 Wash.2d 479, 491, 852 P.2d 1055 (1993) (citing *Chelan,* 109 Wash.2d at 302–03, 745 P.2d 1), *cert. denied,* —— U.S. ——, 114 S.Ct. 1061, 127 L.Ed.2d 381 *and corrected,* 871 P.2d 590 (1994). The statute speaks of a singular money judgment; double judgments (creating treble damages) are not appropriate. *Labor & Indus. v. Overnite Transp.,* 67 Wash.App. 24, 37, 834 P.2d 638 (1992), *review denied,* 120 Wash.2d 1030, 847 P.2d 481 (1993).

Under the third claim, the federal FLSA, it is unlawful for any employer to violate the minimum wage law: $4.25 per hour for employees "engaged in commerce or in the production of goods for commerce" during July, 1993. 29 U.S.C. § 216(b) and § 206(a)(1). Further, non-managerial employees must be paid one and one-half times their normal hourly wage for all hours exceeding forty per week. 29 U.S.C. § 207(a)(1). FLSA awards liquidated damages for violations, but the Court has discretion to award no or reduced

---

**81.** The state court finding regarding the employment relationship between Keenan and the County, while Keenan worked at superior court supervised by Osborn, is of course unrelated to the issue (unresolved both here and in state court) of the employment relationship between Keenan and the County, while Keenan worked at district court supervised by the judges.

liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of FLSA. 29 U.S.C. § 260.

■■■■ The FLSA defines "employ" as "suffer or permit to work". 29 U.S.C. § 203(g). Whether there is an employment relationship under the FLSA is tested by " 'economic reality' rather than 'technical concepts.' " *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961). In evaluating a particular employment situation, courts look primarily at whether the alleged employer possessed four (non-exclusive) powers: 1) to hire and fire employees, 2) to supervise and control employee work schedules or conditions of employment, 3) to determine rate and method of payment, and 4) to maintain employment records. *Hale v. Arizona*, 967 F.2d 1356, 1364 (9th Cir.1992); *cert. denied*, —— U.S. ——, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993); *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.1983). Since April 15, 1986, the FLSA has applied to public employers. *Barner v. City of Novato*, 17 F.3d 1256, 1258 n. 2 (9th Cir.1994).

*Analysis: merits.* Keenan does not provide any facts tying the claims in Count VIII to Whitener–Moberg or Allan. *See* Complaint, Ct.Rec. 1, at ¶ XXVIII. Therefore, as the Keenans admit, the claims must be dismissed as to them.

■■■■ The claims also must be dismissed as to the County and the Commissioners. As the state court found, the County had no involvement with Keenan's employment except to budget funds in advance for the superior court (to hire anyone, not particularly Keenan). As a matter of law, given this (non)involvement, the County and its Commissioners were not Keenan's "employer" under RCW 49.48.010, RCW 49.52.050 or the FLSA.

■■■■ Even if the County and Commissioners were Keenan's employer, the bona fide dispute exception to RCW 49.52.050 and good faith exception to FLSA would apply, given the fact that Keenan was suspended from County district court when Osborn hired her at County superior court. Keenan would hence be precluded from recovering anything but actual wages (and perhaps attorney fees, on this claim only). However, because Keenan already recovered her actual wages (of whatever amount) in *Osborn v. Grant County* under state law, she would be precluded from collecting those wages (and attorney fees) here. *See Labor & Indus. v. Overnite Transp.*, 67 Wash.App. 24, 37, 834 P.2d 638 (1992), *review denied*, 120 Wash.2d 1030, 847 P.2d 481 (1993) (interpreting RCW 49.52.050).

Keenan contends that the County should be estopped from contending that it was not Keenan's employer, because it previously made the opposite contention to the state court. Keenan is partially correct. Both parties are collaterally estopped from relitigating this issue. The County is permitted, as it has, to argue that the state court conclusion applies here.

■■■ The County contends that Keenan's overtime claim is barred because Keenan did not exhaust her administrative remedies under the collective bargaining agreement. The collective bargaining agreement does provide a three-step grievance procedure for resolution of such claims. Keenan took the matter only through step two, and declined to take it to the binding arbitration of step three. As the parties note, there are two cases on point. The Tenth Circuit instructs:

> [W]hen a wage dispute is submitted to arbitration in accordance with a collective-bargaining agreement, the employees may not thereafter maintain an FLSA § 16(b) suit for recovery on the basis of the same factual occurrence as that presented to the arbitrator. We are convinced that the policy of Congress, recognized by the Courts, favors the arbitration of disputes over wages and hours in accordance with a collective-bargaining agreement.

*Satterwhite v. United Parcel Service, Inc.*, 496 F.2d 448, 452 (10th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674

(1974). However, the Supreme Court instructs the opposite:

> The statutory enforcement scheme grants individual employees broad access to the courts. Section 16(b) of the Act, 29 U.S.C. § 216(b), which contains the principal enforcement provisions, permits an aggrieved employee to bring his statutory wage and hour claim "in any Federal or State court of competent jurisdiction." No exhaustion requirement or other procedural barriers are set up, and no other forum for enforcement of statutory rights is referred to or create by statute.
>
> This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would "nullify the purposes" of the statute and thwart the legislative policies it was designed to effectuate. Moreover, we have held that congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement.

*Barrentine v. Arkansas–Best Freight System,* 450 U.S. 728, 740–41, 101 S.Ct. 1437, 1445, 67 L.Ed.2d 641 (1981) (footnote and internal citations omitted). Although *Barrentine* did not expressly overrule *Satterwhite,* this Court must follow the highest court rather than extra-jurisdictional authority of a lower court. Keenan's failure to exhaust the grievance procedure does not bar her wage claims here.

*Conclusion.* The Keenans have not proffered any facts tying this claim to Whitener–Moberg or Allan. Further, the County and Commissioners were not Keenan's employer. Count VIII must be dismissed, against all defendants.

**82.** The Keenans do not define this conduct in their complaint. In the instant briefing, they refer specifically (and only) sex discrimination under RCW 49.60. Even presuming the Keenans raise a CPA claim for other conduct (*i.e.,* terminations, reassurances by Whitener–Moberg, discipline, and wage withholding), such a claim would fail. The first element is not met because none of the conduct is an "unfair practice" (for

## N. COUNT IX: FAILURE TO PAY WAGES

In the second count on this issue, the Keenans again contend that defendants have withheld wages from Keenan, in violation of 29 U.S.C. § 201 (FLSA). They seek injunctive relief.

■ *Standard and analysis: injunctive relief.* Injunctive relief is available under the FLSA. However, with the exception of child labor law violations, only the Secretary of Labor may seek an order to restrain violations of the FLSA. 29 U.S.C. § 211(a); *Barrentine v. Arkansas–Best Freight System,* 750 F.2d 47, 51 (8th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985). Therefore, as the Keenans admit, they cannot raise this claim.

*Conclusion.* Individuals may not sue for FLSA injunctive relief. Count IX must be dismissed, against all defendants.

## O. COUNT X: CONSUMER PROTECTION ACT

The Keenans contend that defendants' maintenance of a hostile work environment was an unfair practice under Washington's Consumer Protection Act ("CPA"), RCW 19.86.[82]

■ *Standard.* The CPA creates a private right of action:

> Any person who is injured in his or her business or property by a violation of RCW 19.86.020 ["unfair or deceptive acts or practices in the conduct of any trade or commerce"], 19.86.030 [restraint of trade], 19.86.040 [monopolies], 19.86.050 [price-fixing], or 19.86.060 [certain stock acquisitions] ... may bring a civil action ... to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit,

the same reasons that such conduct does not violate any other law). The second element is not met because neither of Keenan's positions at district court occurred in trade or commerce. The third element, public interest, is not met because the challenged conduct occurred in a private relationship. The fourth and fifth elements might be met; the challenged conduct might cause injury to Keenan in her job.

including a reasonable attorney's fee, and the court may in its discretion, increase the award of damages to an amount not to exceed three times the actual damages sustained ... [or] ten thousand dollars ...

RCW 19.86.090. The elements of a private CPA claim are:

(1) an unfair or deceptive act or practice; (2) which occurs in trade or commerce; (3) that impacts the public interest; (4) which causes injury to the plaintiff in his or her business or property; and (5) which injury is causally linked to the unfair or deceptive act.

*Washington State Physicians Ins. Exch. v. Fisons Corp.,* 122 Wash.2d 299, 312, 858 P.2d 1054 (1993) (citing other authority).

Regarding the first element, sex discrimination in violation of RCW 19.86 can be an unfair practice:

[A]ny act prohibited by this chapter related to sex discrimination ... which is committed in the course of trade or commerce ... shall be deemed an unfair practice within the meaning of RCW 19.86.020 and 19.86.030 and subject to all the provisions of chapter 19.86 RCW ...

RCW 49.60.030(3).

Regarding the second element, "trade" and "commerce" is defined as "includ[ing] the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2).

■ The third element, public interest, depends on "the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wash.2d 778, 790, 719 P.2d 531 (1986) (en banc).

[A]n act or practice of which a private individual may complain must be one which also would be vulnerable to a complaint by the Attorney General under the act. A breach of a private contract affecting no one but the parties to the contract, whether the breach be negligent or intentional, is not an act or practice affecting the public interest.

*Lightfoot v. MacDonald,* 86 Wash.2d 331, 334, 544 P.2d 88 (1976) (en banc).

■ The CPA exempts municipal corporations (such as Grant County) from the operation (but not the benefits) of the CPA. *Washington Natural Gas Co. v. Public Utility District,* 77 Wash.2d 94, 98, 459 P.2d 633 (1969), citing RCW 19.86.010.

■ *Analysis.* As the Keenans admit, their CPA claim cannot be raised against Grant County or its Commissioners.[83]

■ The CPA fails on the merits as against Allan and Whitener–Moberg. The first element, unfair practice, is not met because there was no sexually hostile work environment. The second element is not met because neither of Keenan's positions at district court occurred in trade or commerce. While the district court provides services to people in Washington, it does not sell these services. The third element, public interest, is met; assuming there were a sexually hostile work environment, it likely might impact other district court employees. The fourth element is met; assuming there were a sexually hostile work environment, it could cause injury to Keenan in her job. Finally, the fifth element of causation is not met; there was no sexually hostile work environment, so it could not cause any injury.

*Conclusion.* This claim cannot be brought against the County and Commissioners. It fails on the merits as to Allan and Whitener–Moberg. Count X must be dismissed, against all defendants.

## P. COUNT XI: DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL

■ The Keenans contend that the elimination of the Administrator position breached promises made to Keenan in late 1989 concerning the scope, nature and longevity of her position. (The Keenans do not raise this claim against Fancher, Allison or

---

**83.** *See* Plaintiffs' Reply Memorandum in Response to Grant County, Fancher, Allison and Snead's Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 5.

Snead.) They contend that this violates state common law.[84]

**■** *Standard.* To obtain recovery in promissory estoppel, plaintiff must establish

> (1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.

*Klinke v. Famous Recipe Fried Chicken, Inc.,* 94 Wash.2d 255, 259 n. 2, 616 P.2d 644 (1980) (quoting other authority). "A promise is 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Havens v. C & D Plastics,* 124 Wash.2d 158, 172, 876 P.2d 435, quoting Restatement (Second) of Contracts § 2(1), *modified,* 1994 Wash. LEXIS 496, 9 I.E.R.Cas. (BNA) 1430 (1994). "Where the terminable at will doctrine is concerned, the promise for promissory estoppel must be a 'clear and definite promise'." *Havens,* 124 Wash.2d at 173, 876 P.2d 435, quoting 1 Paul H. Tobias, Litigating Wrongful Discharge Claims § 4.52, at 4–89 (1993).

*Analysis.* The Keenans do not present any facts supporting this claim as against Whitener–Moberg. Whitener–Moberg was not even a judge until over a year later than the date(s) of the alleged promises. This claim must be dismissed as to her.

The claim also must be dismissed as to Allan and the County. Regarding the first element, promise, Keenan presumably proffers the same alleged agreements as she did in her wrongful discharge claim: (1) an alleged oral agreement between Keenan and Warring (made just prior to Warring's drafting the Employment Contract), (2) the draft Employment Contract, (3) an alleged oral agreement between Keenan and Allan (made just after Warring's drafting the Employment Contract), (4) Allan's alleged offer regarding Keenan's educational expenses, (5) the Position Information Questionnaire and (6) the Employee Policy–Procedures Information Handbook.[85,86] As discussed in section F, proffers 1, 3 and 4 are invalid under the statute of frauds. Proffers 2, 4, 5 and 6 are not promises regarding the scope, nature or longevity of her employment.

Keenan challenges application of the statute of frauds. She compares her alleged wrongful discharge with the facts of *Klinke v. Famous Fried Chicken,* 94 Wash.2d 255, 616 P.2d 644 (1980), where a plaintiff sued a franchisor for breach of contract after he left his job in Alaska, moved to Washington, located a suitable site for a franchise and began negotiations to obtain the site, all the while receiving encouragement from the franchisor that it would give a franchise to plaintiff (which it did not). The *Klinke* court held that promissory estoppel applied:

> "A party who promises, implicitly or explicitly, to make a memorandum of a contract in order to satisfy the statute of frauds, and then breaks that promise, is

---

**84.** The Keenans contend in their briefing that this claim also applies to promises Whitener–Moberg made after January 1, 1991 (*i.e.,* reassurances that Keenan might have the Administrator position again after Allan left the bench). However, this was not pleaded. The Keenans' complaint limits the scope of the claim to promises made "[d]uring the course of [Keenan's] accepting employment as District Court Administrator". Ct.Rec. 1, at ¶ LXXI. The Keenans admit this occurred only through December, 1989, when Keenan was hired as Administrator. K8.

Even if it were pleaded, it would fail. There was no "justifiable" reliance, when Keenan knew that Whitener–Moberg played no part in the Commission's decision regarding Allan, Whitener–Moberg had signed the letter eliminating the Administrator position, and Keenan knew that Whitener–Moberg had been a judge "not very

long". Further, there was no actual reliance, given that Keenan sought legal advice the day she received notice of the elimination (and frequently thereafter), wrote defendants accepting the position under protest and threatened a lawsuit.

The Keenans also do not plead that the County made any promises by enacting its whistleblower resolution. Even if it were pleaded, it would fail. The resolution was not enacted until after elimination of the position.

**85.** Warring is not a party. Presumably, Keenan believes that he and/or Allan were County agents.

**86.** Keenan also proffers "various County policies", which she supports with a non-existent exhibit. The Court ignores this proffer, as it is not "clear and convincing".

estopped to interpose the statute as a defense to the enforcement of the contract by another who relied upon it to his detriment."

94 Wash.2d at 259, 616 P.2d 644, quoting *In re Estate of Nelson,* 85 Wash.2d 602, 610–11, 537 P.2d 765 (1975).

■■■■ However, the claim of wrongful discharge here modifies *Klinke.* First, the strong at-will doctrine in Washington has only "narrow" exceptions, including "express or implied agreement." Thus, in wrongful discharge cases promissory estoppel requires mutual assent, not a unilateral promise. (Non-discharge cases do not require mutual assent. *Havens,* 124 Wash.2d at 173, 876 P.2d 435, citing *Joseph D. Weinstein, Promissory Estoppel in Washington,* 55 Wash. L.Rev. 795, 797 (1980).) Second, in wrongful discharge cases "the promise for promissory estoppel must be a 'clear and definite promise'." *Id.,* quoting 1 Paul H. Tobias, Litigating Wrongful Discharge Claims § 4.52, at 4–89 (1993).

■■■■ Here, there was no mutual assent, Keenan marking her copy of the written draft contract with "no bloody way." There was not even mutual understanding of the alleged agreement(s). Allan committed his version of the agreement(s) to writing, and Keenan refused it as not consistent with her version. The oral agreements proffered also do not comprise a clear and definite promise. Even Keenan, even in after-the-fact litigation, cannot articulate what the promise was. She says the agreement was for an employment period of five years, yet agrees that she served "at the will and pleasure" of the judges. *Compare* Deposition of Keenan, Vol. I, at 145 11. 13–17, *with id.,* at 13 11. 17–19 and K85. She says the agreement was for cause-only termination, yet moments later says that the agreement was for a five-year minimum period. *Compare* Deposition of Keenan, at 145 11. 4–10, *with id.,* at 145 11. 13–17. She says the agreement was committed to writing in the (unobjected-to portions of the) draft contract, yet contends in the instant briefing that Allan merely agreed to put the agreement in writing and never did so. *Compare id.,* at 145 1. 22 to 147 1.2, *with* Plaintiffs' Response Memorandum of Authorities in Opposition to Defendant Allan's Motion for Summary Judgment, at 14 11. 2–3. (As discussed in section F, the "education reimbursement" provision of the draft contract to which Keenan refers is not an employment contract.)

*Conclusion.* There are no facts supporting this claim as against Whitener–Moberg. The claim must be dismissed on its merits against Allan and the County. Count XI must be dismissed, against defendants Allan, Whitener–Moberg and the County. (It was not pled against Fancher, Snead or Allison.)

## Q. COUNT XII: NEGLIGENT MISREPRESENTATION

■■■■■ The Keenans contend that defendants made false representations to Keenan concerning the scope, nature and longevity of her position as Administrator. They contend that this violates state common law.[87]

---

**87.** The Keenans contend in their briefing that this claim also applies to promises Whitener–Moberg made after January 1, 1991 (*i.e.,* reassurances that Keenan might have the Administrator position again after Allan left the bench, and to investigate the alleged affair). However, this was not pleaded. The Keenans' complaint limits the scope of the claim to promises made "for purposes of making decisions relating to her employment contract". Ct.Rec. 1, at ¶ LXXIII. The alleged employment contracts relate only to the Administrator position, for which Keenan was hired in December, 1989. K8.

Even if it were pleaded, it would fail. Neither are then-false statements, but mere promises of future conduct. On the first allegation, there was no "justifiable" reliance, because Keenan knew that Whitener–Moberg played no part in the Commission's decision regarding Allan, Whitener–Moberg had signed the letter eliminating the Administrator position, and Keenan knew that Whitener–Moberg had been a judge "not very long". Further, there was no actual reliance, given that Keenan sought legal advice the day she received notice of the elimination (and frequently thereafter), wrote defendants accepting the position under protest and threatened a lawsuit. On the second allegation, there is no evidence of reliance or pecuniary harm. Further, Whitener–Moberg took appropriate action (if any were even required).

The Keenans also do not plead that the County made any promises by enacting its whistleblower resolution. Even if it were pleaded, it would fail. The resolution was not enacted until after elimination of the position.

*Standard.* Washington has adopted the Restatement (Second) of Torts § 552 (1977), which sets forth the elements for a negligent misrepresentation cause of action:

> One who, [1] in the course of his business, profession or employment ... [2] supplies false information [3] for the guidance of others [4] in their business transactions, is subject to liability for [5] pecuniary loss caused to them by their [6] justifiable [7] reliance upon the information, if [8] he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Havens v. C & D Plastics,* 124 Wash.2d 158, 180, 876 P.2d 435, *modified,* 1994 WL 276416, 1994 Wash.LEXIS 496, 9 I.E.R. Cas. (BNA) 1430 (1994) (ellipsis in *Havens* ). As to each element, the proof must be clear, cogent and convincing. *Havens,* 124 Wash.2d at 180, 876 P.2d 435, citing *Sprague v. Sumitomo Forestry Co.,* 104 Wash.2d 751, 762, 709 P.2d 1200 (1985).

As to the second element, a negligent misrepresentation claim cannot be premised on a failure to perform a promise of future conduct, because the claim requires a false representation as to a presently existing fact. *Havens,* 124 Wash.2d at 182, 876 P.2d 435, citing *High Country Movin', Inc. v. U.S. West Direct Co.,* 839 P.2d 469, 471 (Colo.Ct. App.), *cert. denied,* 1992 Colo. LEXIS 1064 (Colo. Nov. 9, 1992).

The sixth and seventh elements, justifiable reliance, are usually issues of fact but can be decided on summary judgment if reasonable minds would reach only one conclusion. *Havens,* 124 Wash.2d at 182, 876 P.2d 435.

*Analysis.* The Keenans do not present any facts supporting this claim as against Whitener–Moberg or the Commissioners. Whitener–Moberg was not even a judge until over a year later than the date(s) of the alleged promises; the Commissioners were not even introduced to Keenan until after she was hired, after the alleged promises. This claim must be dismissed as to them.

The claim also must be dismissed as to the other defendants. Keenan meets the first and fourth elements, because the alleged misrepresentations would have been made in the course of business. She likely meets the third element ("guidance of others") and fifth element (pecuniary, *i.e.* salary, loss). However, Keenan cannot prove the second element of then-false information. She explicitly pleads only future promises. Finally, while Keenan may have relied (seventh element), Allan exercised reasonable care in communicating the alleged agreement (element eight). He negotiated with her, then set what he believed to be the agreement to writing. When Keenan refused it, he reasonably concluded that there was no agreement and did not consider the matter further.

*Conclusion.* There are no facts supporting this claim as against Whitener–Moberg or the Commissioners. The claim must be dismissed on its merits against Allan and the County. Count XII must be dismissed, against all defendants.

## R. COUNT XIII: DEFAMATION

The Keenans contend that defendants made certain defamatory statements about Keenan, in violation of state common law. Specifically, they contend:

· Whitener–Moberg characterized Keenan's bodycheck of Gunderson as an assault and encouraged the witnesses to label the conduct assaultive as well, D110; and

· Fancher, Snead and Allison published a newspaper letter on February 17, 1994 alleging that Keenan made "an unauthorized entry into the District Court computer," that the County "suspended her as opposed to bringing a legal action," that she "became so out of control that she became assaultive, slamming her body into another employee", and that "charges could have been filed." D118; Plaintiffs' Memorandum in Opposition to Defendant Grant County,

Fancher, Allison and Snead's Motion for Summary Judgment, at 17–18.[88,89]

■■■ *Standard.* To establish a claim for defamation, a plaintiff must show: [1] a false and defamatory statement concerning another, [2] an unprivileged communication to a third party, [3] fault amounting at least to negligence on the publisher's part, and [4] either actionability of the statement or special harm caused by the publication.

*Eastwood v. Cascade Broadcasting,* 106 Wash.2d 466, 470, 722 P.2d 1295 (1986). "Fault" means "in publishing the statement, the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect." *Taskett v. KING Broadcasting Co.,* 86 Wash.2d 439, 445, 546 P.2d 81 (1976) (emphasis removed).

■■ The Washington courts describe the function of summary judgment in defamation proceedings as follows:

"Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of litigation will be used to harass or to coerce a settlement. . . .

"In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is

---

88. The Keenans slightly misquote the letter, which states in relevant part:

There were many reasons for the original 10–day suspension without pay given to Shirley Keenan, but the most graphic was: Dedra Osborn had a personal interest in a certain "case" which had been assigned to one of the District Court Judges. Osborn wanted the case heard by a specific judge, and got Keenan to make an unauthorized entry into the District Court computer to make the change. Keenan got caught! We have all the necessary documentation. It was felt that it would be more appropriate to give her the suspension, as is spelled out in the Union Contractor, rather than bring about a legal action.
. . . .
During the ensuing 11+ months, conditions continued to deteriorate in District Court. . . . Keenan had actually become so out of control that she became assaultive, slamming her body into another employee. The employee who was assaulted filed a complaint with the Ephrata police department, and once again, charges could have been filed, but it seemed far wiser to terminate Ms. Keenan before she did further physical harm to someone.
Exhibit 38 to Deposition of Griggs, attached to Ct.Rec. 184, at 1.

89. Keenan seems to raise in the instant briefing a separate claim of libel per se, under RCW 9.58.010. She did not plead this claim. Even if it were pleaded, it would fail because it was not defamatory and did not affect Keenan's particular vocation.

There are two other newspaper articles proffered as exhibits; the Keenans do not plead or allege that these constitute defamation.

Even if challenged, these articles are not defamatory. Exhibit 31 to Ct.Rec. 181, is an dated *Spokesman–Review* column. The only statement by Allan is

Allan read from a prepared statement that portrays Keenan as nothing more than a revenge-seeking harpy. "When Mrs. Keenan was terminated she vowed she would get even," says Allan. "It appears she has kept her word. This is more of an attempt to embarrass and humiliate me than it is a straightforward claim for damages."
(Note that the columnist, not Allan, used the word "harpy". Further, especially given Keenan's numerous lawsuits and grievances, describing her as a "harpy" does not meet the fault element for defamation.) The only statements by the Commissioners are quotations from their February 17, 1994 letter. There are no statements by Whitener–Moberg.

The other article is Exhibit 146 to the Deposition of Allan, attached to Ct.Rec. 184. It is part of an undated "Journal" article. The only quoted statements by any of the defendants is by Allan:
"The sole motivation for all actions which have been taken was what was best for the operation of the court," Allan said. "It is apparent that Mrs. Keenan simply cannot accept our decision to save the taxpayers some money and operate the court without an administrator, and is willing to use any means to impose her will on the citizens of this county."
Allan said he welcomed a "full and open hearing . . . in an orderly judicial setting, where the truth will ultimately find the light of day."
The Keenans do not challenge two other statements in the Commissioners letter: that district court employees were threatening to walk off the job if something wasn't done about Keenan, and that the commissioners received complaints from the public about Keenan's rude behavior. Even if raised, these statements are not defamatory; they are not false.

Finally, note that the Keenans quote another statement from the Commissioners' letter (that they could not go "to the grocery store, to church

free debate. . . . Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered." *Smith v. People of State of California,* 361 U.S. 147, 154, 80 S.Ct. 215, [219] 4 L.Ed.2d 205 (1959)."

. . . .

"Serious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be sufficient to curtail the exercise of these freedoms."

*Mark v. Seattle Times,* 96 Wash.2d 473, 484–85, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982); quoting first *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967) (ellipses and omission of citations original to *Mark*), then *Tait v. KING Broadcasting Co.,* 1 Wash.App. 250, 255, 460 P.2d 307 (1969). Accordingly, "a defamation plaintiff resisting a defense motion for summary judgment must establish a prima facie case by evidence of convincing clarity." *Mark,* 96 Wash.2d at 487, 635 P.2d 1081.[90] Further,

> The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists.

*LaMon v. Butler,* 112 Wash.2d 193, 197, 770 P.2d 1027, *cert. denied,* 493 U.S. 814, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989) (citing other authority).

"The standard of fault in defamation cases depends upon the nature of the plaintiff." *LaMon,* 112 Wash.2d at 197, 770 P.2d 1027. "If . . . the plaintiff is a private figure, he need show only negligence." *Id.* (Defendants do not contest, for the purpose of summary judgment, that Keenan is a private rather than public figure.)

*Analysis.* The Keenans do not present any facts supporting this claim as against Allan. This claim must be dismissed as to him. The Court examines the alleged publications of the remaining defendants separately.

■■■ 1: Whitener–Moberg's characterization of Keenan's bodycheck of Gunderson as an assault and encouragement to witnesses. Keenan does not make a prima facie case. Keenan does not provide any evidence of convincing clarity, or even admissibility; she relies on inadmissible hearsay and speculation. There is no showing of fault here. Whitener–Moberg had a reasonable basis upon which to believe Keenan had assaulted Gunderson, as she received reports from Gunderson and three eye witnesses. (The Court does not address the other elements of defamation, including falsity, but note that the administrative law judge concluded Keenan intentionally ran into Gunderson and that eyewitness Gantenbein rather than Whitener–Moberg was the first person to characterize Keenan's conduct as an assault.)

■■■ 2: the Commissioners' statement that Keenan made "an unauthorized entry into the District Court computer." Again, Keenan does not make a prima facie case. There is no fault. Prior to writing the letter, the Commissioners had reviewed documentation from district court (including the written statement of another clerk) indicating Keenan had assisted Osborn's request to have Osborn's son's DWI case heard by a particular judge chosen by Osborn. (The Court does not address the other elements of defamation.)

or out to dinner" without public questioning of the district court situation). The Keenans do not contend that this statement is defamatory, but rather allege that it indicates their "selfish" reason for publishing the letter. In any event, it is not defamatory.

**90.** The standard of proof varies with the status of the plaintiff. A defamation claim brought by a

private individual against a private individual, for a statement about private concerns, uses the "preponderance of the evidence" standard. *Dunlap v. Wayne,* 105 Wash.2d 529, 534–35, 716 P.2d 842 (1986). A defamation claim brought by a private individual in which the alleged defamatory publication is an issue of public concern, as

3: the Commissioners' statement that "It was felt that it would be more appropriate to give her the suspension, as is spelled out in the Union Contract, rather than.bring about a legal action." Again, Keenan does not make out a prima facie case. There is no fault. Prior to publishing their letter, the Commissioners had reviewed the judges' documentation of reasons for Keenan's suspension. The judges' reasons included that Keenan had violated court procedures by setting a case in front of a particular judge. Further, Keenan admits it was inappropriate for a district court clerk to circumvent the affidavit of prejudice procedure and schedule a hearing in front of a particular judge at the request of a defendant. (The Court does not address the other elements of defamation.)

■■■■ 4: the Commissioners' statement that she "became so out of control that she became assaultive, slamming her body into another employee." Again, Keenan does not make out a prima facie case. There is no fault. Prior to publishing their letter, the Commissioners reviewed a report concerning the incident. (The Court does not address the other elements of defamation, but note that the administrative law judge concluded Keenan intentionally ran into Gunderson.)

5: the Commissioners' statement that "charges could have been filed" on the assault. Again, Keenan does not make out a prima facie case. There is no fault. Keenan admits that assault could be a violation even of criminal statutes. (The Court does not address the other elements of defamation.)

*Conclusion.* There are no facts supporting this claim as against Allan. The statements attributed to the other defendants are not defamatory. Count XIII must be dismissed, against all defendants.

## S. COUNT XIV: OUTRAGE

■■■■ The Keenans contend that Allan's retaliatory and sexually harassing conduct towards Keenan, and the County's and Whitener–Moberg's failure to correct this conduct, consisted the state common law tort of outrage. (The Keenans do not raise this claim against Fancher, Allison or Snead.)

here, uses the "convincing clarity" standard. *Haueter v. Cowles Pub. Co.,* 61 Wash.App. 572,

*Standard.* The tort of outrage includes the elements of:

(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress.

*Rice v. Janovich,* 109 Wash.2d 48, 61, 742 P.2d 1230 (1987) (citing other authority).

Regarding the first element,

[I]t is not enough that a "defendant has acted with an intent which is tortious or even criminal, or. that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Liability exists "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be recognized as atrocious, and utterly intolerable in a civilized community." .... [T]he tort of outrage "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration.

*Grimsby v. Samson,* 85 Wash.2d 52, 59, 530 P.2d 291 (1975), quoting Restatement (Second) of Torts § 46, comment *d* (emphasis removed). Additionally,

the conduct must be such that a recitation of the facts to an average member of the community would arouse his resentment against [defendant] and lead him to exclaim "Outrageous!"

*Lewis v. Bell,* 45 Wash.App. 192, 195, 724 P.2d 425 (1986), citing *Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 740, 565 P.2d 1173 (1977).

■■■■ Regarding the third element of "severe emotional distress", a plaintiff must show more than a "sign of distress above that level which is a fact of life." *Spurrell v. Block,* 40 Wash.App. 854, 863, 701 P.2d 529, *review denied,* 104 Wash.2d 1014 (1985). Thus, "depression, loss of appetite, libido and

583–84, 811 P.2d 231 (1991).

energy, sleeplessness, and increased headaches" do not constitute severe emotional distress. *Lawson v. Boeing Co.*, 58 Wash. App. 261, 270, 792 P.2d 545 (1990), *review denied*, 116 Wash.2d 1021, 811 P.2d 219 (1991).

■ The initial screening to determine if conduct is sufficiently extreme and outrageous to result in liability is for the trial court. *Lewis*, 45 Wash.App. at 195, 724 P.2d 425, citing *Chambers–Castanes v. King County*, 100 Wash.2d 275, 669 P.2d 451 (1983).

■ *Analysis.* The only facts proffered here by the Keenans are the same as proffered for their sexually hostile work environment claim: (1) Keenan's speculation that serving "at [Allan's] will and pleasure" meant that she was "his woman"; (2) Allan's alleged affair with Hinojosa; (3) Allan's permitting Hinojosa to be hired although she did not type; (4) Allan's not disciplining Hinojosa after her walk-off; (5) Allan's greater toleration of Hinojosa's work errors; (6) Hinojosa's touching of Allan's arm, shoulder and waist in front of Keenan; (7) Allan's once calling Keenan "bimbo" in front of others; (8) Allan's "true blond" comment to Osborn, outside of Keenan's presence; (9, 10) Allan's "good-looking women" comments (once outside Keenan's presence, to the jailers, and once within Keenan's presence); (11) Allan's criticizing Keenan's bikini poster as sexual harassment; (12–14) Allan's calling her "stupid", "airhead" an "idiot"; (15) Allan's throwing files at her; (16) Allan once yelling at her; (17) Allan's criticizing her work performance (especially through "green notes"); and (18) other co-workers disliking her.

These acts, collectively or separately, are not outrageous conduct. No one, except perhaps Keenan and her counsel, would read the previous paragraph and exclaim "Outrageous!"

■ Further, with the possible exception of 7, 10, 12–14 and 15, none constitute intentional or reckless infliction of emotional distress (the second element of outrage).[91]

■ Finally, Keenan does not meet the third element of "severe emotional distress," as she proffers only rashes, itching, and uncontrollable crying.

Interestingly, Keenan contends that

To the extent that this Court finds that there is some other cause of action or theory by which the Plaintiff is entitled to argue for mental or emotional distress damages, dismissal of this claim would be appropriate. Otherwise, Plaintiff has asserted significant questions of fact that a jury might well find in her favor.

Plaintiffs' Memorandum in Opposition to Defendant Grant County, Fancher, Allison and Snead's Motion for Summary Judgment, at 20. In fact the opposite seems to be true in this case. Given Keenan's numerous claims, addressing every indignity she contends was done to her, the failure of all of those claims suggests that her outrage claim must fail as well.

*Conclusion.* This claim fails on the merits. Count XIV must be dismissed, against defendants Allan, Whitener–Moberg and the County. (It was not pled against Fancher, Snead or Allison.)

## T. COUNT XV: INFLICTION OF EMOTIONAL DISTRESS

The Keenans contend that Allan's undefined "conduct" towards Keenan, and the County's and Whitener–Moberg's failure to correct this conduct, inflicted emotional distress for which they are liable under state common law. (The Keenans do not raise this claim against Fancher, Allison or Snead.)[92]

■ *Standard.* The claim of negligent infliction of emotional distress is "measured

---

91. Note that to be actionable, the challenged conduct must be witnessed by the plaintiff or a member of her immediate family. *Chambers–Castanes*, 100 Wash.2d at 288, 669 P.2d 451. Thus, 2, 3, 8 and 9 are not actionable.

92. The Keenans plead that the infliction was done both negligently and intentionally. The Court considers both theories.

The Keenans attempt to raise this claim against the Commissioners in the instant briefing, but they did not plead against them. Even if it were pleaded, the claim would not lie against the Commissioners for the same reasons that it fails against the other defendants.

by the strictures imposed by negligence theory, *i.e.,* foreseeable risk, threatened danger, and unreasonable conduct measured in light of the danger." *Corrigal v. Ball & Dodd Funeral Home,* 89 Wash.2d 959, 962, 577 P.2d 580 (1978) (citing other authority). "Mental suffering, to be compensable, however, must at least be manifested by objective symptoms." *Id.* (citing other authority).

■■■■ The claim of intentional infliction of emotional distress is "also known as" outrage. *Cunningham v. Lockard,* 48 Wash. App. 38, 44, 736 P.2d 305 (1987).

*Analysis.* The Keenans fail on their claim for negligent infliction of emotional distress. As a matter of law, defendants' conduct—the same conduct found here not to comprise sexual harassment—is not "unreasonable conduct." It violates no law (or "danger") and therefore was not foreseeably unreasonable.

The Keenans' claim for intentional infliction of emotional distress is addressed in section S, as outrage.

The Court does not address the moot issue of whether the judges or the County is Keenan's employer.

*Conclusion.* The Keenans fail on their claim for negligent infliction of emotional distress. Their claim for intentional infliction of emotional distress is merely duplicative of the (dismissed) claim of outrage. Count XV must be dismissed, against defendants Allan, Whitener–Moberg and the County. (It was not pled against Fancher, Snead or Allison.)

### U. COUNT XVI: VICARIOUS LIABILITY OF THE COUNTY

The Keenans contend that under *respondeat superior,* the County is vicariously liable for the acts or omissions of the other defendants.[93]

*Standard.* "The liability schemes under Title VII and the ADEA are essentially the same in aspects relevant to this issue; they both limit civil liability to the employer." *Miller v. Maxwell's Intern., Inc.,* 991 F.2d 583, 587 (9th Cir.1993), *cert. denied, sub nom. Miller v. La Rosa,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 *reh'g denied,* —— U.S. ——, 114 S.Ct. 1585, 128 L.Ed.2d 226 (1994), citing 42 U.S.C. § 2000e–5(g) (Title VII) and 29 U.S.C. § 626(b) (ADEA).

*Analysis.* There are neither Title VII nor ADEA violations here. Therefore, there can be no vicarious liability. The Court does not address the moot issue of whether the judges or the County is Keenan's employer.

*Conclusion.* Count XVI must be dismissed, against the County. (It is not pled against the other defendants.)

### V. COUNT XVII: NEGLIGENCE

The Keenans contend that defendants by undefined "conduct" breached an undefined duty owed to Keenan, in violation of state common law.[94]

■■■■ *Standard.* "Under basic tort principles, an action for negligence does not lie unless the defendant owes a duty of care to the plaintiff." *Bailey v. Forks,* 108 Wash.2d 262, 266, 737 P.2d 1257 (1987), *modified,* 753 P.2d 523 (Wash.1988). The existence of a duty is a question of law. *Hansen v. Friend,* 118 Wash.2d 476, 479, 824 P.2d 483 (1992).

■■■■ *Analysis.* The Keenans contend that defendants owed Keenan "a duty to protect her from the unlawful, injurious discriminatory conduct which was allowed to permeate her work place." Plaintiffs' Memorandum in Opposition to Defendant Grant County, Fancher, Allison and Snead's Motion for Summary Judgment, at 23. She cites the County handbook, which states:

> [C]ounty government also has an obligation to you as an employee. County government through your supervisor and/or department head will make every effort to keep you informed as well as

---

**93.** In the instant briefing, the Keenans contend only County liability for Title VII and ADEA violations.

**94.** The Keenans appear to plead that there was a collective breach of duty. The Keenans neither plead nor contend that Whitener–Moberg breached a duty to report a fellow judge, despite Whitener–Moberg's discussion of the theory in her opening memorandum, so the Court does not address this theory.

provide you with appropriate and safe facilities, equipment and materials.

Grant County Employee Policy–Procedures Information Handbook, at 5.

The handbook creates a duty, if at all, only regarding a "safe" workplace, not an "unhostile" one. Defendants' duty to Keenan was that of a reasonable person, and regarding the conduct she challenges is specifically described by Title VII and RCW 49.60. As discussed in section K above, defendants did not create or fail to correct a sexually hostile workplace, and so did not breach their duty.

*Conclusion.* Count XVII must be dismissed, against all defendants.

## W. COUNT XVIII: INVASION OF PRIVACY/FALSE LIGHT

The Keenans contend that defendants invaded Keenan's right to privacy by disclosing publicly matters private to her personal life, employment and work history. They additionally contend that defendants placed Keenan in a false light. They contend that defendants are liable under state common law.

■■■ *Standard.* There are two claims raised here: disclosure and false light. A disclosure claim concerns publication of a true statement:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> (a) would be highly offensive to a reasonable person, and
>
> (b) is not of legitimate concern to the public.

*Tacoma v. Tacoma News,* 65 Wash.App. 140, 146, 827 P.2d 1094, *review denied,* 119 Wash.2d 1020, 838 P.2d 692 (1992), citing Restatement (Second) of Torts § 652D.

■■■ A false light claims concerns publication of a false, or false because published out-of-context, statement:

A false light claim arises when someone publishes a matters that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed....

[A]n invasion of privacy action is primarily concerned with compensating for injured feelings or mental suffering.... A plaintiff need not be defamed to bring a false light action:

> It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position.

*Eastwood v. Cascade Broadcasting,* 106 Wash.2d 466, 470, 722 P.2d 1295 (1986), quoting Restatement (Second) of Torts § 652E, comment *b.*

*Analysis.* The Keenans raise only the issue of the Commissioners' letter to the editor, specifically the statements cited in her defamation claim. Plaintiffs' Memorandum in Opposition to Defendant Grant County, Fancher, Allison and Snead's Motion for Summary Judgment, at 24. There are no facts alleged as to Allan or Whitener–Moberg.[95]

■■■ The letter does not support a claim of disclosure. Given Keenan's status as a court employee, her numerous grievances and lawsuits, and especially the numerous newspaper articles and editorials by that point (several articles including quotations by Keenan or her attorney), the Commissioners' statements were of legitimate concern to the public.

■■■ The letter also does not support a claim of false light. As discussed regarding Keenan's defamation claim, section R, the Commissioners had documentation supporting each statement before they wrote the letter. They therefore did not know of or

---

**95.** Even if the Keenans challenged Whitener–Moberg's characterization of the Gunderson incident as an "assault," that claim would fail because it was not within Keenan's private life, was

not publicized, did not attach a false light (given Whitener–Moberg's lack of fault), and was of legitimate concern to the public.

recklessly disregard the falsity of the publication (if the statements were even false).

Interestingly, Keenan contends the exact same statements are false (in her defamation and false light claims) and true (in her disclosure claim). This conflict highlights Keenan's failure to meet her burden of proof on the truth/falsity element of each claim.

*Conclusion.* There are no facts supporting claims against Allan and Whitener–Moberg. There is no merit to the Keenans' claims of disclosure and false light against the County Defendants. Count XVIII must be dismissed, against all defendants.

## X. COUNT XIX: LOSS OF CONSORTIUM[96]

The Keenans contend that as a result of defendants' undefined "conduct", Daniel Keenan has suffered and will suffer the loss of affection and support of Keenan.

 *Standard.* Washington permits a "deprived" spouse to sue for loss of consortium damages, in claims other than wrongful death. *Lund v. Caple,* 100 Wash.2d 739, 744, 675 P.2d 226 (1984). *See Walker v. State,* 60 Wash.App. 624, 630, 806 P.2d 249 ("In a wrongful death action, loss of consortium is an element of the damages and not a separate cause of action") (citing other authority), *review granted,* 117 Wash.2d 1001, 815 P.2d 266 (1991), *and cause dismissed,* 118 Wash.2d 1014, 825 P.2d 300 (1992). However, "an element of loss of consortium is a separate, direct injury to a spouse." *Lund,* 100 Wash.2d at 743, 675 P.2d 226.

*Analysis.* Defendants have caused no injury to Shirley Keenan, as sections F–W of this Order exhaustively discuss. Therefore, Daniel Keenan cannot prove his loss of consortium claim.

*Conclusion.* Count XIX must be dismissed, against all defendants.

## Y. CONCLUSION

**IT IS HEREBY ORDERED:**

1. Defendant Allan's Motion for Summary Judgment of Dismissal and for Statutory Costs is **GRANTED.**

2. Defendant Whitener–Moberg's Motion for Summary Judgment is **GRANTED.**

3. Defendants Grant County, Allison, Fancher and Snead's Motion for Summary Judgment is **GRANTED.**

4. The Complaint is **DISMISSED WITH PREJUDICE.**

5. Plaintiffs' Motion for Partial Summary Judgment Re Defendant Allan's Affirmative Defenses is **DENIED AS MOOT.**

6. Plaintiffs' Motion for Partial Summary Judgment Re Defendant Whitener–Moberg's Affirmative Defenses is **DENIED AS MOOT.**

7. Plaintiffs' Motion for Partial Summary Judgment Re Defendants Grant County, Fancher, Allison and Snead's Affirmative Defenses is **DENIED AS MOOT.**

8. Defendants Grant County, Fancher, Allison and Snead's FRCP 56(e) and LR 56 Request to Strike Portions of Plaintiffs' Statement of Material Facts in Opposition to Defendants' Summary Judgment Motions, Ct.Rec. 240, is **DENIED** (see footnote 1).

9. The motion to strike a trial witness, Ct.Rec. 236; motions in limine, Ct.Recs. 245, 252 (withdrawn by movant), 253, 254, 255, 256, 259 and 263; and motion to permit interlocutory appeal, Ct.Rec. 278, all are **DENIED AS MOOT.**

10. All parties shall bear their own costs.

11. The Court retains jurisdiction over the pending determination of costs for Plaintiffs' Motion to Compel Testimony of Sally Carter–Dubois, Ct.Rec. 129, which should be completed by June 30, 1995. This limited jurisdiction does not modify appeal rights.

**IT IS SO ORDERED.** The Clerk is instructed to enter this Order accordingly and forward copies to counsel and to the State of Washington Court of Appeals, Division III, attention Joyce J. McCown (regarding *Dedra J. Osborn, Grant County Clerk v. Grant*

---

**96.** The parties do not brief this claim, but defendants seek dismissal of "all claims", so the Keenans were required to raise any material fact disputes precluding summary judgment on this ground. The Court therefore addresses the claim.

**1394**

*County, by and through the Grant County Commissioners,* App. No. 13833–0–III). The Clerk is further instructed to enter an Order of Judgment and forward copies to counsel.